**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**PARKERSBURG DIVISION**

WILLIAM R. RHODES, et al.,

                 Plaintiffs,

v.                                  CIVIL ACTION NO.  6:06-cv-00530

E.I. Du Pont De Nemours and Company,

                 Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the court is the plaintiffs' Motion for Class Certification [Docket 188].  The plaintiffs seek certification of a class of people allegedly harmed by C-8 contamination of their drinking water supply.  The plaintiffs have presented compelling evidence that exposure to C-8 may be harmful to human health, and the evidence certainly justifies the concerns expressed by the plaintiffs in this case.   What the plaintiffs misunderstand, however, is what they must show in order for me to certify the class.  I cannot certify a class based on some potential harm to the general public, rather, there must be specific injuries to each member of the proposed class.  The fact that a public health risk may exist is more than enough to raise concern in the community and call government agencies to action, but it does not show the common individual injuries needed to certify a class action.  For the reasons set forth below, this court **FINDS** that the proposed class does not satisfy Rule 23 of the Federal Rules of Civil Procedure.  The motion is **DENIED**.

## I. Facts

This case arises from defendant E.I. du Pont de Nemours and Company's ("DuPont") release of perfluoroctanoic acid, a substance also known as PFOA or C-8, from its Washington Works plant ("the plant") in Wood County, West Virginia.[1]   The plaintiffs allege that C-8 released from the plant has contaminated the drinking water in the Parkersburg Water District ("PWD") whose well field is located on the Ohio River five miles upstream from the plant.  (Am. Class Action Compl. ¶ 1 [Docket 6]; Def.'s Mem. Opp'n Class Certification 7 [Docket 193].)

By way of introduction, C-8 is not a naturally occurring substance and therefore all C-8 found in human blood is attributable to human activity.  (Answer ¶ 59 [Docket 3].)  C-8 is used in the manufacture of many industrial and consumer products including non-stick cookware coatings and architectural coatings.  (Def.'s Mem. Opp'n Ex. B.16.)  C-8 is also formed by the degradation of "telomers," which are substances used in products such as stain and water repellent surface coatings on carpets, textiles, and paper.  (*Id.* Exs. B.10, B.16.)  Because C-8 itself does not degrade, it is persistent in the environment and can accumulate in living organisms.  (Def.'s Mem. Opp'n 8, Ex. B.16.)  In fact, C-8 is present at some level nationwide in human blood.  (Pl.'s Mot. Class Certification Ex. 38.)

DuPont has used C-8 at the plant in its manufacturing operations since the early 1950s. (Def.'s Mem. Opp'n 7.)  Throughout that time, DuPont has released C-8 from the plant into the air

---

[1]      According to DuPont, "PFOA is a polymerization aid used in the manufacture of fluoropolymers, substances with special properties that have manufacturing applications and are used to make various consumer and industrial products." (Def.'s Mem. Opp'n 7 [Docket 193].) The chemical is also known as ammonium perfluoroctanoate ("APFO"), FC-143, DFS-1, and DFS-2. (Am. Class Action Compl. ¶ 1 [Docket 6].)  For simplicity, this order will refer to this chemical as "C-8."

and discharged it into the Ohio River.  (Am. Class Action Compl. ¶ 57.)   Those emissions

contaminated the public water supplies in neighboring communities.  (Pl. Mot. Class Certification

Ex. 3)  In 1984, detectable levels of C-8 were discovered in the tap water of those communities.

(Answer ¶ 41.)

At this time, the effect of C-8 exposure on human health remains uncertain.  (Def.'s Mem.

Opp'n Exs. B.15, B.16, B.38.)   Nevertheless, studies have indicated that C-8 *may* cause liver

disease, elevated cholesterol levels, and several types of cancer.   These studies have concerned

government agencies and led them to conduct research on the  health effects of C-8 and also to take

C-8 abatement measures.[2]  Doctors and scientists studying the effects of C-8 on human health have

also recommended taking precautionary measures such as removing C-8 from drinking water

supplies and using alternative drinking water sources, especially for children and the elderly.  (Pl.'s

Mot. Class Certification Ex. 31.)

Both federal and state agencies have been involved in regulating C-8 emissions from the

Washington Works plant.  In 2001, the West Virginia Department of Environmental Protection

("WV DEP") entered into a Consent Order with DuPont for the purpose of determining whether C-8

emitted from the Washington Works plant had negatively impacted human health and the

environment.  (*Id.* Ex. 2.)  In 2004, the United States Environmental Protection Agency ("EPA")

filed a civil complaint against DuPont for its failure to report human serum sample levels from

---

[2]         For example, in 2006, the United States Environmental Protection Agency ("EPA")
commenced a PFOA [C-8] Stewardship Program "whose goal is to work toward essentially
eliminating emissions and product content levels of PFOA and related chemicals."  (Def.'s Mem.
Opp'n Ex. B.15.)  That year, the Ohio Environmental Protection Agency listed C-8 as a "toxic" air
pollutant.  (Pl.'s Mot. Class Certification Ex. 40.)   In 2007, the New Jersey Department of
Environmental Protection recommended a .04 ppb (parts per billion) C-8 level in drinking water.
(*Id.* Ex. 41.)

twelve persons living near the plant that showed high levels of C-8.  This complaint led to a settlement in which DuPont agreed to pay the largest civil administrative penalty ever obtained by EPA under a federal statute and DuPont also agreed to research human exposure to C-8.  (*Id.* Ex. 32.)  In 2006, the EPA entered into a Consent Order with DuPont requiring DuPont to "offer alternative drinking water or treatment for public or private water users living near the Washington Works plant if the level of [C-8] detected in the drinking water is equal to or greater than 0.50 parts per billion."  (Def.'s Mem. Opp'n Ex. B.21.)

Residents near the Washington Works plant have also sought relief from the C-8 emissions through litigation.  In 2002, plaintiffs' counsel represented a class of people living in the vicinity of the Washington Works plant in a class action suit against DuPont.  The class in that case, which was certified by a West Virginia state court, asserted common law tort claims and sought various forms of relief, including medical monitoring and injunctive relief to abate the contamination.  *Leach v. E.I. Du Pont Nemours & Co., et al.*, No. 01-C-608, 2002 WL 1270121, at *1 (W. Va. Cir. Ct. April 10, 2002).  Subsequently, the *Leach* plaintiffs and DuPont entered into a settlement agreement.  The settlement class was defined as all individuals who, for a period for at least one year, consumed drinking water containing .05 ppb (parts per billion) or greater of C-8 attributable to releases from the Washington Works plant from any of six specified Public Water Districts or any eligible private sources and who did not opt out of the class or waive their class member rights.  (Pl.'s Mot. Class Certification Ex. 16.)  The *Leach* Settlement Agreement created a two-step approach for providing medical monitoring to the class.  First, the settlement parties agreed to choose members of a "Science Panel" to conduct research and determine whether any probable links exist between C-8 and any human disease.  If the Science Panel were to find a probable link, then

a "Medical Panel" would design a medical monitoring protocol for the class members corresponding to the Science Panel's finding.  (Def.'s Mem. Opp'n 3; Pl.'s Mem. Supp. 5 [Docket 189].)

