THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
PARKERSBURG DIVISION

WILLIAM R. RHODES,
RUSSELL H. MILLER, AND
VALORI A. MACE,

       Plaintiffs,

                              CIVIL ACTION NO. 6:06-0530

v.

E. I. DU PONT DE NEMOURS AND COMPANY,

       Defendant.

E. I. DU PONT DE NEMOURS AND COMPANY'S MEMORANDUM OF
LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
BASED UPON THE STATUTE OF LIMITATIONS

Defendant, E.I. du Pont de Nemours and Company ("DuPont"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, submits this Memorandum of Law in Support of its Motion for Summary Judgment based on the statute of limitations. In summary, Plaintiffs' claims should be dismissed because (i) Plaintiffs knew of their alleged claims against DuPont for more than two years prior to the Complaint being filed, (ii) Plaintiffs were put on notice of their alleged claims through the media coverage of PFOA being present in the Parkersburg water supply, and (iii) Plaintiffs were represented by counsel who had explicit knowledge of PFOA in the Parkersburg water supply yet that counsel waited more than two years after gaining such knowledge to file this action and they affirmatively acted to remove these Plaintiffs from that previously-filed litigation.

## I.      FACTS

Plaintiffs filed this action on May 23, 2006, in the Circuit Court of Wood County, West Virginia, alleging that PFOA[1] from DuPont's Washington Works Plant contaminated drinking water in Parkersburg.  DuPont removed the action to this Court on June 29, 2006.  On September 30, 2008, Plaintiffs' Motion for Class Certification was denied.[2]  Plaintiffs filed their Second Amended Class Action Complaint in January 2009.[3]

This is not the first litigation in which DuPont has defended claims brought on behalf of these Plaintiffs for the same purported harm, or the first time that Plaintiffs' counsel have filed claims arising from the presence of PFOA in the water supplied by the Parkersburg Utility Board ("PUB").  In April of 2001, Plaintiffs' counsel filed suit against DuPont in Leach, et al., v. E.I. du Pont de Nemours and Company, No. 01-C-608 (Cir. Ct.  Wood Co. W. Va.)  ("Leach"), representing individuals living in the vicinity of the Washington Works Plant, including the Plaintiffs in this action.  The Leach Complaint "asserted common law tort claims and sought various forms of relief, including medical monitoring and injunctive relief" for exposure to PFOA.  Rhodes, 253 F.R.D. at 368.

In an Order dated April 10, 2002, Wood County Circuit Judge William G. Hill ("Judge Hill") granted the Leach plaintiffs' motion to certify a class consisting of  "all persons whose drinking water is or has been contaminated with [PFOA] attributable to releases from DuPont's Washington Works plant . . . ."  PUB customers were part of the class alleging contamination.  Judge Hill was a resident of Parkersburg, a PUB customer, and, as a result, was a member of the

---

[1] PFOA (perfluorooctanoic acid) has been used as a processing aid in the manufacture of fluoropolymers representing a wide range of high-performance products that are versatile and durable and possess properties such as non-stick characteristics and heat and chemical-resistance.

[2] On January 31, 2008, Plaintiffs moved for this Court to certify a class consisting of "all individuals (other than Leach Class members) who, for a period of at least one year since November 1, 2005, . . . have been residential customers of the Parkersburg Water District."  Rhodes v. E.I. du Pont de Nemours and Company, 253 F.R.D 365, 369 (S.D.W.Va. 2008).

[3] Plaintiffs' Second Amended Class Action Complaint added a cause of action for public nuisance.

Leach class.  Plaintiffs' counsel clearly considered him to be a part of the class.  In fact, in their

memorandum opposing DuPont's motion to disqualify Judge Hill because he was a member of

the class, Plaintiffs' counsel argued that DuPont had waived the right to object to Judge Hill

since it had known he was a member of the class for over a year.  Plaintiffs' counsel specifically

argued:

> Not only has DuPont been aware of the precise scope and
> boundaries of the Class that was certified in this case more than
> a year ago, but DuPont also has been well aware of the levels
> of C-8 detected in the City of Parkersburg water supply since
> even before this case was certified as a class action . . . The
> results of those C-8 tests were made available to DuPont by at
> least March 27, 2002 (*see* Exhibit 2 attached hereto), and were
> publicly disclosed through the mass media by at least March
> 28, 2002 (*see* Exhibit 3 attached hereto). . . . [T]hose tests
> indicated that C-8 had been detected in the City's production
> wells at a level of 0.069 ppb . . . [which] represented
> contamination of that water supply.

Ex. 1, Plaintiffs' Memorandum in Opposition to DuPont's Motion to Disqualify Judge Hill, p. 5-
6, Leach, et al., v. E.I. du Pont de Nemours and Company, No. 01-C-608 (Cir. Ct. Wood. Co. W.
Va.).

