**THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**PARKERSBURG DIVISION**

**WILLIAM R. RHODES, et al.,**

        **Plaintiffs,**

**vs.**                                    **CIVIL ACTION NO. 6:06-0530**
                                             **(Judge Joseph R. Goodwin)**

**E. I. DU PONT DE NEMOURS AND COMPANY,**

        **Defendant.**

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DUPONT'S MOTION**
**FOR SUMMARY JUDGMENT BASED UPON THE STATUTE OF LIMITATIONS**

Defendant E.I. du Pont de Nemours and Company's ("DuPont's") Motion For Summary

Judgment Based Upon The Statute Of Limitations (the "Motion") should be denied.  DuPont's

Motion is based upon false and misleading representations of fact and an inaccurate and

incomplete discussion of the applicable law.  Contrary to DuPont's claims, none of the Plaintiffs

in this case were parties in any prior litigation against DuPont involving PFOA, DuPont has

failed to provide any evidence that any of the Plaintiffs had knowledge of their current claims

against DuPont prior to the running of any potential statute of limitations, and the nature of

DuPont's continuing torts necessarily prevents the running of any such statute of limitations in

this case.  DuPont's Motion is, therefore, factually and legally baseless.

## I.  STATEMENT OF FACTS

As set forth below, DuPont has misrepresented the factual record to this Court.  For

purposes of DuPont's summary judgment motion, the actual facts are more accurately

summarized as follows:

### A.  The 2002 Testing Results Showed No Quantifiable Amounts of PFOA in Parkersburg's Finished Drinking Water.

Sampling of Parkersburg city water supplies and finished drinking water did not first occur until March 2002. (DuPont Memo., Ex. 2.) DuPont correctly notes that the PFOA level detected at that time in one supply well was 0.069 parts per billion ("ppb"). (*Id.*) DuPont fails to mention, however, that the 2002 testing found no quantifiable level of PFOA in the actual "finished" drinking water – the water actually delivered to customers after treatment. (*Id.*) And, as DuPont has admitted and vigorously maintained for years, only the "finished" drinking water sampling data provide a good indication of the PFOA levels that might actually be present in the homes of the individuals receiving the water. (Ex. 1, Andrew Hartten Aff. ¶ 10.) In contrast, the sampling results from the supply wells are far less indicative of actual drinking water levels, as the supply well water has yet to be treated prior to consumption by individual consumers. (*Id.* at ¶ 12.) Thus, according to DuPont's own expert, "the drinking water levels of [PFOA] in the Parkersburg, West Virginia water supply have been 'NQ,' or non-quantifiable," as reflected in the 2002 sampling results. (*Id.* at ¶ 15.) "Non-quantifiable" means that a trace amount of PFOA was detected, but below the 0.050 ppb threshold at which point the amount could no longer be quantified at that time. (*Id.* at ¶ 14.) Additional testing in April 2002 confirmed that there were no quantifiable levels of PFOA in the City's finished drinking water. (DuPont Memo., Ex. 2.)

**B.  Plaintiffs Filed the Current Class Action Suit Only Months After Testing Revealed, For the First Time, Quantifiable Amounts of PFOA in Parkersburg's Finished Drinking Water.**

DuPont admits that there was no additional sampling or analysis of the City's drinking water for PFOA until October 2005. (*See* DuPont Memo., Ex. 2.) What DuPont omits is that no further testing occurred because "[t]he city of Parkersburg was taken out of the tests of area water systems because the [2002] levels of C8 were so low." (*See* Ex. 2, *C8 levels have increased in the city*, The Parkersburg News, May 24, 2006.) The October 2005 sampling

revealed, *for the first time*, quantifiable levels of PFOA in the finished drinking water being delivered to the City's customers (at levels as high as 0.079 ppb).  (DuPont Memo., Ex. 2.)  After the October 2005 sampling results were reported in the local media in the Spring of 2006 (Ex. 2), Plaintiffs initiated the current suit against DuPont immediately thereafter.

**C.  Parkersburg Water Customers Were Never Members of the *Leach* Class, and Thus Were Never "Carved Out" of That Class.**

Contrary to DuPont's claims, the *Leach* case was filed against DuPont in August 2001 (not April as claimed by DuPont) and *none* of the Plaintiffs in this case were among the Plaintiffs in the *Leach* case nor, as discussed below, were any of them included within the scope of the class that was eventually certified in that case.  (*See* Ex. 3, *Leach* Am. Complaint at 1.)

DuPont's representation to this Court that all Parkersburg water customers were allegedly within the scope of the *Leach* class until Plaintiffs' counsel secured some "modification" or change to the class definition to "carve out" the City's water customers from the class is false.  First, there was no "modification" or "change" to the *Leach* class definition, as claimed by DuPont.  As DuPont notes, the issue of whether Parkersburg water customers fell within the *Leach* class definition first arose in connection with DuPont's attempt in 2003 to disqualify Judge Hill because DuPont claimed that he was somehow a member of the class as a Parkersburg water customer.  Yet, the court accepted DuPont's proposed meaning of "contaminated" in the class definition as meaning only those water supplies with quantifiable levels of PFOA:

> The Court rejected DuPont's request to redefine the class after plaintiffs agreed that they would not dispute DuPont's interpretation of the existing class definition's reference to "contaminated" water as including only water where C-8 is present above "quantifiable" levels, and plaintiffs agreed not to dispute DuPont's own water sampling results confirming that C-8 was not present in the city of Parkersburg water supply, after treatment, at "quantifiable levels."  In order to clarify that point, *this Court hereby **FINDS** that water is "contaminated" with C-8 within the Court's original, existing April 10, 2002, definition of the class if the water contains "quantifiable" levels of C-8*.