The PWD was not one of the water districts included in the *Leach* class definition because, at the time, water from the PWD contained less than .05 ppb of C-8.  (Pl.'s Mem. Supp. 3.)  Shortly after the *Leach* settlement, the C-8 levels in the PWD water supply, after briefly fluctuating, exceeded the .05 ppb level and have continued to rise.  (Pl.'s Mot. Class Certification Ex. 23.)

## II. Procedural Background

On May 26, 2006, William R. Rhodes, Russell H. Miller, and Valori A. Mace ("the named plaintiffs") filed a class action complaint in the Circuit Court of Wood County, West Virginia.  The plaintiffs asserted six claims arising from the presence of C-8 in the PWD water supply: (1) negligence; (2) gross negligence, reckless, willful and wanton conduct; (3) private nuisance; (4) past and continuing trespass; (5) past and continuing battery; and (6) medical monitoring.  (Am. Class Action Compl. 13-19)  The plaintiffs sought the following remedies: medical monitoring relief, compensatory and punitive damages, attorneys' fees, pre-judgment and post-judgment interest, and appropriate equitable and injunctive relief, "including providing notice and medical monitoring relief to the Plaintiffs and the class and to abate and/or prevent the release and/or threatened release of PFOA or C-8."  (*Id.* 19)

On June 29, 2006, DuPont removed the action to this court.  On January 31, 2008, after extensive discovery, the plaintiffs moved for this court to certify a class of "all individuals (other than *Leach* Class members) who, for a period of at least one year since November 1, 2005, to the date of an Order certifying the class herein, have been residential water customers of the [PWD]." (Pl.'s Post-Hr'g Br. 1 [Docket 246].)  They seek certification under both Rule 23(b)(1) and Rule

23(b)(2) of the Federal Rules of Civil Procedure for all six claims raised in their Amended Complaint. (*Id.* 2.) The plaintiffs have stated that they "do not seek to certify any issues relating to assessment of compensatory or punitive damages for any of their claims, including any individual personal injuries or property damage." (*Id.* 3.)

On June 11, 2008, I ordered that a preliminary class certification hearing be held to allow the court to examine the expert testimony submitted in support of class certification. This examination was compelled not only by my duty to conduct a "rigorous analysis" at the class certification stage, but also to protect absent class members' rights. (Mem. Op. & Order 20, June 11, 2008 [Docket 220].)

I held hearings on July 2 and 3, 2008, and August 6 and 7, 2008, during which two experts testified in support of the plaintiffs' motion. The plaintiffs' first expert, Dr. David Gray, is a toxicologist that currently serves as the Toxicology Program Director at a company called Tetra Tech (Mot. Hr'g 20:8-9, July 2, 2008 [Docket 232].) and works with toxicologists and risk assessors on various projects involving human exposure to toxic substances. (*Id.* 20:15-20). He has extensive experience conducting risk assessments and otherwise studying the health effects of human exposure to toxic substances. (*Id.* 16:3-17:1, 22:17-26:19.) For this case, Dr. Gray applied the EPA Office of Water 2000 Ambient Water Quality Criteria Methodological Guideline in conducting a risk assessment and identifying an "ambient water quality criteria" ("AWQC")[3] for non-cancer effects. (*Id.* 46:14-15, 48:20.) Based on his risk assessment, Dr. Gray testified that exposure to .02 ppb of C-8 in drinking water would be significant after one year because health "effects would be

---

[3]     An AWQC "is a level in water that is protective for exposed populations against adverse effects due to consumption of toxic agents in water." (Mot. Hr'g 48:25-49:2, July 2, 2008.).

observable at that time through clinical tests." (*Id.* 195:5-16.)  He further explained in his expert report that "the buildup of C-8 body burden in the Class due to exposure through drinking water results in increased risk of serious latent disease."  (Pl.'s Hr'g Ex. 11 [Docket 240].)

Dr. Barry Levy, an Occupational and Environmental Health physician and epidemiologist, testified as the plaintiffs' second expert. (Mot. Hr'g 41:18-19, July 3, 2008 [Docket 233].) Dr. Levy engages in research and publication, teaches at Tufts University School of Medicine, and spends half of his professional time in litigation counseling.  *(Id.* 48:1-10, 49:14-17.)  Dr. Levy has evaluated and treated patients for occupational and environmental exposure, has evaluated populations of individuals and made recommendations about the recognition and prevention of disease, and has designed medical monitoring protocols.  (*Id.* 50:5-20, 52:3-4.)  For this case, Dr. Levy conducted an epidemiological survey of available studies and literature concerning the human health effects of C-8.  *(Id.* 100:14-22.)  Upon examining these studies and applying the Bradford Hill principles, he concluded that C-8 generally causes the following diseases: hepatotoxicity (liver damage), dyslipidemia (abnormal lipid or cholesterol levels), coronary artery disease, cerebrovascular disease, diabetes melitus, non-malignant thyroid disorders, bladder cancer, and prostate cancer.  *(Id.* 100:14-22, 126:17-20.)   Dr. Levy testified that the proposed class has been significantly exposed to C-8 (*Id.* 90:18-91:5), and that, as a result, the proposed class has suffered a significantly increased risk of those eight diseases.  *(Id.* 126:12-24.)  He also testified that the proposed class should receive community-wide medical monitoring for those diseases (Mot. Hr'g 114:10-17, Aug. 6, 2008 [Docket 242].), that there are tests available to detect the early warning signs of those diseases, and that these tests are not ordinarily prescribed to the general population.  (*Id.* 99:5-24, 99:25-101:15.)

### III. Applicable Law Governing Class Certification

### A. Federal Rule of Civil Procedure 23

The certification of a class action under Federal Rule of Civil Procedure 23 is a two-step process. *See United Bhd. of Carpenters & Joiners, Local 899 v. Phoenix Assoc., Inc.*, 152 F.R.D. 518, 521 (S.D. W. Va. 1994). First, the plaintiffs must show that their proposed class satisfies all four of the prerequisites of Rule 23(a): commonality and typicality of issues, adequacy of representation, and numerosity rendering the joinder of all members impracticable. Fed. R. Civ. P. 23(a). Second, the action must fall within at least one of the subsections of Rule 23(b).[4] *See Lukenas v. Bryce's Mountain Resort*, 538 F.2d 594, 595 n.2 (4th Cir. 1976). In addition to the requirements set out by Rule 23, there is an implied requirement that the proposed class be ascertainable. *Roman v. ESB*, 550 F.2d 1343, 1348 (4th Cir. 1976).