However, at the disqualification hearing, Plaintiffs' counsel did an about-face and argued

that   Judge Hill should exclude PUB customers, apparently deciding that it was more prudent to

lose part of the class than to lose Judge Hill as the presiding judge.  Plaintiffs' counsel proposed

a modification to the Leach class to exclude water sources with "non-quantifiable" levels.  At

that time, science was able to detect PFOA in the PUB water but was only able to quantify the

amount of PFOA at a level above 0.05 ppb. PFOA was present in PUB drinking water at levels

between 0.01 ppb and 0.049 ppb, making it detectable, but non-quantifiable.  Plaintiffs' counsel

understood this.[4]  Judge Hill accepted plaintiffs' proposed class modification and, by order dated

---

[4] Measurements taken since November 1, 2005 – the initial date of the Plaintiffs' proposed class definition in this
action – indicate results of 0.065 ppb (12/29/2005), 0.027 ppb (03/02/2007), 0.049 ppb (11/07/2007) and 0.049 ppb
(12/19/2008) (Ex. 2, Chart of PUB PFOA levels dated 01/07/2009).  Recent test results note finished water at 0.070
ppb (reported based on the following findings: Well 1, 0.11 ppb; Well 2, 0.035 ppb; Well 3, Not Quantifiable; Well
4, Not Quantifiable; Well 5, Not Quantifiable).

June 26, 2003, modified the definition of "contaminated" to mean "quantifiable levels" of PFOA. The order effectively carved out the individuals consuming water from the Parkersburg water supply from the <u>Leach</u> class.

In sum, Plaintiffs' counsel knew as early as 2001 that measured levels of PFOA were present in the PUB wellfields up to 0.069 ppb,[5] but requested that Judge Hill carve these very Plaintiffs out of <u>Leach</u> and, ultimately, its settlement. Five years after <u>Leach</u> was filed and nearly fifteen months after it was settled, these same lawyers filed this case on behalf of these three PUB customers.

As described more particularly herein, the Plaintiffs knew that there were at least two cases involving claims arising from PFOA in the local water supply, discussed their concerns over PFOA with others (including attorneys), and admit to knowledge of media coverage all well in advance of May 23, 2004.

As early as March 2002, *The Parkersburg News*, *The Parkersburg Sentinel*, and the *Marietta Times* reported the presence of PFOA in the PUB water. During the Settlement Hearing for the <u>Leach</u> lawsuit, the settlement administrator testified that over four hundred (400) separate newspaper articles appeared about the <u>Leach</u> case between 2001 and February 2005 (Ex. 3, Transcript from <u>Leach</u> Final Settlement Hearing, 2/28/05, 18:5-22). Furthermore, between August 19, 2002, and April 29, 2004, no fewer than nineteen (19) news stories related to PFOA, PFOA litigation, or releases of PFOA from the Washington Works Plant aired on WTAP, the Parkersburg Fox television affiliate (Ex. 4). PFOA at the Washington Works Plant also received national news coverage when ABC's 20/20 aired a story entitled "Safe or Sorry? New Evidence

---

[5] <u>See</u> Ex. 1, p. 6.

Reveals Dangers of Teflon" on November 14, 2003 (Ex. 5).  And, attached as Exhibit 6 is an index of the many articles which addressed PFOA prior to May 23, 2004.[6]

Specifically, from its filing in 2001 and prior to May 23, 2004, Ms. Mace followed the Leach litigation in the local newspaper, researched the effects of PFOA on the Internet, and watched stories on local nightly news (Ex. 7, Mace Dep., 07/25/07, 350:18-351:15, 354:9-355:8; Ex. 8, Mace Dep. 05/03/07, 130:18-22).  By September 2003, Ms. Mace had retained Attorney Harry Deitzler to file the instant suit (Ex. 7 at 484:23-486:19).  Similarly, Mr. Rhodes testified that he was aware of PFOA in the local water supply by 2002 after having read newspaper articles on the Leach class action (Ex. 9, Rhodes Dep., 05/07/07, 145:12-17, 145:21-146:2; Ex. 10, Rhodes Dep., 07/27/07, 275:7-22).  Furthermore, after reading about the Leach litigation during this 2001-2004 time period, Mr. Rhodes stated that he continued to use bottled water largely because of his concerns over PFOA (Ex. 10 at 159:2-24).  Mr. Miller also stated that he "undoubtedly" would have read newspaper articles about PFOA, and distinctly recalled reading about the Tennant[7] PFOA litigation against DuPont which was resolved in 2001 (Ex. 11, Miller Dep., 05/04/07, 33:9-16, 214:11-215:10).

## II.    ARGUMENT

Based upon the undisputed facts of this case, including explicit admissions of Plaintiffs and Plaintiffs' counsel, DuPont is entitled to summary judgment because Plaintiffs' claims are barred, as a matter of law, by the applicable West Virginia statutes of limitation.  Plaintiffs' original Class Action Complaint was filed on May 23, 2006, making any cause of action that accrued prior to May 23, 2004 untimely under W. Va. Code § 55-2-12.  Whether based on their individual knowledge, exposure to media coverage, or knowledge attributable to them through

---

[6] The articles referenced in the index can be provided upon request.
[7] Wilbur Tennant, et. al v. E.I. DuPont de Nemours & Co. (S.D.W.Va.); Case No. CA-6:99-0488 (the Tennant case was filed in this Court and involved the farmer who lived next to the Dry River Landfill).

their attorneys, Plaintiffs clearly knew, or reasonably should have known, of their claims well before May 23, 2004.

All seven counts in the Second Amended Complaint (including medical monitoring) allege some form of personal injury. Also, all but the medical monitoring claim (Count Six) allege property damage. For ease of analysis, DuPont has organized this argument by the damage Plaintiffs allegedly incurred. As is set forth herein, all of the claims and all of the damages alleged in the Second Amended Complaint are barred by the statute of limitations.