3

> Consequently, because plaintiffs have agreed not to dispute DuPont's claims that the city of Parkersburg water supply does not contain quantifiable levels of C-8 after treatment, this Court further **FINDS** that such water is not, therefore, "contaminated" water within the meaning of the existing definition of the class.

(Ex. 4, June 26, 2003 *Leach* Order at 4 (emphasis added).)  Thus, the existing class definition did not include Parkersburg city water customers, because existing sampling data indicated that the City's finished water did not contain quantifiable levels of PFOA and therefore was not "contaminated with C-8" within the existing class definition.[1]

### D.  Prior to the October 2005 Sampling Results, Media Coverage Never Indicated a Problem With PFOA in the City of Parkersburg's Drinking Water.

DuPont also seriously misrepresents the scope of media coverage relating to any PFOA contamination in the Parkersburg city water.  DuPont alleges there have been *hundreds* of stories in the media relating to the "local" PFOA contamination.  By use of the general term "local," DuPont attempts to mislead the Court.  DuPont lists at least 66 articles, and refers to "hundreds" more,[2] that allegedly discuss "local" PFOA contamination.  In reality, those articles discuss PFOA contamination in *communities other than Parkersburg*—such as Little Hocking, Lubeck, and other communities downstream from the DuPont plant.  DuPont's misleading attempt to merge coverage of those other communities into coverage relating to Parkersburg is, at best, untrue, and must be rejected.[3]  Instead, only a handful of media stories actually addressed the

---

[1] DuPont's representation to this Court that Plaintiffs' counsel had "clearly considered" Judge Hill to be a member of the *Leach* Class by virtue of his use of the City of Parkersburg's water supply is simply false. As indicated by the language actually quoted by DuPont from the Briefs submitted by Plaintiffs' counsel in *Leach*, Plaintiffs' counsel simply referred to the existence of the City of Parkersburg's water sampling data, DuPont's knowledge of that data, and what had been reported in the media with respect to that data.  Plaintiffs' counsel *did not* assert that Judge Hill was in fact a Class member or that *any* customer of the City of Parkersburg was or had been ever a member of the *Leach* Class.

[2] Although DuPont provides a list of articles, it conveniently fails to attach the actual articles which would demonstrate that the articles do not stand for what DuPont alleges.

[3] DuPont's representation to the Court that "plaintiffs' counsel has previously conceded" in its July 16, 2003 brief to the West Virginia Supreme Court in *Leach* that this limited media coverage of what had been found in the Parkersburg water supply in 2002 was sufficient to show that "plaintiffs knew or should

Parkersburg city water, and those stories never indicated any potential risk of injury or harm to the city's consumers.  In fact, those stories minimized the non-quantifiable traces of PFOA in the Parkersburg water.[4]

Moreover, DuPont conveniently omits from its chronology of media coverage any reference to the numerous newspaper articles and other media coverage announcing that the C-8 Assessment Of Toxicity Team ("CAT Team"), funded and created by DuPont and the West Virginia Department of Environmental Protection ("WVDEP"), announced in May 2002 a 150 ppb safety standard for PFOA in drinking water, which was then referenced repeatedly in the

---

have known enough to 'excite their attention' or 'raise suspicions' regarding their claims well in advance of May 23, 2004" is false.  Plaintiffs' counsel said nothing of the sort.  In fact, Plaintiffs' counsel expressly noted that the media coverage at issue led the public to believe that nothing more than a "trace" of PFOA had been found in a Parkersburg water well with "no evidence of the chemical" being found in the water "going out of the plant" "after treatment."  (DuPont Memo., Ex. 17 at 5-6.)

[4] "I really don't see any immediate danger.  Our water is really good."  (Ex. 5, *C8 Traces Found*, The Parkersburg News, March 28, 2002.(quoting Parkersburg Mayor Jimmy Columbo)).  "The amount is 'very, very low,' said David Watkins, groundwater program manager for the state environmental protection division.  The state for the time being will not do further sampling until health limits are set for human exposure, he said.  'At this time we don't see any reason to continue [testing],' he said."  (*Id.*)

"Because of the very small amount, the state is not recommending any additional testing."  (Ex. 6, *Trace of C8 in Parkersburg water*, The Marietta Times, March 28, 2002 (quoting Clarence Cox, Parkersburg utility board manager).)  "Fortunately for us, it is having no impact on us, which is good for Parkersburg."  (*Id.* (quoting Cox).)

"Public water systems in the area had no violations of reportable contaminants in the past year, according to the latest water quality reports."  (Ex. 7, *Area water systems get clean bill in latest reports*, The Parkersburg Sentinel, June 24, 2003.)  "For quality, I would put our water with the best quality water in West Virginia, either one or two.  Our pretreatment process will take 99.9 percent of the impurities out of the water."  (*Id* (quoting Parkersburg Mayor Jimmy Columbo).)

"[T]he Parkersburg water system has no detectable levels of C8."  (Ex. 8, *Luigino's nixes plans for $36 million frozen food plant*, The Parkersburg News and Sentinel, March 21, 2003.)

"C8 is a non-issue, [Wood County Commission President Rick Modesitt] said.  The site has no contamination and Parkersburg water is safe and free of the compound, Modesitt said. . . .  'We don't have contaminated water,' said Clarence Cox, manager of the Parkersburg Utility Board."  (Ex. 9, *Colombo seeks another buyer for land after Luigino's pullout*, The Parkersburg News and Sentinel, March 22, 2003.)

media as a basis to tell everyone that any amount of PFOA in any drinking water supply less than

150 ppb was perfectly safe and presented no risks whatsoever.[5]

### E.  DuPont, Itself, Has Vigorously Maintained to the Public (and to These Plaintiffs) That the Levels of PFOA in Parkersburg's Water Are "Safe."