The plaintiffs argue that their proposed class meets the conditions of both Rule 23(b)(1) and 23(b)(2). Rule 23(b)(1)(A) allows certification if "prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party

---

[4]      Rule 23(b) states in pertinent part that a class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class . . .

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

Fed. R. Civ. P. 23(b)(1)-(2).

opposing the class." Fed. R. Civ. P. 23(b)(1)(A).  "The phrase 'incompatible standards of conduct' is thought to refer to the situation where different results in separate actions would impair the opposing party's ability to pursue a uniform continuing course of conduct."  7AA Charles Alan Wright, et al., *Federal Practice and Procedure* § 1773 (3d ed. 2005).  This provision "requires more than a risk that separate judgments would oblige the opposing party to pay damages to some class members but not to others or to pay them different amounts . . . ."  *Id.* at 13.  "[S]ubdivision (b)(1)(A) is applicable when practical necessity forces the opposing party to act in the same manner toward the individual class members and thereby makes inconsistent adjudications in separate actions unworkable or intolerable."  *Id.* at 22.

Rule 23(b)(2) requires the party opposing the class to have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Class actions under subsection (b)(2) are limited to those seeking primarily injunctive or declaratory relief.[5]  "The term 'generally applicable' has been said to signify that the party opposing the class does not have to act directly against each member of the class.  The key is whether the party's actions would affect all persons similarly situated so that those acts apply generally to the whole class."  7A Charles Alan Wright, et al., *Federal Practice and Procedure* § 1775, at 41 (3d ed. 2005) (citations omitted).

I agree with the Third Circuit that a proposed class must be "cohesive" to be certified under Rule 23(b)(2).  *See Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d. Cir. 1998). The cohesiveness requirement originally arose in the 23(b)(3) context and stems from the Supreme Court's statement

---

[5]     It is apparent that the plaintiffs are seeking primarily injunctive or declaratory relief in the form of a court-supervised medical monitoring program.  (Am. Class Action Compl. ¶ 125.)

that "[t]he Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997); *see also In re New Motor Vehicles Canadian Exp.*, No. MDL 1532, 2006 WL 623591, at *8 (D. Me. Mar. 10, 2006). The *Barnes* court required cohesiveness under 23(b)(2) because "in a (b)(2) action, unnamed members are bound by the action without the opportunity to opt out." *Barnes*, 161 F.3d at 142-43.

The cohesiveness requirement is similar to but "more stringent" than the commonality requirement of Rule 23(a). *See Lienhart v. Dryvit Syst., Inc.*, 255 F.3d 138, 147 n.4 (4th Cir. 2001); *Barnes*, 161 F.3d at 142-43. In a traditional (b)(2) class, "when a class of individuals alleges a group harm, and seeks a broad, class-wide, injunctive remedy, there is an 'underlying premise' of cohesiveness that makes (b)(2) certification appropriate." *In re New Motor Vehicles*, 2006 WL 623591, at *9. Thus, when a 23(b)(2) class is cohesive,

> [a]ny resultant unfairness to the members of the class [as a result of being bound by the action] was thought to be outweighed by the purposes behind class actions: eliminating the possibility of repetitious litigation and providing small claimants with a means of obtaining redress for claims too small to justify individual litigation.

*Barnes*, 161 F.3d at 143 (quoting *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 248-49 (3d Cir. 1975)).

If the injunctive remedy must be individualized, however, it would be "unjust to bind absent class members to a negative decision where the class representatives's claims present different individual issues than the claims of the absent members present." *Id.* (quoting *Santiago v. City of Philadelphia*, 72 F.R.D. 619, 628 (E.D. Pa. 1976)). In addition, the presence of individual issues may result in an unmanageable case, negating the benefits of litigating as a class action. *Id.* This

-10-

is particularly true in a certification request involving the tort of medical monitoring. "Proposed medical monitoring classes suffer from cohesion difficulties, and numerous courts across the country have denied certification of such classes." *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1122 (8th Cir. 2005) (citing *e.g.*, *Ball v. Union Carbide Corp.*, 385 F.3d 713, 727-28 (6th Cir. 2004)); *Barnes*, 161 F.3d at 143-46; *Boughton v. Cotter Corp.*, 65 F.3d 823, 827 (10th Cir. 1995).

In analyzing class certification claims under the federal rule, the Fourth Circuit encourages federal courts to "give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case best serve the ends of justice for the affected parties and . . . promote judicial efficiency." *Gunnells v. Healthplan Svcs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) (quoting *In re A.H. Robins*, 880 F.2d 709, 740 (4th Cir. 1989), *abrogated on other grounds by Amchem*, 521 U.S. at 617-18). Thus, a court has "wide discretion in deciding whether or not to certify a proposed class." *Cent. Wesleyan College v. W.R. Grace Co.*, 6 F.3d 177, 185 (4th Cir. 1993) (quoting *In re A.H. Robbins Co.*, 880 F.2d at 728-29). Nevertheless, the court must still engage in "rigorous analysis" to determine whether the proposed class meets the Rule 23 requirements. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). A court may "probe behind the pleadings" to determine whether class certification is appropriate. *Id.* "The likelihood of the plaintiffs' success on the merits, however, is not relevant to the issue of whether certification is proper." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006).

Finally, I note that the plaintiffs bear the burden of persuading the court that a class should be certified. *See id.* at 321 ("[It] *is the plaintiff* who bears the burden of showing that the class *does comply* with Rule 23.") (citing *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 65 n.6 (4th Cir. 1977)). If the plaintiffs meet their burden, then the court must certify the class action lawsuit.

-11-

## B. The Plaintiffs' Claims

The plaintiffs must demonstrate that each cause of action asserted against DuPont meets the class certification requirements explained above.  The plaintiffs raise six causes of action in their amended complaint, namely: negligence; gross negligence, reckless, willful and wanton conduct; private nuisance; past and continuing trespass; past and continuing battery; and the tort of medical monitoring.  (Am. Class Action Compl. 13-17.)  The plaintiffs, however, have failed to provide any argument or analysis as to their causes of action, with the sole exception of their claim for medical monitoring, and have similarly neglected to analyze the susceptibility of each claim to class treatment.  Throughout this class certification process, the plaintiffs ignored those other causes of action until they belatedly and minimally addressed them in their Post-Hearing Reply Brief In Support of Class Certification.  (Pl.'s' Post-Hr'g Reply Br. 1-6 [Docket 250].)  The plaintiffs bear the burden of demonstrating that their claims are appropriate for class certification, *Thorn*, 445 F.3d at 321, and because they have not adequately addressed their claims of negligence, gross negligence, private nuisance, past and continuing trespass, and past and continuing battery, I **FIND** that the plaintiffs have failed to meet their burden of showing that class certification is appropriate as to those claims.