**A.      Plaintiffs' Personal Injury Claims are Barred by the Statute of Limitations.**

Plaintiffs' claims for personal injury damages, including but not limited to all claims for medical monitoring, are barred by the statute of limitations and should be dismissed. Plaintiffs knew, or through the exercise of reasonable diligence should have known, of their alleged claims for personal injury damages attributable to PFOA released by DuPont prior to May, 2004. As Plaintiffs' original Class Action Complaint was filed with the Court on May 23, 2006, Plaintiffs' claims for personal injury damages are untimely under W. Va. Code § 55-2-12(b).

Under West Virginia law, recovery for medical monitoring lies in tort and it, like the other claims for personal injury, is subject to the statute of limitations contained in W. Va. Code § 55-2-12:

> Every personal action for which no limitation is otherwise prescribed shall be brought: . . . (b) within **two years** next after the right to bring the same shall have accrued if it be for damages for personal injuries; . . . .

W. Va. Code § 55-2-12(b) (1959) (emphasis added); State ex rel. Chemtall v. Madden, 216 W. Va. 443, 456, 607 S.E.2d 772, 784 (2004). It is well established in West Virginia that "[t]he statute of limitations ordinarily begins to run when the right to bring an action for personal injuries accrues which is when the injury is inflicted." Syl. Pt. 1, Jones v. Trustees of Bethany

College, 177 W. Va. 168, 351 S.E.2d 183 (1986).  In Chemtall, West Virginia joined a majority

of jurisdictions that apply the discovery rule to claims for medical monitoring.[8] The court held:

> [a] medical monitoring cause of action accrues when a plaintiff
> knows, or by the exercise of reasonable diligence should know,
> that he or she has a significantly increased risk of contracting a
> particular disease due to significant exposure to a proven
> hazardous substance and the identity of the party that caused or
> contributed to the plaintiff's exposure to the hazardous substance.

Syl. Pt. 10, Chemtall.

Under the discovery rule, "the statute of limitations begins to run when a plaintiff has

knowledge of the fact that something is wrong and not when he or she knows of the particular

nature of the injury." Goodwin v. Bayer Corp., et al., 318 W. Va. 215, 221, 624 S.E.2d 562, 568

(2005); see also McCoy v. Miller, 213 W. Va. 161, 166, 578 S.E.2d 355, 356 (2003).

Furthermore, once a potential plaintiff has knowledge that something is wrong, "that plaintiff has

an affirmative duty to further and fully investigate the facts surrounding the potential breach."

Goodwin, 318 W. Va. at 221, 624 S.E.2d at 568 (quoting McCoy 213 W. Va. at 165, 578 S.E.2d

at 360); see also Carey 999 F. Supp. at 1116 (noting that "[p]laintiffs cannot sit idly by and wait

for the defendants to admit their liability or even for the federal government to prove their

claims.  They must do that themselves.").

Importantly, ". . . whatever puts a person on inquiry amounts in law to 'notice' of such

facts as an inquiry pursued with ordinary diligence and understanding would have disclosed."

Rutherford v. John Hancock Mutual Life Ins. Co., 562 F.2d 290, 293 (4th Cir. 1977); see also

Wood v. Carpenter, 101 U.S. 135, 141 (1879) (recognizing that "[w]hatever is notice enough to

excite attention and put the party on his guard and call for inquiry, is notice of every thing to

which such inquiry might have led"); Adams v. Cooper Industries, 2006 WL 2983054, at *2

---

[8] See Carey v. Kerr-McGee Chemical Corp. 999 F. Supp. 1109, 1120 (N.D.Ill. 1998) (applying the discovery rule to bar plaintiffs' claims for medical monitoring under the applicable statute of limitations); Barnes v. American Tobacco Co., 984 F. Supp. 842, 858, 859 (E.D.Pa. 1997) (recognizing that the discovery rule, rather than continuing tort theory, applies to medical monitoring claims).

(E.D.Ky. 2006) (providing that "[i]f the plaintiff knows of any fact that should raise his suspicion, that is the equivalent of actual knowledge of the entire claim"). While DuPont denies there is a link between PFOA and the injuries Plaintiffs allege, Plaintiffs certainly believe there is a link, and they had the information they used to reach that conclusion for over two years before they brought this lawsuit.

1.    **Valori Mace Knew of Her Alleged Claims in 2001.**

Ms. Mace admitted knowledge of her perceived risks associated with PFOA in PUB water beginning as early as 2001 when the Leach class action was filed, culminating with the creation of an attorney-client relationship with Harry Deitzler, Plaintiffs' counsel in the instant litigation, on **September 18, 2003** regarding the very claims raised in this action (Ex. 8 at 127:17-128:2; Ex. 7 at 484:23-486:19). During her May 3, 2007, deposition, Ms. Mace also admitted having conversations about PFOA in the summer of 2001, around the time that the Leach class action was filed (Ex. 8 at 127:17-128:2).