DuPont also fails to disclose to the Court that, during the years before testing revealed

quantifiable levels of PFOA in Parkersburg's water in 2005, the media coverage that *did* exist

and was even potentially available to the Plaintiffs contained numerous, repeated representations

by *DuPont itself* that PFOA, even at levels more than *three thousand times higher* than

Parkersburg's 2002 sampled levels, was perfectly "safe" and would provide absolutely no basis

for believing there is *any* risk of harm or any concerns whatsoever.[6]

---

[5] "It was determined a water level containing less than 150 parts per billion of C8 would not cause harm to humans, said Dee Ann Staats, Ph.D., science adviser for the West Virginia Department of Environmental Protection."  (Ex. 10, *C8 safety limits set by experts: DuPont levels well below parameters*, The Parkersburg News, May 10, 2002.)  "We brought together some of the best scientists in the country.  I am confident the human health protective levels established by the team are supported by the data.  These findings should bring comfort to the citizens of the Wood and Mason counties."  (*Id.* (quoting Dr. Henry G. Taylor, state health officer and commissioner of the Bureau for Public Health).

"I feel comfortable that the number [150 ppb] is rock solid.  I feel confident that this is a good health protective number because all 10 toxicologists were able to come to a consensus on that number.  I feel that this will give residents confidence that their water is safe."  (Ex. 11, *Acceptable level for C8 set: Amounts found in area water supplies not considered dangerous*, The Marietta Times, May 10, 2002 (quoting Dr. Dee Ann Staats, Ph.D., science advisor for WVDEP).)

"The highest number recorded from any of the [Little Hocking] water association's wells was 10.10 ppb, still well below the 150 ppb considered to be the safe level established by West Virginia health officials and recognized by the Ohio EPA."  (Ex. 12, *New high in levels of C8 worries water customers*, The Marietta Times, Apr. 28, 2004.)

"[T]he [WVDEP], the West Virginia Department of Health and Human Resources, and DuPont determined that the protective safety level for oral exposure to C8 in drinking water should not exceed 150 parts per billion. . . .  [T]his level of daily exposure to the human population, including sensitive subpopulations, is not likely to result in detrimental health effects over a lifetime."  (Ex. 13, *Examining the water we drink: Concerns about C8 linger*, The Marietta Times, Sept. 27, 2003.)

[6] "The more we study PFOA (another name for C8), the more confident we are in our conclusions that PFOA is safe."  (Ex. 14, *DuPont disputes study that links C8 to cancer risk*, The Marietta Times, May 6, 2004 (quoting Robert Rickard, DuPont lead toxicologist).)

"It is our belief that there are no health effects associated with PFOA."  (Ex. 15, *DuPont to launch $1M C8 study*, The Parkersburg News and Sentinel, Apr. 30, 2004 (quoting DuPont's Dr. Rickard).)

"In 50 years there have been no known adverse human health effects.  We are confident PFOA poses no danger to the public at current levels based on scientific evidence."  (Ex. 16, *EPA hears from local citizens*, The Marietta Times, June 7, 2003 (quoting DuPont Global Vice President Dr. Uma Chowdry).)

Thus, even if Plaintiffs had access to all of the pervasive media coverage DuPont describes (but does not attach as evidence) and had actually read or seen it, that coverage included repeated, emphatic representations by DuPont, the WVDEP, and local government officials that whatever trace amount of PFOA that might have been present in the Parkersburg's water supply in 2002 was *thousands of times less* than any potential level of concern and did not provide a basis for any potential risks or concerns of any kind.[7]

### F. Prior to the October 2005 Sampling Results, the Named Plaintiffs Lacked Knowledge of Any PFOA Contamination in the Parkersburg Finished Water.

Perhaps most troubling, however, is DuPont's gross distortion and misrepresentation of the Plaintiffs' actual sworn testimony in this case as to what they actually were aware of and when they actually became aware of it. As discussed below, DuPont's claims that all three Plaintiffs in this case "actually knew of their alleged claims against DuPont for more than two years prior to the Complaint being filed" (DuPont's Motion at 2) and that "Plaintiffs knew, or

---

"We have over the years tested samples from our employees for C8 and we have been able to show no adverse effects." (Ex. 17, *DuPont officials file a request to protect its medical records*, The Marietta Times, May 17, 2003 (quoting Steve Fennell, attorney for DuPont).)

"The bottom line is that we have factual data that indicate that the highest blood levels are in DuPont employees who work in the C8 area, and we know that there have been no adverse health effects seen in those employees." (Ex. 18, *DuPont criticizes report from Little Hocking residents*, The Parkersburg News and Sentinel, March 8, 2003 (quoting Paul Bossert, DuPont Washington Works Plant Manager).) "We have every confidence that our operation at Washington Works is safe for our employees and neighbors in the community." (*Id.* (quoting DuPont's Dr. Rickard).)

"Based on internal scientific research, DuPont officials now claim the man-made substance presents no harm to humans." (Ex. 13.)

"DuPont officials contend that over five decades of handling the chemical, they have found no harmful health effects for humans." (Ex. 19, *Federal agencies press for inventory of products with C8*, The Marietta Times, June 21, 2003.)

[7] DuPont's suggestion that Plaintiffs' expert, Dr. Gray, somehow generated information prior to the May 23, 2004, date at issue here (or prior to the filing of the Complaint herein in 2006) sufficiently alerting the Plaintiffs or their counsel that the non-quantifiable levels of PFOA found in the Parkersburg City finished water in 2002 were harmful is misleading and disingenuous, at best. Although Dr. Gray began working with Plaintiffs' counsel in 2002, the 0.02 ppb "health protective drinking water criterion" DuPont refers to was set forth by Dr. Gray in his *November 13, 2007,* expert report prepared for this case, which was generated over a year *after* this case was filed. Given that this point is confirmed in the very deposition transcript excerpts that DuPont, itself, cites to this Court, DuPont's misleading and inaccurate characterization of those facts to this Court is very troubling. (*See* DuPont's Ex. 18, at 25.)

should have known, of their claims as early as 2001" (*id.* at 4) are simply not true and not supported by the evidence.