I will therefore examine only the medical monitoring cause of action and the propriety of class certification as to that claim.  West Virginia recognizes a cause of action for medical monitoring expenses "where it can be proven that such expenses are necessary and reasonably certain to be incurred as a proximate result of a defendant's tortious conduct."  *Bower v. Westinghouse Elec. Corp.*, 522 S.E.2d 424, 430 (W. Va. 1999).  In order to prevail on a medical monitoring claim, the plaintiff must prove that:

-12-

> (1) he or she has, relative to the general population, been significantly exposed;
> (2) to a proven hazardous substance; (3) through the tortious conduct of the
> defendant; (4) as a proximate result of the exposure, plaintiff has suffered an
> increased risk of contracting a serious latent disease; (5) the increased risk of
> disease makes it reasonably necessary for the plaintiff to undergo periodic
> diagnostic medical examinations different from what would be prescribed in the
> absence of exposure; and (6) monitoring procedures exist that make the early
> detection of a disease possible.

*Id.* at 432-43.  Though the West Virginia Supreme Court of Appeals delineated six discrete elements

for the medical monitoring cause of action, the elements are inherently intertwined.  The satisfaction

of any single element depends on whether the others were also satisfied.  As the Third Circuit

explained: "'Significant exposure' . . . refers to an exposure which . . . is sufficient to cause a

significantly increased risk, which in turn is sufficient to require a monitoring regime different from

that normally required in the absence of exposure."  *Redlands Soccer Club, Inc. v. Dep't of the Army

of the U.S.*, 55 F.3d 827, 846 (3d Cir. 1995).  Thus, although a separate analysis of each element is

required, the cause of action should also be evaluated as a whole.  That said, the proceedings in this

case have focused on just three of the elements: exposure, risk, and the necessity for medical

monitoring.

### 1. Significant Exposure Relative to the General Population

The first element of the medical monitoring cause of action at issue requires: 1) that an

individual was exposed to a substance, and 2) that the exposure of that individual was significant

relative to the general population's exposure to the same substance.  *Bower*, 522 S.E.2d at 433.  A

plaintiff need not show direct evidence of exposure, such as blood tests.  *Redlands Soccer Club*, 55

F.3d at 847.  Instead, a plaintiff may rely on expert testimony.  *Id.*

Each plaintiff's exposure must, however, be significant relative to the general population.

Exposure is significant if a plaintiff has been exposed to a larger quantity of the toxic substance or

-13-

has been exposed for a longer duration than the general population.  *Id.* at 846.  Though a plaintiff does not need to quantify the exposure, he must be able to demonstrate that his exposure was somehow greater than "what would normally be encountered by a person in everyday life . . . ."  *Id.*

### 2. Significantly Increased Risk of Contracting a Serious Latent Disease

Under the second pertinent element of the medical monitoring cause of action, a plaintiff must demonstrate that her or she has "suffered a significantly increased risk of contracting a particular disease relative to what would be the case in the absence of exposure."[6]  *Bower*, 522 S.E.2d at 433.  Because it is difficult to quantify a risk in terms of money damages, a plaintiff is not required to "show that a particular disease is certain or even likely to occur as a result of exposure."  *Id.*; *see also Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 826 (D.C. Cir. 1984).  Moreover, the plaintiffs need not demonstrate a "particular level of quantification" of risk.  *Bower*, 522 S.E.2d at 433 (quoting *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 979 (Utah 1993)).  A plaintiff must also show that his significantly increased risk is that of a "serious latent disease."  *Bower*, 522 S.E.2d at 430.  Although the West Virginia Supreme Court of Appeals did not define "serious latent disease" in *Bower*, a helpful definition can be found in *Hansen*, which guided the discussion in *Bower.*  In *Hansen*, the Utah Supreme Court  defined a "serious disease" as "an illness that in its ordinary course may result in significant impairment or death."   858 P.2d at 979.

---

[6]  Although the syllabus for *Bower* reports this element as requiring an "increased risk" rather than a "significantly increased risk," *Bower*, 522 S.E. 2d at 426, a "'statement contained in a syllabus is to be read in light of the opinion.'" *Farley v. Worley*, 599 S.E.2d 835, 849 (W. Va. 2004) (quoting *Jones v. Jones.*, 58 S.E.2d 857, 859 (W. Va. 1949)).  I conclude that the medical monitoring cause of action requires a "significantly increased risk" because the text of the *Bower* opinion requires a "significantly increased risk," *Bower*, 522 S.E.2d at 433, and also because the *Bower* court derived its medical monitoring elements from opinions that applied the higher standard. *Id.* at 432.

Furthermore, a plaintiff must also show that the exposure caused by the defendant was the proximate cause of that increased risk. In other words, the risk must be different and greater than it would have been absent the significant exposure at issue. *Bower*, 522 S.E.2d at 433. As stated in *Hansen*:

> [I]f the plaintiff is exposed to a toxic substance in large quantities or for a long duration and later is negligently exposed to the same substance in a small quantity or for a short duration by the defendant, there should be no recovery from the one causing the later exposure if it does not change the monitoring regime that would have been appropriate to the plaintiff before that exposure. That person or entity would not have caused the plaintiff to incur a monitoring expense that he or she would not otherwise have had, and the elements of the cause of action would not be complete.

*Hansen*, 858 P.2d 980.

### 3. Necessity of Diagnostic Testing

A plaintiff asserting a medical monitoring cause of action must also show that diagnostic testing is "reasonably necessary." *Bower*, 522 S.E.2d at 433. Diagnostic testing is "reasonably necessary" if "a qualified physician would prescribe based upon the demonstrated exposure to a particular toxic agent." *Id.* The "qualified physician" standard is flexible. *Bower* only requires "some reasonable medical basis for undergoing diagnostic monitoring" and explicitly rejects financial cost and frequency of testing as significant factors in determining necessity. *Id.* Further, the medical basis for prescribing such monitoring may be founded in part "upon the subjective desires of a plaintiff for information concerning the state of his or her health." *Id.*

### IV. Discussion

I **FIND** that class certification is inappropriate for the claims raised in this case because they require individualized inquiries that are not conducive to common treatment as required by Rule 23. Though the plaintiffs could overcome that obstacle by demonstrating a plausible common method

of proving their medical monitoring claim on a class-wide basis, they have not done so.  Therefore, I **DENY** the plaintiffs' motion for class certification.