After the Leach class action was filed, Ms. Mace admits that she followed the case because she was "concerned and curious" about C8 and any potential effects of long-term exposure (Ex. 7 at 350:18-351:15; 353:15-354:2). To that end, Ms. Mace researched the health effects associated with PFOA and followed the Leach class action throughout 2001, 2002, and into 2003 (Id., at 350:18-351:9). While Ms. Mace followed the Leach litigation, she read articles in the Parkersburg newspapers and recalls seeing headlines about PFOA throughout 2002 and 2003 and "[getting] on the internet and popp[ing] in C-8 to see what would come up and read[ing] a little bit." (Id., at 354:9-355:8). Additionally, Ms. Mace recalls having seen stories on the WTAP nightly news discussing PFOA (Ex. 8 at 130:10-22).

Ms. Mace's concerns, coupled with information garnered from the Parkersburg area print media, the internet, and the WTAP nightly news, led her to consult with Harry Deitzler in 2003

for purposes of this very litigation.  Ms. Mace acknowledged that she "saw Harry [Deitzler] at a

– it was a cookout, Chamber of Commerce cookout, and was asking him, you know, what the

deal was with C-8 and we discussed it briefly and it went from there." (Id., at 268:8-11).  When

asked if she recalled where the cookout was held she testified, "Buzzy Dil's property." (Id., at

268:18-20).  The cookout to which Ms. Mace is referring was a Business After Hours ("BAH")

barbeque held by the Mid-Ohio Valley Chamber of Commerce on September 18, 2003, at Buzzy

Dils Lot (Ex. 12, Flier for September 18, 2003, Chamber of Commerce Cookout at Buzzy Dils).

While Ms. Mace was certain where the meeting took place, she attempted to date the meeting at

"Buzzy Dils" at some point in 2005 or 2004 (Ex. 8 at 268:12- 269:2).  However, there is no

doubt that this distinct meeting could not have occurred at any time after 2003; the last time the

Chamber of Commerce held a cookout at "Buzzy Dils" was on September 18, 2003 (See Ex. 13,

Affidavit and Report of the Mid-Ohio Valley Chamber of Commerce, p. 2, Financial Report).[9]

The record clearly reflects that both Ms. Mace and her attorney, Harry Deitzler, agree that they

had created an attorney-client relationship at the meeting on September 18, 2003:

> Q.     As I recall, you said that the first time you spoke to
>        somebody about C-8 being in Parkersburg, not the first
>        time you learned about it, but spoke with somebody about
>        C-8 being in the city of Parkersburg water was when you
>        chatted with Harry about C-8 being in the Parkersburg
>        water in the lawsuits, at the time of the number two lawsuit,
>        et cetera, and you said it was at a Chamber of Commerce
>        event at Buzzy Dils.
> A.     Yes.
> Q.     Right?
> A.     Yes.
> Q.     You remember that very specifically, right?
> A.     Yes.
> Q.     Okay.  And – and that's when you first talked to Harry
>        about the possibility of this lawsuit on behalf of the folks of
>        the city of Parkersburg.
> A.     I –

---

[9] Subsequent editions of the BAH barbeque cookout were held at the Holiday Inn in 2004 and 2005 (Ex. 13).

MR. DEITZLER:      She's not allowed to tell you what we did or
                   didn't talk about because **at that point she would have
                   been seeking attorney client.**
BY MR. PAUL:
Q.      Okay, let me ask that.  I'll just ask.  **When you talked to
        him [Harry Deitzler] at Buzzy Dils, you were either
        seeking to be represented by Harry in regard to that or
        under the view that you were, in fact, going to be or
        were, I guess were, represented by Harry with regard to
        legal matters relating to C-8.**
A.      **I believe so.**

(Ex. 7 at 484:23-486:19)(emphasis added).   Through the exercise of reasonable diligence:

reading articles on PFOA, following the <u>Leach</u> class action, searching the Internet, researching

the health effects of PFOA, and watching the news on television, Ms. Mace was clearly aware of

the alleged dangers of PFOA, her exposure to PFOA in PUB water, and that DuPont was being

accused of responsibility for that exposure.   In fact, she consulted an attorney to address her

concerns regarding PFOA by September 18, 2003.

    Ms. Mace's situation is analogous to <u>Goodwin v. Bayer Corp.</u>, where the court found

plaintiff's claim was time-barred.   The Court in <u>Goodwin</u> noted that "[plaintiff] engaged counsel

who advertised an expertise and experience in [these types of] claims.   Waiting some five more

years to consider potential neuropsychological harm under such circumstances is unreasonable."

218 W. Va. at 223, 624 S.E.2d at 570.   There is no dispute as to the material facts: by September

18, 2003, nearly three years prior to filing this lawsuit, Ms. Mace was cognizant of her potential

claims and sought the advice of Mr. Deitzler regarding her concerns.   As Ms. Mace had specific

knowledge of her potential claims in 2003, well outside of the two year statutory period, Ms.

Mace's claims are barred.