**1. Valori Mace did not know of her claims until 2006**.

Nothing in Ms. Mace's testimony supports DuPont's assertions that Ms. Mace knew or should have known of her potential claim anytime prior to the year 2006. Although Ms. Mace was somewhat familiar with the *Leach* case and PFOA contamination in Lubeck, this general knowledge pertaining to a different community is irrelevant to what she knew about the Parkersburg water supply. Ms. Mace expressly testified that she was not aware that PFOA was found in Parkersburg city water until she saw a WTAP TV news segment sometime in early 2006 reporting on the October 2005 sampling results of the Parkersburg city water. (Ex. 20, Mace Dep. 129:7-14, 130:20-131:8, 484:3-14; Ex. 21, Mace Aff. ¶¶ 4, 11, 16, 17.) Nothing she read, saw, or heard in the news media prior to the week preceding May 8, 2006, gave her any reason to believe that she may have a claim against DuPont for personal injury, property damage, or medical monitoring due to exposure to Parkersburg city water. (Mace Aff. ¶¶ 14-17.) While DuPont states that Ms. Mace followed *Leach* because she was "concerned and curious" (DuPont's Memo. at 8), DuPont omits that her concern arose from the fact that she knew several people who lived in Lubeck and were exposed to the PFOA tainted water in that other community. (Mace Aff. ¶ 20.)

Moreover, DuPont's contention that Ms. Mace "researched PFOA on the internet" beginning in 2001 is an overstatement. At most, she had "possibly popped in C-8 [on the Internet] to see what would come up and read a little bit" but that she did not recall what she had read. (Mace Dep. 354:13-355:8; Mace Aff. ¶ 18.)

DuPont's assertion that Ms. Mace retained Mr. Deitzler in 2003 to file the instant Parkersburg claims is similar fiction.  Ms. Mace talked to Mr. Deitzler at a Chamber of Commerce BBQ,[8] but that discussion did not relate to contamination in the Parkersburg city water.  (*Id.* ¶¶ 3-12.)[9]  This conversation did not include discussion of claims arising from contamination in Parkersburg city water because, at the alleged time of the conversation, Ms. Mace was not aware of any contamination in the Parkersburg city water.  (Mace Dep. 128:3-15, 129:7-14, 130:20-131:8, 484:3-14; Mace Aff. ¶¶ 4-12.)

**2.   William Rhodes did not know of his claims until 2006.**

DuPont says that Mr. Rhodes knew or should have known of PFOA in his drinking water "sometime between January and April 2002" due to his reading newspaper articles discussing the *Leach* case and the Lubeck water supply.  (DuPont's Motion at 11.)  However, Mr. Rhodes was (repeatedly) clear in his testimony that his knowledge of PFOA contamination was limited to the Lubeck water supply.  (Ex. 22, Rhodes Dep. 23:2-24:14, 274:11-16; Ex. 23, Rhodes Aff. ¶¶ 2, 8-9.)  He was equally clear that he had no knowledge of contamination in the Parkersburg city water until 2006.  (Rhodes Dep. 23:2-24:14, 96:6-21, 274:11-16; Rhodes Aff. ¶¶ 2-4, 7-10.)

DuPont inaccurately suggests to this Court that Mr. Rhodes was drinking bottled water "since approximately 2000, motivated in part by his concerns over PFOA in the PUB [Parkersburg City] water supply."  (DuPont's Memo. at 11.)  Mr. Rhodes explained multiple times in his deposition that he started drinking bottled water in 2000 "because of the chlorine

---

[8]  It is unclear what year this conversation took place, as Ms. Mace and Mr. Deitzler met and talked at several Chamber annual BBQs.  Ms. Mace believed this specific conversation occurred in 2005.  (Mace Dep. 268:17.)

[9]  Instead, that conversation dealt with two separate issues: (1) potential claims for employees of CGM, Ms. Mace's father's company, who were working at or near the DuPont Washington Works facility (Mace Aff. at. ¶¶ 5, 7); and (2) legal matters relating to PFOA and the death of Ms. Mace's sister, Kathi, who died of Renal Cell Carcinoma and at the time of her death her doctors asked about living near a chemical dump yard (*id.* ¶¶ 6-7; Mace Dep. 134:2-17).

taste," not because of any concerns or alleged awareness of potential claims arising from any *PFOA* being in his drinking water.  (Rhodes Dep. 158:14-159:7; Rhodes Aff. ¶ 10.)  News of contamination in the Lubeck water supply, if anything, only confirmed that his practice of drinking bottled water was a good idea.  (*Id.*)

### 3.  Russell Miller did not know of his claims until 2006.

DuPont's discussion of Mr. Miller's testimony is particularly misleading and troubling. As for information from the *Tennant* case, Mr. Miller testified simply that he was aware of the case and that it involved some cows that were dying near "a dump or something."  (Ex. 24, Miller Dep. 214-215; Ex. 25, Miller Aff. ¶ 2.)  Nothing in the *Tennant* case caused Mr. Miller to have any reason to believe that DuPont had contaminated Parkersburg's city water with PFOA or any other pollutant.  (*Id.*)

As for his discussions with his daughter, Mr. Miller made clear in his deposition that he was referring to what he had heard about PFOA in the *Little Hocking, Ohio* water supply where his daughter was considering purchasing a house – *not* Parkersburg.  (Miller Dep. at 368:18-369:3, 402:14-19; Miller Aff. ¶ 5.)