In order to conduct a "rigorous analysis" of the plaintiffs' medical monitoring claim, I have carefully examined the evidence in support of class certification, including the expert testimony presented.  I have examined the parties' evidence with the single purpose of determining whether the requirements of Rule 23 have been met.  Much of my inquiry focused on whether the plaintiffs have presented a cohesive class or instead a class rife with individualized issues.  Accordingly, I have not intentionally assessed the merits of the plaintiffs claims; any overlap of my class certification analysis with the issues on the merits is "only coincidental."  *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004).

### A. Class Certification Is Not Appropriate Under Rule 23(b)(2)

To succeed on their motion for class certification under Rule 23(b)(2), the plaintiffs must demonstrate that the proposed class meets the rule's cohesiveness requirement.  *See Barnes*, 161 F.3d at 143.  In other words, the plaintiffs must offer evidence that commonly proves the elements of a medical monitoring claim for each proposed class member.  In evaluating that evidence, I must determine if it has the potential to commonly prove that: each potential class member has experienced significant exposure; each has experienced a significantly increased risk of disease; and a reasonable doctor considering the exposure and increased risk of each individual would recommend medical monitoring different from what he would have prescribed absent the exposure. In making this determination, I must stop short of deciding the case on the merits.

Upon examining the evidence, I conclude that the plaintiffs have not shown that each of the potential class members claims can be proven by common rather than individualized proof, nor have they shown that the plaintiffs' class is cohesive.

### 1. The Class Members' Significant Exposure Cannot Be Shown on a Class-Wide Basis

The plaintiffs must show that they can commonly prove that each and every class member has been exposed to C-8 above so-called "background levels" of exposure, that is, exposure levels experienced by the general population. The plaintiffs have offered both direct evidence and indirect expert evidence to support their argument that this element is amenable to class-wide proof. But I **FIND** that their evidence is not sufficient.

### a. The Plaintiffs' Direct Evidence Cannot Show Class-Wide Significant Exposure

The plaintiffs have presented the following direct evidence: 1) the extent to which the C-8 contamination level exceeds the level DuPont previously agreed to address under the *Leach* settlement; 2) special precautions that public health agencies have recommended for areas where C-8 is detected in drinking water; and 3) a comparison of the C-8 concentration in the named plaintiffs' blood with the levels in the general nationwide population. (Pls.' Post-Hr'g Br. 6.) This direct evidence does not demonstrate that the plaintiffs can commonly prove that each of the proposed class members has been significantly exposed to C-8.

First, evidence showing that C-8 levels in the PWD drinking water have exceeded the level used for defining the *Leach* settlement class is irrelevant because it only shows the C-8 contamination level at which DuPont has voluntarily entered into a comprehensive settlement agreement. That level did not constitute a concession by DuPont about the quantity of C-8 that must be in drinking water to effect a significant exposure. The association between the drinking water

contamination level identified in the *Leach* settlement and the level at issue here also tells me nothing about how the PWD customers' C-8 exposure level compares to the level of C-8 exposure experienced by the general population.

The public health agencies' recommendations about safe levels of C-8 in drinking water are also deficient evidence. Although they do reveal the agencies' precautionary procedures and guidelines, those recommendations provide no comparison between the exposure of the proposed class and the general population.

Evidence of the elevated C-8 concentrations in the named plaintiffs' blood likewise fails to show common exposure on a class-wide basis. The evidence of the higher C-8 concentration in the named plaintiffs' blood as compared to the general population suggests only that the *named plaintiffs* have been "significantly exposed." The class, however, is defined based on the members' shared source of PWD drinking water, not on their elevated blood serum C-8 concentrations. (Pls.' Reply Br. 16 [Docket 206].) In order for the elevated blood levels to serve as common proof of the class' significant exposure, the plaintiffs would have had to establish a relationship between the class' common characteristic (that is, a common source of drinking water) and the C-8 levels in the named plaintiffs' blood. The plaintiffs have offered no such evidence.

**b. Dr. Gray's Expert Testimony Cannot Show Class-Wide Significant Exposure**

In addition to the direct evidence discussed above, the plaintiffs also have offered expert testimony from Dr. Gray "that the significance of exposure can be assessed class-wide by comparing the level of C-8 in the Class' water supply with a 'safe' level . . . derived through use of a standard

risk assessment methodology created by the [EPA]."[7] (Pls.' Post-Hr'g Br. 6.)  As with the plaintiffs'

direct evidence, Dr. Gray's testimony cannot provide a relevant comparison between the plaintiffs'

exposure and the exposure of the general population.  On this record, the general population's level

of exposure to C-8 in their drinking water is unknown.

Dr. Gray further missed the mark because he focused on the level of exposure that could

cause detectable adverse effects from C-8.  This inquiry is irrelevant to the required determination

of whether an exposure is significant.  Dr. Gray testified that "exposure of Class members to water

exceeding the [AWQC level] is 'significant' for purposes of medical monitoring after at least one

year, because that is when testing would first begin to detect adverse effects in the population."  (*Id.*)

"Detection," however, is not synonymous with "significance."  According to *Bower*, "significance"

is a measure of *relative exposure*—it requires a comparison of each proposed class member's

exposure to the exposure of the general population.  *Bower*, 522 S.E.2d at 432.  Dr. Gray has offered

nothing to support a conclusion that the quantity and duration of C-8 exposure required to cause

---

[7] The plaintiffs also offered Dr. Levy's testimony regarding the plaintiffs' significant exposure.  The plaintiffs assert that:

> Dr. Levy relies on two independent bases for his own opinion that the significance of the Class' exposure to C-8 can be assessed on a common, class-wide basis: 1) Dr. Gray's risk assessment and calculations of the .02 parts per billion AWQC for C-8 and the higher levels found in Parkersburg's water supply; and 2) direct evidence of the named Plaintiffs' high C-8 blood levels compared to the levels found in the general population.

(Pls.' Post-Hr'g Br. 6–7.)  Framed in this way, Dr. Levy's testimony is redundant.  His application of Dr. Gray's risk assessment mirrors Dr. Gray's testimony that significant exposure can be determined based on a risk assessment.  Also, his testimony regarding the plaintiffs' high C-8 blood levels merely repeats the direct evidence provided by the plaintiffs.

Moreover, Dr. Levy admits that he has not made any determinations about the national or West Virginia background levels of C-8 in a public water supply.  (Mot. Hr'g 128:11-17, Aug. 6, 2008.)  Without this knowledge, Dr. Levy cannot reliably testify as to whether the class has been exposed above background levels.

detectable adverse health consequences is higher than the quantity and duration of C-8 exposure experienced by the general population.