## 2.      William Rhodes Knew of His Alleged Claims in 2002 or earlier.

    During Mr. Rhodes' deposition on May 7, 2007, Mr. Rhodes acknowledged that he first

became aware of PFOA by reading the newspaper "[p]robably five or six, seven years ago . . . "

dating his knowledge of PFOA in the area as far back as 2000 (Ex. 9 at 145:12-17). Specifically, Mr. Rhodes read about the "[p]eople in Lubeck, West Virginia, suing DuPont." (Id., at 145:21-146:12). Under further questioning, Mr. Rhodes conceded that he would have been aware of litigation over the harms allegedly caused by PFOA being in the local water supply sometime between January and April 2002:

> Q.    Okay. In this article there in about the fourth – I'm sorry. Fifth paragraph it looks like – says, The class action lawsuit was filed in August 2001 against DuPont and Lubeck Public Service District. Plaintiffs allege as a result of C-8 in their water supply they suffered damage to their health and property. Lubeck residents are seeking funds for medical monitoring, et cetera. Do you see that?
>
> A.    Yes.
>
> Q.    Okay. So it tells us that the lawsuit was filed as far back as August 2001. I am showing you articles from January through April 2002. Would you believe by January through April 2002 you would have been aware of this issue?
>
> A.    Yes.

(Ex. 10 at 275:7-22). Tellingly, Mr. Rhodes had been drinking bottled water since approximately 2000, motivated in part by his concerns over PFOA in the PUB water supply:

> Q.    I just want to make sure that I run that down a little bit more. At the time you started reading about the Lubeck lawsuit, the Leach lawsuit, in the paper [in 2001], had you already been drinking bottled water?
>
> A.    Yes.
>
> Q.    Okay. For approximately how long do you think?
>
> A.    I don't really know. Maybe a year.
>
> Q.    A year or so?
>
> A.    Two years.
>
> Q.    A year or two years?
>
> A.    Yeah, something like that.
>
> Q.    And you were doing that because of the chlorine taste?
>
> A.    Yes.
>
> Q.    **Okay. Okay. And then along came the Leach lawsuit and articles in the paper about Lubeck and you decided to stick with the bottled water because of concern over C-8. Right?**
>
> A.    **That's true.**
>
> Q.    **Okay. You've used bottle water since?**

A.      **Yes.**

(<u>Id.</u>, at 159:2-24) (emphasis added).  These material facts are not in dispute:  Mr. Rhodes was

well aware of the ongoing <u>Leach</u> class action against DuPont and the issues involved in that case.

Furthermore, Mr. Rhodes alleges that his continued use of bottled water was based, in part, on

his awareness that PFOA was in his drinking water from PUB.  He personally linked this to the

media coverage generated by the <u>Leach</u> litigation.  It is clear that Mr. Rhodes knew, or through

the exercise of reasonable diligence should have known, of his claims well in advance of May

23, 2004.  Accordingly, Mr. Rhodes' claims are barred.

**3.      Russell Miller Knew of His Alleged Claims Prior to May 23, 2004.**

Mr. Miller's knowledge of litigation over the purported dangers of PFOA predates even

<u>Leach</u> and can be traced back to the time period during which litigation was pending in <u>Tennant,</u>

which was resolved in August 2001.  Mr. Miller testified during his deposition that he recalled

reading about <u>Tennant</u> in the newspaper:

> Q.      Okay.  Are you familiar with a – any litigation known as
> the Tenant litigation, Tenant's Farms or anything of that
> nature?
> A.      Oh, I – that's the guy with the cattle?
> Q.      Yes, sir.
> A.      I remember something about that in the paper, where his
> cattle was dying or something down – I remember that –

(Ex. 11 at 214:11-18).  Mr. Miller further recalled that "there was a lot of conversation about

[Tennant] that – and he lived down in near DuPont, as I recall, had a farm down there."  (<u>Id.</u>, at

215:1-4).

Mr. Miller's exposure to issues involving PFOA and DuPont, however, was not limited to

the <u>Tennant</u> litigation.  Miller subscribed to the *Parkersburg News* and "undoubtedly" recalled

articles about C8 (<u>Id.</u>, at 32:3-6, 33:9-16).

Furthermore, Mr. Miller admitted that when he read about the water issues in the Parkersburg area such as Lubeck and Little Hocking, he was concerned about the water he was drinking in Parkersburg (Ex. 14, Miller Dep., 07/26/07, 367:23-368:4). Notably, Mr. Miller's daughter began to search for a home to purchase in 2003 - 2004[10]. Prior to that time, Mr. Miller had read news reports about the "contamination" in local water. In fact, Mr. Miller testified that he told his daughter of the contamination, but added "I don't know that much about the contamination... except what I read in the paper." (Ex. 11 at 19:10-11). Mr. Miller also testified that he knew Mr. Deitzler and often called him for legal advice (Id., at 21:23-29). He also specifically knew Mr. Deitzler was involved in the Leach case, and when he decided he wanted more information regarding C8, he contacted Mr. Deitzler (Id., at 15:5-19). Mr. Miller further testified:

> Q.   Okay. And you had read it in the paper prior to the time that your daughter was looking to purchase a home?
> A.   Yeah. In fact, as I indicated to you earlier, there was public notification[11] sent out not to use that water down there by the people involved in the water and they were furnishing water to people and I told her you don't need to be buying a house down there with that kind of water problems. I said the valuation of that property's going to zilch.
> Q.   When you heard about the public notification, did that also cause you concern about the water you were drinking here in Parkersburg?
> A.   Certainly.

(Ex. 14 at 368:18-369:7).

From his testimony, Mr. Miller had knowledge of and concerns about PFOA in and around Parkersburg by May 2004. In fact, he testified that his personal knowledge, gained from reading the local papers, culminated on June 6, 2004. A quick look at the local newspapers in the months leading up to Little Hocking Water Associations public notification pinpoints Mr.