Mr. Miller further testified that he did *not* regularly read or watch the news and did not actually recall seeing a single television story or recall reading a single story on the topic, even after he learned that PFOA was actually in the Parkersburg water supply.  (Miller Dep. 33:6-23.) Further, he was not aware prior to May 2006 of PFOA in the Parkersburg city water in any amount that could create a health concern or property damage problem.  (Miller Aff. ¶ 3,4, 9-13; Miller Dep. at 402:14-19.)  In fact, he believed PFOA contamination in Parkersburg was unlikely due to its location significantly upstream from the DuPont plant.  (Miller Aff. ¶ 3.)

### G.  DuPont Continues to Emit PFOA From Its Washington Works Plant.

Finally, DuPont continues to emit PFOA from its Washington Works Plant. (Ex. 2; *see also* DuPont's Answer to 2nd Am. Compl. (Doc. No. 270) at ¶¶ 12, 48, 57 ("DuPont also admits that it emits ... PFOA into the air" from its Washington Works Plant); Ex. 26, DuPont's 10/31/08 report to USEPA confirming releases of PFOA into air and water from the Plant in 2007.)

## II.  STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.  ARGUMENT

Not only is DuPont's motion based upon false and misleading factual representations, as set forth above, but it is also based on inaccurate and inapplicable legal doctrines.  First, despite DuPont's complete failure to even reference the continuing tort doctrine, that doctrine applies here to toll any applicable statute of limitations, because the Plaintiffs continue to suffer injury and DuPont continues its tortious acts and omissions that give rise to the Plaintiffs' claims.  Second, even absent the continuing tort doctrine, the statute of limitations did not begin to run until early 2006, when Plaintiffs first learned of their claims using reasonable diligence.  For these two, independent reasons, DuPont's statute of limitations defense does not bar any of the Plaintiffs' claims.

### A. The Continuing Tort Doctrine Tolls the Statute of Limitations Here.

DuPont omits any discussion of the continuing tort doctrine in its summary judgment motion or memorandum.  Its silence speaks volumes.  In West Virginia, the continuing tort doctrine provides that "[w]here a tort involves a continuing or repeated injury, the cause of action accrues at and the statute of limitations begins to run from the date of the last injury or when the tortious overt acts or omissions cease."  *Graham v. Beverage*, 566 S.E.2d 603, 606 (W. Va. 2002).  Here, the last injury has yet to occur and the tortious acts or omissions have yet to cease.  Thus, the statute of limitations governing the Plaintiffs' claim has not began to run.

West Virginia courts consistently apply this doctrine in connection with tort claims based on environmental contamination.  *See, e.g.*, *Taylor v. Culloden Pub. Serv. Dist.*, 591 S.E.2d 197 (W. Va. 2003); *State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*, 488 S.E.2d 901 (W. Va. 1997).  In *Taylor*, the owner/operator of a wastewater treatment facility continuously dumped untreated sewage into Indian Creek Fork, causing damage to adjacent property owned by the plaintiffs.  Although the plaintiffs knew of the facility's tortious conduct as early as 1974, it was not until 1999 that the plaintiffs first asserted legal claims, including nuisance and trespass, against the treatment facility.  Reversing the trial court's summary judgment ruling dismissing the claims on statute of limitations grounds, the court applied the continuing tort doctrine and rejected the defendant's statute of limitations argument, explaining that "the temporary nuisance continues until such time as those acts are abated or discontinued." 591 S.E.2d at 205.  Thus, the statute of limitations did not run until the nuisance was abated.  *Id.*

In *Kermit*, the WVDEP brought a civil suit against a lumber treatment company who had released hazardous waste on a site it had abandoned several years prior to the filing of the suit. The WVDEP sought to compel clean-up of the site and sought civil penalties and damages for

statutory violations and under a public nuisance theory.  The West Virginia Supreme Court

rejected the statute of limitations defense, explaining that:

> As long as the arsenic remains on the Kermit Lumber business site in amounts
> above the regulatory limits and as long as the arsenic is flowing into the Tug Fork
> River, the harm or nuisance continues and thus, is a continuing (or temporary)
> nuisance.  It is inconceivable that the arsenic caused all the damage it could prior
> to 1988 when the [lessee] vacated the business site.

*Kermit*, 488 S.E.2d at 925; *see also Patrick v. Sharon Steel Corp.*, 549 F. Supp. 1259, 1264

(N.D.W. Va. 1982) (applying the continuing tort doctrine to toll the statute of limitations for

personal injury and property damage claims based on the defendant steel corporation's operation

of its coke works facility).

Here, as in *Taylor* and *Kermit*, the Plaintiffs continue to suffer injury and DuPont

continues its tortious acts and omissions that give rise to the Plaintiffs' claims.  First, the

available sampling results indicate that PFOA remains (and is actually increasing) in the

Parkersburg city drinking water, continuing to expose the Plaintiffs and their properties to PFOA

contamination.  (*See* DuPont Memo., Ex. 2.)  Second, the evidence indicates (and DuPont does

not dispute) that DuPont continues to release and emit PFOA in the river and in the air,

continuing its tortious conduct.  (*See* Ex. 2; DuPont's Answer to 2nd Am. Compl. (Doc. No. 270)

at ¶¶ 12, 48, 57; Ex. 26.)  Moreover, DuPont's continuing refusal to remediate the PFOA in the

Parkersburg city water supply is a continuing omission.[10]

---

[10]  Likewise, any argument DuPont would make that the Plaintiffs' nuisance injuries are permanent (as
opposed to temporary) would be disingenuous.  The crucial distinction between a "permanent" and
"continuing" (temporary) nuisance "is whether the nuisance may be discontinued or abated."  *Kermit*, 488
S.E.2d at 924-25 (finding that the continued release of arsenic from the site constituted a temporary,
continuing nuisance); *see also Taylor*, 591 S.E.2d at 204-05 (finding that the waste water treatment
facility's continued release was a temporary, continuing nuisance).  Here, like in *Kermit* and *Taylor*,
DuPont's continuing release of PFOA and refusal to remediate the Parkersburg city water supply
constitutes a temporary, continuing nuisance.  DuPont's nuisance is abatable.  In fact, as part of the
*Leach* class action settlement, DuPont agreed to abate the nuisance for the *Leach* class members,
proving that the nuisance is indeed abatable.