Although I have found that none of the plaintiffs' evidence demonstrates common proof of the class members' medical monitoring claims, it is important to note that the "significant exposure" element is defined in relation to the other elements of a medical monitoring claim. Thus, even though the plaintiffs were not able to directly establish class-wide significant exposure, it is possible that they could still indirectly establish this element by demonstrating a class-wide need for medical monitoring. *See Redlands Soccer Club*, 55 F.3d at 846. If the plaintiffs can show through expert testimony or other evidence that all the class members have suffered an injury, *i.e.*, require medical monitoring due to C-8 exposure caused by DuPont, then the injury itself provides indirect evidence of significant exposure. *See id.* at 847. Therefore, I must assess the plaintiffs' evidence regarding the need for medical monitoring before I can decide whether the significant exposure claim is subject to class-wide proof. *See infra* IV.A.3.

## 2. The Class Members' Significantly Increased Risk of Disease Cannot Be Shown on a Class-Wide basis

The plaintiffs bear the burden of showing that they can commonly prove that each class member has suffered a significantly increased risk of disease. Common proof of this element is complicated because the plaintiffs must not only show that the class members have experienced a significantly increased risk but also that: 1) the risk is of a serious latent disease, 2) the defendant proximately caused that risk to each class member, and 3) the risk is significant relative to what it would have been absent the exposure.

DuPont argues that the plaintiffs cannot show an increased risk of disease with class-wide proof because each class member's "risk of disease will vary based upon: (a) variations in [C-8]

exposure and dose . . . and (b) variations in an individual's background risk of disease absent [C-8] exposure." (Def.'s Mem. Opp'n 30.) It further argues that the plaintiffs' evidence is inadequate to show "that their claim that the [C-8] exposure in PWD drinking water has caused an increased risk of disease among members of the class proposed, is subject to common proof." (*Id.* 32.)

DuPont's arguments are persuasive because the plaintiffs concede that individual characteristics and habits will affect the level of risk experienced by each class member.[8] To settle this argument, I examine the plaintiffs' evidence on the issue of whether each class member has experienced a significantly increased risk of disease.

### a. Plaintiffs' Direct Evidence Cannot Show That Each Class Member Has Experienced a Significantly Increased Risk of Disease

The plaintiffs incorrectly assert that the *Leach* settlement agreement and regulatory information provide direct evidence that the proposed class members have suffered a significantly increased risk of disease. First, DuPont's voluntary agreement to participate in the *Leach* medical monitoring program is not a legally cognizable admission that those settlement class members commonly suffered a significantly increased risk of disease. On the contrary, the medical monitoring program provided for in the *Leach* settlement specifically includes a research component

---

[8]    For instance, Dr. Gray explained that there are "differences in susceptibility to toxic effects within the general population." (Def.'s Mem. Opp'n Ex. B.4, at 28:16–17.) Moreover, this variability in individual susceptibilities could be even greater than accounted for the by the uncertainty variables in his risk assessment. (*Id.* 30:4–33:2.) Dr. Gray also admitted that the level of risk experienced by any individual class member would vary depending on water consumption habits. (*Id.* 80:14–81:7.) Individual characteristics and habits such as age, eating habits, water consumption, background exposure, and residence in the contaminated area would all affect the level of C-8 in an individual's blood and thus lead to a distribution of risk among the population. (*Id.* 218:15–230:7.)

to determine what affect, if any, C-8 has on human health. (Pls.' Mem. Supp.  5.; Def.'s Mem. Opp'n 3.)

The plaintiffs' reliance on regulatory data is also misplaced.  Though governmental agencies are concerned about the presence of C-8 in the environment, none have concluded that persons exposed to C-8 have a significantly increased risk of disease.  All of the reports emphasize the lack of information about harms caused by C-8.  (Pls.' Mot. Class Certification  Ex. 38, 41.)

### b. Dr. Gray's Expert Testimony Cannot Show that Each Class Member Has Experienced a Significantly Increased Risk of Disease

Dr. Gray's testimony does not provide common proof of the proposed class members' significantly increased risk of a serious latent disease for two reasons.  First, Dr. Gray's risk assessment upon which he based his conclusions only shows a C-8 concentration for drinking water at and below which the general population is "safe,"[9] but does not demonstrate that any extra level above the "safe" level are significantly harmful.  Second, the risk assessment cannot and does not support an opinion that each individual class member has experienced a significantly increased risk of disease.

I find that a risk assessment is of limited utility in a toxic tort case, especially for the issue of causation, because of the risk assessment's distinct purpose.  Risk assessments have largely been developed for regulatory purposes and thus serve a protection function in providing a level below which there is no appreciable risk to the general population.  They do not provide information about actual risk or causation.  *See* Bernard D. Goldstein & Mary Sue Henifin, *Reference Guide on*

---

[9]    Dr. Gray explained that a risk assessment identifies a " level of exposure below which there should not be an appreciable risk of adverse effects, above which there is increased risk." (Mot. Hr'g 41:23-42:1, July 2, 2008.)  For the purposes of this order, I will refer to that level as the "safe" level, as the plaintiffs referred to it in their Post-Hearing Brief.  (*See* Pls.' Post-Hr'g Br. 6.)

*Toxicology* in *Federal Judicial Center Reference Manual on Scientific Evidence* 413 (2000). "Because of their appropriately prudent assumptions when there are limited data, risk assessments intentionally encompass the upper range of possible risks." *Id.; see also Sutera v. Perrier Group of Am. Inc.*, 986 F. Supp. 655, 664 (D. Mass. 1997) (rejecting regulatory standards as a measure of causation because the purpose of regulatory standards is to "reduce public exposure to harmful substances.") (quoting *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 198 (5th Cir. 1996)); *O'Neal v. Dep't of the Army*, 852 F.Supp. 327, 333 (M.D. Pa. 1994) (determining that risk figures based on the EPA's upper-bound estimates for another chemical are "appropriate for regulatory purposes in which the goal is to be particularly cautious [but] overstate the *actual* risk and so, are inappropriate for use in determining whether medical monitoring should be instituted.").