---

[10] A copy of the recorded deed is attached hereto as Exhibit 15.
[11] Attached as Exhibit 16 is the public notification issued by Little Hocking Water Association in June 2004.

Miller's knowledge and concerns prior to May 23, 2004.  On December 6, 2003 Parkersburg water was specifically highlighted in a *Marietta Times* article headlined "Court Sides with DuPont."  The article specifically notes that C8 had been found in Parkersburg water and quotes Mr. Deitzler as announcing that all concerned citizens and class members should attend a public meeting to be held in Parkersburg (See Ex. 6).  On April 30, 2004 *The Parkersburg News* ran a story "DuPont to launch $1M C8 Study." (Id.).  And, the *Marietta Times* ran a story on April 28, 2004, "New High Levels of C8 Worries Water Customers." (Id.).

Mr. Miller was aware of the presence and alleged health hazards associated with PFOA in the Parkersburg area as early as 2001.  Also, prior to the Little Hocking Water Association's public notice, Mr. Miller specifically concedes he had gained specific knowledge about alleged local contamination from prior media reports.  The Little Hocking public notification occurred June 6, 2004.  Prior to that date, Mr. Miller not only knew who to call with questions about PFOA but he knew, or through the exercise of reasonable diligence should have known, of his claims for damages well in advance of May 23, 2004.  As such, Mr. Miller's claims are barred.

**B.  Plaintiffs' Claims for Property Damages and All Other Damages are Barred by the Statute of Limitations.**

Plaintiffs' claim for property damages and all other damages allegedly caused by the presence of PFOA in or on their respective properties are barred by the applicable statute of limitations.  Plaintiffs knew or should have known of any and all alleged damage well before May 23, 2004, making their instant claims untimely under W. Va. Code § 55-2-12(a).  In West Virginia, actions to recover property damage are subject to a two-year statute of limitations:

> Every personal action for which no limitation is otherwise prescribed shall be brought: (a) Within two years next after the right to bring the same shall have accrued, if it be for damage to property; . . . .

14

W. Va. Code § 55-2-12(a) (1959). As such, Plaintiffs' claim for property and other damages are similarly barred.

**C.      Because of Extensive Media Coverage, Plaintiffs Knew or Should Have Known of Their Claims Prior to May 23, 2004.**

As a result of the extensive media coverage generated by the Leach class action coverage that warned of both the presence and allegedly harmful effects of PFOA in PUB wells, Plaintiffs knew or should have known enough to "excite their attention" or "raise suspicions" regarding their claims well in advance of May 23, 2004. Plaintiffs' counsel has previously conceded as much.[12]

In Sayre v. General Nutrition Corp., 867 F. Supp. 431 (S.D.W.Va. 1994), aff'd 67 F.3d 296 (4th Cir. 1995), Chief Judge Charles Haden held that media coverage can impute knowledge of a cause of action and thereby trigger the two year statute of limitations under W. Va. Code § 55-2-12(b). In Sayre, the plaintiff watched an NBC Nightly News report in 1989 on the health risks associated with taking L-tryptophan after experiencing adverse health effects while using the drug. Sayre, 867 F. Supp. at 432-33. In dismissing the plaintiff's complaint as untimely, this Court noted that "the plaintiff, by the exercise of reasonable diligence, should have known that L-tryptophan had a causal relation to her injury when she saw the warning reported by NBC [in] 1989." Id. at 435. The court further recognized that "[p]laintiffs may not close their eyes to means of information reasonably accessible to them and must in good faith apply their attention to those particulars which may be inferred to be within their reach." Id. at 435 (quoting Slack v. Kanawha County Housing, 188 W. Va. 144, 150, 423 S.E.2d 547, 553 (1992)).

Similarly, in Townley v. Norfolk & Western Rwy., 887 F.2d 498, 499 (4th Cir. 1989), the Fourth Circuit Court of Appeals charged the plaintiff with constructive knowledge of his medical

---

[12] See Ex. 17, Plaintiffs' Response to the Rule to Show Cause and Supporting Memorandum of Law, p. 5-6, E.I. du Pont de Nemours and Company v. Honorable Judge George W. Hill, No. 03-1211 (W. Va. Sup. Ct. of App.).

condition four years prior to an official diagnosis. In Townley, the plaintiff attempted to obtain information on black lung benefits 7 years after reading a 1980 newspaper article advising railroad workers to apply for black lung benefits. Id. at 499. Affirming the district court's dismissal of plaintiff's claim as time-barred, the Fourth Circuit held that "[e]ven if [the plaintiff] truly did not believe he had black lung [prior to diagnosis], it is obvious from his actions that he possessed sufficient information that he knew, or should have known, that he had been injured . . . ." Id. at 501. See Ball v. Union Carbide Corp., 385 F.3d 713, 722 (6th Cir. 2004); Carey v. Kerr-McGee Chemical Corp., 999 F. Supp. 1109, 1117 (N.D.Ill. 1998); Winters v. Diamond Shamrock Chemical Co., 941 F. Supp. 617, 622 (E.D.Tex. 1996).

In the instant case, Plaintiffs admit to being aware of local and national media coverage related to the presence and allegedly hazardous effects of PFOA (including coverage of local litigation over PFOA in water) before May 23, 2004, and as early as 2001.[13]  Beginning with the filing of the Leach class action on August 30, 2001, local and national media coverage of alleged health hazards associated with PFOA present in the PUB water supply was so widespread that Plaintiffs should have known of their potential claims (such as they are) no later than 2003.