Because the Plaintiffs continue to suffer injury and DuPont continues its tortious acts and omissions that give rise to the Plaintiffs' claims, the continuing tort doctrine applies here, tolling accrual of the applicable statute of limitations so long as the Plaintiffs suffer injury and DuPont refuses to cease its tortious acts and omissions.

> **B.  Even Absent the Continuing Tort Doctrine, the Statute of Limitations Would Not Have Begun to Run Until Early 2006, When the Plaintiffs First Learned of Their Claims.**

DuPont focuses its statute of limitations argument exclusively on when the Plaintiffs first obtained knowledge of their claims, incorrectly asserting that Plaintiffs knew of their exposure to appreciable PFOA levels as early as 2001.  In doing so, DuPont misrepresents and manipulates facts, documents, and deposition testimony.  No one knew of any quantifiable levels of PFOA in the Parkersburg finished drinking water prior to October 2005, when, for the first time, testing identified quantifiable amounts of PFOA in samples of the Parkersburg finished water. Moreover, these tests were not made public until a WTAP TV news report in early 2006.  Before then Plaintiffs had no indication of appreciable levels of PFOA in the Parkersburg drinking water, and thus had no indication of any possible risk of harm, personal injury, or property damage or the need for medical monitoring due to their PFOA exposure.

In tort actions, under the discovery rule, the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence, should know that the plaintiff has been injured.  *Davey v. Estate of Haggerty*, 637 S.E.2d 350, 354 (W. Va. 2006).[11]  This rule "tolls the statute of limitations until a plaintiff, acting as a reasonable, diligent person, discovers

---

[11]  West Virginia courts require even greater knowledge on behalf of a plaintiff prior to the accrual of medical monitoring claims.  Specifically, "a medical monitoring cause of action accrues when a plaintiff knows, or by the exercise of reasonable diligence should know, that he or she has a *significantly increased risk of contracting a particular disease due to significant exposure to a proven hazardous substance* . . . ."  *State v. Madden*, 607 S.E.2d 772, 785 (W. Va. 2004) (emphasis added).  For all the same reasons why the Plaintiffs' non-medical monitoring claims have not accrued (as set forth in this brief), these reasons apply with greater force to Plaintiffs' medical monitoring claims, given the stricter standard.  DuPont makes no mention of this increased standard.

the essential elements of a possible cause of action, that is, discovers duty, breach, causation and injury." *Id.* (quotation omitted). The law only requires plaintiffs to exercise *reasonable* diligence in obtaining knowledge of the injury. *Id.* (reversing summary judgment based on statute of limitations). And although plaintiffs have a duty to "investigate the facts" surrounding their injury (*see* DuPont's Memo. at 7), such duty does not and cannot arise until plaintiffs have obtained knowledge of the injury through the exercise of reasonable diligence.

Moreover, in actions for personal injury or property damage caused or contributed to by exposure to any hazardous substance, pollutant, or contaminant released into the environment from a facility, the federally required commencement date ("FRCD") applies if it is later than the state mandated commencement date. *See* 42 U.S.C. § 9658(a)(1). The FRCD incorporates a discovery rule in which the applicable two-year statute of limitations does not accrue until "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages . . . were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." *Id.* at § 9658(b)(4)(A). Importantly, under the FRCD, the showing of mere "reasonable suspicion" is insufficient to trigger the running of the statute. *Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176, 208 (2d Cir. 2002) (finding that the mere existence of public controversy regarding the health effects related to contaminants emitted from a landfill, creating "suspicion" as to whether plaintiffs had personal injury claims, was insufficient to trigger the running of the statute); *see also O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1148 (9th Cir. 2002) ("the federal standard requires more than suspicion alone.").

The relevant factual question for the discovery rule is at what point should the Plaintiffs have obtained knowledge, by use of reasonable diligence, of *their* injuries caused by sufficient levels of PFOA in the Parkersburg drinking water. This is a question of fact. As set forth

below, the Plaintiffs could not have known of their injuries prior to May 2004 because (1) levels of PFOA sufficient to constitute injury were not identified in the Parkersburg finished drinking water until 2005; (2) the pre-2005 PFOA levels in Parkersburg finished drinking water were insufficient to constitute "contamination;" (3) the Plaintiffs' knowledge of PFOA contamination in the water supplies of communities downstream is insufficient to constitute knowledge of contamination in the Parkersburg finished drinking water; and (4) prior to 2006, the Plaintiffs were consistently informed by allegedly knowledgeable sources (including DuPont, city and state officials, and the news media) that they were safe from any injury or harm relating to PFOA.  At the very least, this evidence creates an issue of material fact as to when the Plaintiffs knew or should have known of their injuries due to PFOA in the Parkersburg finished drinking water.  As such, DuPont's motion for summary judgment must be denied.

### 1.  The evidence demonstrates that prior to 2005, there was no known quantifiable level of PFOA in the Parkersburg finished drinking water.