Medical monitoring, as a common law tort, requires more certainty than that provided by an estimate of the "upper range of possible risks." *See Allen*, 102 F.3d at 198 (explaining that regulatory agencies trying to reduce public exposure to harmful substances require a lower "threshold of proof . . . than that appropriate in tort law" which requires "particularized inquiries into cause and effect") (quoting *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1107 (8th Cir. 1996)). The West Virginia Supreme Court of Appeals has clearly explained that the medical monitoring cause of action is "well-grounded" in traditional tort law. *Bower*, 522 S.E.2d at 429, 430; *see also State of West Virginia ex rel. Chemtall Inc. v. Madden*, 607 S.E.2d 772, 784 (W. Va. 443). The cause of action developed from the understanding that a person who must undergo expensive medical examinations because of a defendant's tortious conduct has suffered an injury even though physical harm remains latent or in fact never occurs. The injury instead is the tortious invasion of an individual's protected interest in "avoiding expensive diagnostic examinations[.]" *Bower*, 522

S.E.2d at 430 (quoting *Friends for All Children*, 746 F.2d at 826); *see Day v. NLO*, 851 F. Supp. 869, 880 (S.D. Ohio 1994)*; Hansen*, 858 P.2d at 977.

Consistent with traditional tort law, a plaintiff seeking medical monitoring must prove with "reasonable certainty" that he or she has suffered such an injury. *Bower*, 522 S.E.2d at 431 (quoting *Jordan v. Bero*, 210 S.E.2d 618, 623 (W. Va. 1974)); *see Redlands Soccer Club*, 55 F.3d at 846 n.8 ("'[S]pecial' medical monitoring implicitly recognizes the longstanding requirement in all tort cases . . . that a plaintiff must prove an injury before he may recover anything from a defendant."); *Hansen*, 858 P.2d at 981. In other words, a plaintiff must prove beyond speculation that he was injured because he cannot "avoid" necessary diagnostic examination. *Bower*, 522 S.E.2d at 431, 432. Without the injury, *i.e.*, the unavoidable costs of necessary medical examinations, the plaintiff has no cause of action.

Accordingly, a risk assessment cannot provide the requisite reasonable certainty required to show a medical monitoring injury. Because a risk assessment overstates the risk to a population to achieve its protective and generalized goals, it is impossible to conclude with reasonable certainty that any one person exposed to a substance above the criterion established by the risk assessment has suffered a significantly increased risk.[10]

In response to DuPont's criticism of Dr. Gray's testimony, the plaintiffs argue that Dr. Gray's calculations were "derived solely for the purpose of assessing community-wide risks" and thus are "inappropriate" for assessing the risk of specific individuals. (Pls.' Reply Br. 15.) But that

---

[10]     I note that the risk assessment could be helpful to a fact finder at trial to determine the magnitude of risk suffered by a medical monitoring plaintiff. As previously stated, it does not, however, establish that every person exposed above the criterion established by the risk assessment has suffered a significantly increased risk of disease.

is precisely what the cause of action requires this court to do before certifying a class, namely, I must find that the plaintiffs' evidence can demonstrate proximate causation as to each individual in the proposed class.

### c. Dr. Levy's Testimony Also Cannot Show That Each Class Member Has Experienced a Significantly Increased Risk of Disease

Dr. Levy, the plaintiffs' second expert, testified at the hearing that the plaintiffs were significantly exposed to C-8 and, as a result, are at a significantly increased risk of several serious latent diseases. Dr. Levy relies on three bases for that conclusion: 1) Dr. Gray's risk assessment, 2) his review of the scientific literature and epidemiological analyses, and 3) data produced by the C-8 Health Project. In the aggregate, Dr. Levy's testimony and the sources upon which he relies cannot show that the class' exposure to C-8 proximately caused the proposed class to experience a significantly increased risk of any disease.[11]

Though Dr. Levy's epidemiological studies may show that C-8 generally can cause various diseases, they do not show that C-8 has caused a significantly increased risk of disease to the proposed class members. Though *Bower* does not require a quantification of the increased exposure, there must be some indication that the risk is different from what it would have been absent exposure. *See Bower*, 522 S.E.2d at 433. The general potential of a substance to cause disease is insufficient.

The data from the C-8 Health Project likewise cannot support a significantly increased risk of disease. The C-8 Health Project was designed to collect health data from the *Leach* settlement class to be used by the *Leach* Science Panel in identifying any probable links between C-8 exposure

---

[11] Because I have already discussed why Dr. Gray's risk assessment cannot show class-wide exposure to a significantly increased risk of disease, I will not repeat that analysis here.

in drinking water and human disease.  *Id.*  Dr. Levy plotted results from the C-8 Health Project onto graphs showing a positive correlation between increasing blood serum concentrations of C-8 and increasing levels of liver enzymes.  (Pls.' Hr'g Exs. 37, 40.)  The graphs show that people exposed to similar levels of C-8 in their drinking water as the named plaintiffs are experiencing increased levels of C-8 in their blood.  The graphic information suggests that members of the proposed class may also be experiencing those effects.

However, the C-8 Health Project results used by Dr. Levy are only preliminary.  (Def. Hrg. Ex. 31.)  Further, as explained by a member of the *Leach* Science Panel, the C-8 Health Project data cannot provide reliable conclusions at this point in time:

> [T]he [C-8] Science Panel does not believe [the data released by the C-8 Health Project] provide valid information regarding the presence or absence of association between [C-8] exposure and health outcomes. . . .  There is a possibility the initial impressions from these simple tabulations may change considerably when we evaluate the information more systematically.

 (Def. Hrg. Ex. 5.)

Even if I were to give full credence to Dr. Levy's epidemiological studies and accept the inferences suggested by the C-8 Health Project data, the aggregate evidence would only show that C-8 generally causes some human diseases; it does not show that the specific exposure in this case proximately caused a significantly increased risk of disease for each proposed class member.  The C-8 Health Project data show that there is a distribution of C-8 health effects throughout the general population.  Moreover, Dr. Levy himself admitted that, at least with respect to liver toxicity, there are most likely people in Parkersburg that have lived there for several years and maintain the same level of risk as the general population of contracting the disease.  (Mot. Hr'g 74:16-21, Aug. 6, 2008.)

-26-

In sum, *Bower* requires evidence that exposure to a chemical proximately caused an identifiable (though not necessarily quantifiable) significantly increased risk of disease. The general causal relationship between C-8 and human disease that Dr. Levy claims exists may justify the establishment of a public health medical monitoring program, but it is insufficient to establish tort liability.

### 3. The Class Members' Need for Medical Monitoring Cannot Be Shown on a Class-Wide Basis

### a. Ability to Design a Class-Wide Medical Monitoring Program Does Not Show a Need for Class-Wide Medical Monitoring

The plaintiffs submit that the *Leach* settlement agreement and DuPont's participation in developing the Science and Medical Panels is evidence that a class-wide medical monitoring program is necessary. (Pls.' Post-Hr'g Br. 9.) Specifically, the plaintiffs assert that in the settlement agreement DuPont essentially conceded that medical monitoring is necessary by agreeing "that this process for allowing a common assessment of diseases to be monitored and the tests to be offered community-wide is a fair and scientifically appropriate process for resolving the claims of tens of thousands of individuals exposed to C-8 in their drinking water." (*Id.*) As discussed above, however, DuPont's agreement to participate in a *voluntary* medical monitoring program is *not* an admission that a class of plaintiffs exposed in a similar manner must be subject to a uniform medical monitoring program. It is certainly possible, and may even be likely, that the Science and Medical Panels established by that agreement will conclude that some members of that class do not need medical monitoring at all. Therefore, the *Leach* settlement medical monitoring program shows no more than that "such a process can be used for the entire community." (*Id.* at 10.)