The presence of PFOA in the PUB water supply was well documented by the news media. The WTAP local television news stories (Ex. 4) and the national television coverage (Ex. 5) would have placed the Plaintiffs and the community on notice of any alleged problems prior to May 23, 2004. Coverage in the print media was even more widespread and pervasive. According to the Leach class claim administrator, 400 articles on PFOA in the local water supply were printed between 2001 and February 2005. Articles published by the *Parkersburg News and Sentinel* and *Marietta Times* discussed (i) the potential toxicity of PFOA, (ii) the presence of

---

[13] Ms. Mace admitted that she "followed" the Leach class action in the newspaper and read articles about PFOA (Ex. 7 at 350:18-351:15, 353:15-354:2, 354:9-355:8). Mr. Rhodes readily admitted that by 2002 he was aware of PFOA in the local water supply after having read newspaper articles on the Leach class action (See Ex. 9 at 145:12-17, 145:21-146:2; Ex. 10 at 275:7-22). Mr. Miller stated that he "undoubtedly" would have read newspaper articles about PFOA, and distinctly recalled reading about the Tennant case against DuPont (Ex. 11 at 33:9-16, 214:11-18).

PFOA in Parkersburg water as early as April 27, 2002, and (iii) that trace amounts of PFOA in the Parkersburg water had reached levels of 0.069 ppb. See Ex. 6, Jesse Mancini, <u>Parkersburg's Well No. 1 Tests Positive for Contaminant</u>, *Parkersburg News and Sentinel*, March 28, 2002; Tom Hrach, <u>Trace of C8 in Parkersburg Water</u>, *Marietta Times*, March 28, 2002 (<u>Id.</u>);   Staff Reports, <u>Judge Hill: C-8 is Toxic to Humans</u>, *Parkersburg News and Sentinel*, May 7, 2003 (<u>Id.</u>).

Plaintiffs readily admit that they were repeatedly exposed, well before May 23, 2004, to media coverage of PFOA in the Parkersburg water. Plaintiffs should have known of their alleged claims for damages prior to May 23, 2004. As Plaintiffs' alleged claims for damages accrued at some unspecified point in time prior to May 23, 2004, Plaintiffs' May 23, 2006, Class Action Complaint is untimely under W. Va. Code § 55-2-12(b). Accordingly, DuPont is entitled to judgment as a matter of law on the statute of limitations.

**D.      The Knowledge of Plaintiffs' Attorneys Bars Recovery.**

Plaintiffs' counsel acquired knowledge during the <u>Leach</u> action that should be imputed to Plaintiffs to bar their claims under the statute of limitations. Through their representation of the <u>Leach</u> class, Plaintiffs' counsel knew as early as 2001 that the PUB water supply had detectable levels of PFOA. Due to Plaintiffs' counsel's clear and conscious decision to carve out the citizens of Parkersburg from the <u>Leach</u> litigation, including these three Plaintiffs, the knowledge possessed by Plaintiffs' counsel should be imputed to these Plaintiffs,' who were members of the <u>Leach</u> class for over a year and were represented by these same attorneys. Ms. Mace even claimed an individual attorney client privilege for communications that took place during the <u>Leach</u> litigation. Those communications were well before May 23, 2004.

It is well established that "the knowledge of an agent is imputed to his principal." <u>Eitel v. Schmidlapp</u>, 459 F.2d 609, 615 (4th Cir. 1972). Under West Virginia law, "[k]nowledge of, or notice to, the attorney for a litigant or party to a legal proceeding, of [m]atters arising in the

course of the litigation or proceeding, is ordinarily imputed to such litigant or party." Brewster v. Hines, 155 W. Va. 302, 314, 185 S.E.2d 513, 521 (1971) (quoting 7 C.J.S. *Attorney and Client* § 69, 865-66).[14]

Without question, Plaintiffs' counsel knew during the Leach litigation that there was PFOA in the Parkersburg Water District water supply. Specifically, in a July 16, 2003, brief filed with the Supreme Court of Appeals of West Virginia, Plaintiffs' counsel in Leach contended that "DuPont has known since at least March 2002 the extent to which the City of Parkersburg's drinking water is 'contaminated with C-8' . . . ."[15] Moreover, Ms. Mace had formed an attorney-client relationship with Plaintiffs' counsel regarding these issues in 2003.

Based upon the facts of this case, Plaintiffs should be charged with knowledge possessed by their counsel when determining the applicable statute of limitations. Counsel should not be able to revive what he knows to be an otherwise untimely action by relying upon a client's lack of familiarity with the legal system. If counsel possesses knowledge that a client's cause of action is otherwise untimely, there is no sound policy behind allowing such an action to proceed.