The Parkersburg city water was first tested for PFOA in March 2002 (and again in April 2002).  The 2002 tests identified only trace, non-quantifiable amounts of PFOA in the Parkersburg finished drinking water.  (*See* Statement of Facts § A., *supra*.)  The trace amounts attracted little attention—as compared to other communities, like Lubeck and Little Hocking, where PFOA levels were higher and quantifiable—as the local newspapers reported that "tests on treated water in Parkersburg do not show detectable concentrations from the Plant" and that there is "no evidence of the chemical" in the water delivered by the city to its customers.  (Exs. 5-6.)  As DuPont concedes, no further testing occurred in Parkersburg until October 2005. (Dupont Memo., Ex. 2.)

The first quantifiable level of PFOA in the Parkersburg finished water was not discovered until *October 2005* (and again in December 2005), when the City of Parkersburg tested its

finished water and found PFOA levels at 0.079 ppb.  (*Id.*)  *These tests were the first results*
*indicating quantifiable levels of PFOA in the Parkersburg finished drinking water.*  On May 23,
2006, only seven months after the first quantifiable test result in October 2005 and only weeks
after the results were first made the public, the Plaintiffs timely filed this case.

> **2.      The non-quantifiable levels of PFOA prior to 2005 were insufficient to put
> Plaintiffs on notice of their injuries.**

The mere knowledge of detectable, but non-quantifiable, traces of PFOA in the
Parkersburg finished water was insufficient to put a reasonable plaintiff on notice of an injury to
person or property.[12]  Instead, "a plaintiff's claims accrue when it first knows of both (1) the
presence of [the chemical at issue] *at a level sufficient to constitute an injury* and (2) the harmful
impact of [that chemical] on drinking water."  *Id.* (emphasis added).  Until the contaminant is at
a level sufficient to constitute an injury, there is no appreciable harm, and the statute of
limitations does not accrue.

In *In re MTBE*, the Court ruled that the appropriate standard to measure the level of
contamination sufficient to trigger the statute of limitations was the maximum contaminant level
established by the state environmental agency.  2007 WL 1601491 at *7.  Here, the only
arguably applicable West Virginia "standard" that existed during the time period in question for
PFOA in drinking water was the 150 ppb level announced by DuPont/WVDEP CAT Team in
May 2002, as an amount below which there was allegedly no risk of any harm whatsoever.  (*See*
Exs. 10-13.)  The 150 ppb standard was highly publicized to all residents around the DuPont

---

[12] Indeed, this very issue has been addressed repeatedly by New York state and federal courts.  *See
Aiken v. Gen. Elec. Co.*, 869 N.Y.S.2d 863, 2008 N.Y. App. Div. LEXIS 9212 (N.Y. App. Div. 2008); *In re
Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig.*, 2007 WL 1601491 (S.D.N.Y. June 4, 2007); *In
re MTBE Products Liab. Litig.*, 475 F. Supp. 2d 286 (S.D.N.Y. 2006); *Atkins v. Exxon Mobil Corp.*, 780
N.Y.S.2d 666 (N.Y. App. Div. 2004).  In the context of the statute of limitations applicable there, those
courts held that "the mere detection of [the contaminant] in wells at very low levels would not make a
reasonable person aware of a legally-cognizable injury sufficient to trigger the statute of limitations."  *In re
MTBE*, 2007 WL 1601491 at *6.

N of 21

plant, including Parkersburg residents.  (*Id.*)  In contrast, the 2002 non-quantifiable amounts (less than 0.05 ppb) measured in the Parkersburg finished drinking water were at least ***three thousand times less than*** the state's heavily-publicized 150 ppb safety standard.  Clearly, in this context, the non-quantifiable levels reported to have been detected in the Parkersburg water supply were insufficient to put a reasonable plaintiff on notice of any possible personal injury or property damage arising from their exposure to such water.[13]

### 3.    Prior to 2006, the Plaintiffs were unaware of PFOA contamination in Parkersburg city water.

The Court should reject DuPont's misleading attempt to link the Plaintiffs' general knowledge of the *Leach* case and PFOA contamination in Lubeck, Little Hocking, and other downstream communities to their knowledge of contamination in the *Parkersburg* finished water.  Otherwise, Plaintiffs would be wrongfully charged with knowledge of PFOA problems based on the fact that downstream communities had such problems, despite the fact that all the available information (from DuPont, city and state officials, and the news media) indicated no problems in Parkersburg, located "upstream" of the DuPont plant.

The evidence instead shows that, although Plaintiffs obtained some general knowledge relating to these downstream communities, they were not aware of any PFOA problems in the Parkersburg city water until such problems were first reported in Spring 2006 (based on the 2005 sampling results).  (Ex. 20, Mace Dep. at 129:7-14, 130:20-131:8, 484:3-14; Ex. 21, Mace Aff. ¶¶ 4, 11, 16, 17; Ex. 22, Rhodes Dep. at 23:2-24:14, 96:6-21, 274:11-16; Ex. 23, Rhodes Aff. ¶¶ 2-4, 7-10; Ex. 24, Miller Aff. ¶ 3,4, 9-13; Ex. 25, Miller Dep. at 402:14-19.)  Indeed, DuPont

---

[13] Moreover, in the *Leach* case, DuPont fully litigated the issue of what level of PFOA constitutes "contamination" of finished drinking water.  There, the *Leach* court ruled that water was not considered "contaminated" unless the PFOA levels were quantifiable (at least 0.05 ppb).  As such, the court ruled that Parkersburg's finished water was not contaminated.  (Ex. 4.)  This ruling, including the definition of contamination, was also reported in the local media.

fails to submit any evidence that the Plaintiffs knew about—or were even concerned with the

possibility of—PFOA contamination in Parkersburg city water prior to 2006.  Instead, DuPont

relies only upon evidence that Plaintiffs somewhat followed the *Leach* case, not out of concern

of possible exposure in Parkersburg, but out of mere "curiosity," or perhaps concern for friends

or family members who actually lived (or considered moving to) one of the affected downstream

communities.  (Ex. 21, Mace Aff. ¶ 20; Ex. 24, Miller Dep. at 368:18-369:3, 402:14-19; Ex. 25,

Miller Aff. ¶ 5.)  This is a basic, yet crucially relevant distinction that DuPont ignores.