-27-

**b. Dr. Levy's Testimony Cannot Show that Each Class Member Needs Medical Monitoring**

Dr. Levy's testimony is not relevant proof of the proposed class' need for medical monitoring because Dr. Levy misunderstands the medical monitoring relief established in *Bower*. *Bower* provides medical monitoring relief for individual tortious injuries. Dr. Levy, however, views medical monitoring as public health relief for populations exposed to a hazardous substance. (Mot. Hr'g 65:8-24, 66:9-12, Aug. 6, 2008.) He relies on the Agency for Toxic Substances and Disease Registry ("ATSDR") Guidelines, which prescribe a public health methodology, for his conclusion that the class requires medical monitoring. (*Id.* 65:19-24.) Though Dr. Levy stated that ATSDR is not a regulatory body, and noted that many private companies have voluntarily set up medical monitoring programs, he admited that his opinion as to the need for medical monitoring in this case stems from a precautionary concern related to those addressed by health regulations: "No amount of [C-8] in water is good for you or good for anyone drinking it or otherwise using it. No amount of inhaling smoke in a bar—and it sort of comes out of that same perception that exposure to a hazardous substance is not good. If we can do something about it, we should." (*Id.* 80:17-22, 81:16-25.) Dr. Levy emphasized the prophylactic nature of his recommendation by stating that "one shouldn't wait until all the information possible is in and fully analyzed before taking some action to undertake a medical monitoring program to begin to detect serious latent disease in that population." (*Id.* 108:19-22.)

As I discussed earlier, precautionary measures to keep the general population safe are a fundamentally distinct form of relief from the medical monitoring cause of action which provides relief to individuals that have already been injured. Though regulators need not wait for full

information before acting, the medical monitoring cause of action does require certainty that an injury has occurred.

Dr. Levy assumes that a member of the proposed medical monitoring class can have the determination of their particular and individualized diagnostic needs deferred until after the implementation of the medical monitoring protocol.  He explains that, "while the [medical monitoring] program is set up based on the common exposure, the implementation would be individualized. . . .  Individualized implementation . . . [is] standard with regard to medical monitoring." (*Id.* 82:5-23.) Though individualized implementation may be standard in public health monitoring programs, the tort of medical monitoring requires that determination to occur prior to a finding of liability.  By assuming that these determinations can be deferred, Dr. Levy avoids making the individual inquiries into the need for medical monitoring that would destroy the cohesiveness of the class.

Because Dr. Levy is recommending a public health medical monitoring program rather than medical monitoring addressing tortious injuries to individuals, I **FIND** that Dr. Levy's testimony cannot provide common proof that medical monitoring is reasonably necessary for the proposed class.

### 4. Summary of Class Certification Analysis Under Rule 23(b)(2)

The plaintiffs have failed to show that the three contested elements of the medical monitoring claim can be shown through common proof, namely, whether the plaintiffs could demonstrate that the class had been significantly exposed to C-8 relative to the general population; whether the plaintiffs could show that the class had a significantly increased risk of contracting a serious latent disease; and whether the plaintiffs could demonstrate that diagnostic testing was necessary.  Rather,

it is plain that a determination as to each of those elements for each class member will require an individualized inquiry.  I **FIND** that the plaintiffs have not shown that the class is sufficiently cohesive to satisfy Rule 23(b)(2).

### B. Class Certification Is Not Appropriate Under Rule 23(b)(1)(A)

The plaintiffs also argue that certification under Rule 23(b)(1)(A) is proper because DuPont admitted in the *Leach* case that individual actions could subject DuPont to inconsistent determinations.  *See Leach*, 2002 WL 1270121.  The plaintiffs also contend that certification is necessary "[t]o avoid the potential for inconsistent orders directing the manner of abatement, remediation, and monitoring," (Pls.' Mem. Supp. 17.)  Finally, the plaintiffs argue that individual actions could lead to adjudications inconsistent with the medical monitoring program commenced under the *Leach* settlement.  (Pls.' Reply Br. 23–24.)

Certification under Rule 23(b)(1)(A) is not appropriate because the plaintiffs have not shown that "practical necessity" forces DuPont to act in the same manner towards all the class members.  As discussed above, the plaintiffs have not presented reliable common class-wide proof of the potential class members' claims.   Therefore, determining whether each class member has experienced a significantly increased risk of disease and requires medical monitoring will involve extensive individual inquiries. *See O'Connor v. Boeing N. Am., Inc.*, 180 F.R.D. 359, 377 (C.D. Cal. 1997) (explaining that the defendant would not be required to treat all members of a medical monitoring class action alike because the medical monitoring needed by each class member would depend on individual factors).  Because each class member's claim is so individualized, disparate remedies and standards of conduct are likely.  "When the relief in question is fraught with

individualized issues, resort to Rule 23(b)(1) is inappropriate." *Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 99 (W.D. Mo. 1997).

Although the plaintiffs are also seeking abatement and remediation relief, which are often amendable to class-wide treatment, they have not identified which injuries this relief would remedy and have provided no information about the propriety of granting this relief. The plaintiffs have only cursorily briefed this issue and I cannot determine whether such relief would be likely in individual actions or would lead to inconsistent adjudications. *See Pruitt v. Allied Chem. Corp.*, 85 F.R.D. 100, 107 (D.C. Va. 1980). I **FIND** that the plaintiffs have not shown that the proposed class satisfies the conditions of Rule 23(b)(1)(A).

## V. Conclusion

I **FIND** that class certification would be inappropriate in this case for all of the plaintiffs' claims because they have not demonstrated that the class complies with Rule 23 of the Federal Rules of Civil Procedure. Specifically, the plaintiffs have failed to show that the class is ascertainable or that the class itself is cohesive. Instead, I **FIND** that the plaintiffs' claims require too much of an individualized inquiry to qualify for class-wide treatment. The plaintiffs' motion for class certification therefore is **DENIED**.

I note, however, that the named plaintiffs' individual claims survive this Order. Furthermore, this disposition does not preclude the plaintiffs from formally bringing a motion under Rule 15 to amend their complaint to include a public nuisance claim.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.  The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:        September 30, 2008

Joseph R. Goodwin, Chief Judge