The instant case is an egregious example. Plaintiffs' counsel knew as early as 2001 that detectable levels of PFOA were present in the PUB finished water (and knew the levels in the wells went up to 0.069 ppb),[16] but requested that Judge Hill carve these very Plaintiffs out of the litigation and, ultimately, the settlement. Five years after Leach was filed and nearly fifteen months after it was settled, these same lawyers filed this case on behalf of these three PUB

---

[14] Other jurisdictions have imputed the knowledge of an attorney to a client to trigger the statute of limitations. See Veal v. Geraci, 23 F.3d 722, 725 (2d Cir. 1994) (imputing knowledge of attorney to client for statute of limitations purposes); Schwartz v. Philip Morris USA, Inc., 449 F. Supp. 2d 992, 1072 (E.D.N.Y. 2006) (recognizing that "[a]n attorney's knowledge of an injury can work to bar his client's claim under a statute of limitations"); Vermont Agency of Natural Res. v. Towns, 168 Vt. 449, 453, 724 A.2d 1022, 1025 (1998); Stalberg v. Western Title Ins., 27 Cal. App. 4th 925, 930, 32 Cal. Rptr. 2d 750, 752-53 (1994)

[15] See Ex. 17, p. 5.

[16] See Ex. 1, p. 6.

customers. Accordingly, the knowledge possessed by Plaintiffs' counsel as early as 2001 should be imputed to Plaintiffs to bar their claims under W. Va. Code § 55-2-12.

**E.    Any Contention that Plaintiffs' Claims for Damages Did Not Accrue Until the PFOA Levels in the PUB Water Reached 0.05 ppb is Without Merit.**

Any contention by Plaintiffs that their claims for damages did not accrue until PFOA levels in PUB supplied water reached 0.05 parts per billion ("ppb") is without merit. The threshold amount of PFOA cited in Plaintiffs' Complaint (0.05 ppb) is not a regulatory standard imposed by any state or federal administrative or regulatory body. Rather, 0.05 ppb merely reflects an old and outdated level at which technology could articulate a precise, quantifiable reading during the pendency of the Leach litigation. It in no way represents any recognized risk threshold for exposure to PFOA and has not been the quantifiable threshold for years.

Plaintiffs' arbitrary and misleading reliance upon 0.05 ppb is demonstrated by Plaintiffs' own toxicology expert, Dr. David Gray. Dr. Gray opined that using the 1987 Sabinski rat study, he calculated what he termed a "health protective drinking water criterion" for human risk of 0.02 ppb - not 0.05 ppb as stated in Plaintiffs' Complaint (Ex. 18, Dr. Gray Dep., 1/25/08, 25:8-26:4; 140:1-141:3). Dr. Gray began serving as Plaintiffs expert in **February, 2002** (Id., 140:1-141:3).

Any contention by Plaintiffs that a cause of action could not have accrued until the level of PFOA in PUB water was quantifiable is misplaced, inherently misleading and divorced from Plaintiffs' own expert. As such, the notion that the statute of limitations was tolled until PFOA levels rose to an arbitrary, albeit quantifiable, level is illogical, unsupported by law or science, and insufficient to prevent the dismissal of Plaintiffs' claims under W. Va. Code § 55-2-12(b).

## III.    CONCLUSION

For the reasons set forth herein, Plaintiffs' causes of action should each be dismissed as none were filed within the appropriate statute of limitations and Plaintiffs have unfairly and inequitably delayed filing the claims sought in this action.


**E. I. DU PONT DE NEMOURS AND COMPANY**

**By:   SPILMAN THOMAS & BATTLE, PLLC**


**/s/ Niall A. Paul**

Niall A. Paul (WV Bar #5622)
Clifford F. Kinney, Jr. (WV Bar #6220)
300 Kanawha Boulevard, East (Zip 25301)
P.O. Box 273
Charleston, WV 25321-0273
Tel: 304.340.3800
Fax: 304.340.3801
npaul@spilmanlaw.com

Libretta Porta Stennes
Anthony F. Cavanaugh
Steptoe & Johnson, LLP
1330 Connecticut Avenue, NW
Washington, DC  20036-1795
Tel: 202.429.3902
lstennes@steptoe.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### PARKERSBURG DIVISION

WILLIAM R. RHODES,
RUSSELL H. MILLER, and
VALORI A. MACE,

      Plaintiffs,

    v.                             CIVIL ACTION NO.  6:06-cv-0530

E. I. DU PONT DE NEMOURS
AND COMPANY,

      Defendant.

### CERTIFICATE OF SERVICE

     I, Niall A. Paul, do hereby certify that on March *30*, 2009, I electronically filed the foregoing "**E. I. du Pont de Nemours and Company's Memorandum of Law in Support of its Motion for Summary Judgment Based upon the Statute of Limitations,**" with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Harry G. Deitzler
R. Edison Hill
Hill, Peterson, Carper, Bee and  Deitzler, PLLC
NorthGate  Business Park
500 Tracy Way
Charleston, WV  25311-1261

Robert A. Bilott
Gerald R. Rapien
Taft, Stettinius & Hollister, LLP
1800 First Tower
425 Walnut Street
Cincinnati, OH 45202-3957

Larry A. Winter
Winter Johnson & Hill PLLC
P.O. Box 2187
Charleston, WV  25328

J. Steven Justice
Taft, Stettinius & Hollister, LLP
110 North Main Street
Suite 900
Dayton, OH  45402-1786

and I hereby certify that I have mailed, by United States Postal Service, the document to the

following non-CM/ECF participants:

Gerald R. Rapien
Taft, Stettinius & Hollister, LLP
1800 First Tower
425 Walnut Street
Cincinnati, OH 45202-3957

/s/ Niall A. Paul
Niall A. Paul (WV Bar #5622)