Knowledge of contamination downstream is *not* knowledge of contamination in Parkersburg.

> **4.    Prior to 2005, Plaintiffs were consistently and repeatedly informed by the
> news media and by DuPont that they had not suffered any injury due to
> PFOA contamination.**

Finally, Plaintiffs could not reasonably have known of their claims due to unsafe

exposure to PFOA in Parkersburg finished drinking water.  This is especially true when all

allegedly knowledgeable sources (including DuPont, city and state officials, and the news media)

repeatedly represented to the public that, given the non-quantifiable PFOA levels in the city's

drinking water, the Parkersburg's water customers were perfectly "safe" from any risk of harm

or any concerns whatsoever.[14]

Inundated with information from the supposedly knowledgeable sources, all indicating

no problems with Parkersburg's finished water and no risk of harm or injury from consumption

---

[14] *See, e.g., LaSalle Bank Nat'l Assoc. v. Lehman Brothers Holdings, Inc.*, 237 F. Supp. 2d 618 (D. Md. 2002) (no inquiry notice when one of referenced reports proposed no further action for soil or groundwater contaminants); *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 661 (S.D. Ala. 2005) (holding that the FRCD standard requires a plaintiff to possess notice of contamination sufficient to cause the plaintiff to disbelieve any further misrepresentations by the defendant about the contamination). Specifically, prior to Spring 2006, the news media coverage and City officials repeatedly assured everyone that there were no PFOA problems in Parkersburg. (*See* Statement of Facts § D., *supra* (quoting Exs. 5-13).)  In May 2002, the DuPont/WVDEP CAT Team announced a PFOA drinking water safety standard of 150 ppb. (*Id.* (quoting Exs. 10-13).)  Moreover, DuPont itself has always publicly maintained that PFOA-contaminated drinking water, even at levels at least *three thousand times higher* than Parkersburg's 2002 levels, is perfectly "safe" and provides no basis to reasonably believe there was any risk of harm or concern.  (*See* Statement of Facts § E, *supra* (quoting Exs. 13-19).)

of such water, Plaintiffs cannot be held to have reasonably known of their claims prior to 2006 (let alone, prior to May 23, 2004, two years prior to the filing of the Complaint). Again, at the very least, this is a disputed factual question, making summary judgment inappropriate here.

### 5. Plaintiffs' lawyers also lacked knowledge of sufficient, quantifiable levels of PFOA prior to 2005.

DuPont's attempt to attribute to Plaintiffs their lawyers' knowledge of PFOA contamination in the Parkersburg finished water supply sufficient to run the statute of limitations also fails. First, Plaintiffs' lawyers did not acquire any knowledge of any such contamination of the Parkersburg water supply until the October 2005 sampling results were disclosed suggesting sufficient, quantifiable levels in the finished water for the first time. Second, Plaintiffs did not hire their lawyers until May 8, 2006. (Ex. 21, Mace Aff. ¶ 2; Ex. 23, Rhodes Aff. ¶ 6; Ex. 25, Miller Aff. ¶ 8.) As such, Plaintiffs could not have obtained knowledge from their lawyers prior to that date (even if their lawyers had such knowledge).

### IV.    Conclusion

For all of the foregoing reasons, DuPont's motion for summary judgment fails as a matter of law and fact and must be denied.

Respectfully submitted,

**/s R. Edison Hill**
R. Edison Hill (WVSB#1734)                      United Center; 500 Virginia Street, East
Harry G. Deitzler (WVSB#981)                    P.O. Box 2187
Hill, Peterson, Carper,                         Charleston, WV  25328
   Bee & Deitzler, PLLC                    (304) 345-7800
NorthGate Business Park
500 Tracy Way                                   Robert A. Bilott (OSB#046854)
Charleston, WV  25311-1261                      Taft, Stettinius & Hollister LLP
(304) 345-5667                                  425 Walnut Street, Suite 1800
                                                Cincinnati, OH  45202
Larry A. Winter (WVSB#4094)                     Telephone:  (513) 381-3828
Winter Johnson & Hill PLLC

### CERTIFICATE OF SERVICE

I, R. Edison Hill, hereby certify that on April 22nd, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Nathan B. Atkinson, Esq. | natkinson@spilmanlaw.com |
| Anthony F. Cavanaugh, Esq. | acavanaugh@steptoe.com |
| Mark P. Fitzsimmons, Esq. | mfitzsimmons@steptoe.com |
| Laurence F. Janssen, Esq. | ljanssen@steptoe.com |
| Clifford F. Kinney, Jr., Esq. | ckinney@spilmanlaw.com |
| Niall A. Paul, Esq. | npaul@spilmanlaw.com |
| Jenifer Quinn-Barabanov, Esq. | jquinnba@steptoe.com |
| Libretta P. Stennes, Esq. | lstennes@steptoe.com |

and I hereby certify that I have electronically mailed the document to the following non-CM/ECF

participant:

Douglas G. Green, Esq.                        dgreen@steptoe.com


**/s R. Edison Hill**
R. Edison Hill (WVSB#1734)
Hill, Peterson, Carper, Bee & Deitzler, P.L.L.C.
NorthGate Business Park
500 Tracy Way
Charleston, WV  25311-1261
304-345-5667 (office)
304-345-1519 (fax)
rehill@hpcbd.com

1018000v1