THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
PARKERSBURG DIVISION

**WILLIAM R. RHODES, et al.,**
**Plaintiffs,**

**vs.**
                              **CIVIL ACTION NO. 6:06-0530**
                              **(Judge Joseph R. Goodwin)**

**E.I. DUPONT DE NEMOURS AND COMPANY,**
**Defendant.**

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.      INTRODUCTION

Defendant E.I. du Pont de Nemours & Company's ("DuPont's") Motion for Summary Judgment (the "Motion") should be denied. It is based upon misleading representations of fact, mischaracterizations of Plaintiffs' claims, and an inaccurate and incomplete discussion of the applicable law. Contrary to DuPont's arguments, there is more than sufficient evidence and legal authority to support each of Plaintiffs' claims in this case and each form of relief sought for those claims.

### II.      STATEMENT OF FACTS

**A.      DuPont is a Source of PFOA in the Parkersburg Water Supply and Plaintiffs' Blood.**

Many relevant underlying facts of this case have already been summarized in the parties' class certification briefs, exhibits, and related hearing testimony as well as this Court's June 11 and September 20, 2008 Orders.[1] Those facts will not be repeated in their entirety, but are incorporated by reference.

Since the 1950's, DuPont has used PFOA at its Washington Works Plant in Wood County, West Virginia ("the Plant") and released it into the surrounding environment, including the air, soils and the Ohio River, resulting in contamination of human drinking water supplies. Pl. Memo at 2-3; Pl. Reply at 2-3; 9/08 Op. at 2-3; Affidavit of R. Edison Hill in Support of Plaintiffs' Memorandum in Opposition to

---

[1] *See* Doc. 188 ("Pl. Memo") at 2-10; Doc. 188-1 ("Pl. Br. Ex. _"); Doc. 206 ("Pl. Reply") at 2-12; Doc. 220 ("6/08 Op.") at 2-3; Doc. 246 ("Pl. Post Hrg. Br.") at 5-7, 19-21; Doc. 250 ("Pl. Post Hrg. Reply") at 1-7, 25-27; Doc. 255 ("9/08 Op."). at 2-7; Doc. 276; Doc. 275-2 ("Hill Non-MM Aff."); Doc. 278; and Doc. 277-2.

Defendant's Motion for Summary Judgment ("Hill Aff."), Ex. 8, at 11, Ex. 9, at 30-31, Ex. 20, at 23-38, and Ex. 21, at Section 3. Although DuPont's own Director of Employee Relations had recommended to management as early as 1982 that all "available practical steps be taken to reduce [PFOA] exposure because," among other things, "[t]here is obviously great potential for current or future exposure of members of the local community from emissions leaving the Plant perimeter," DuPont did not do so. *Leach v. E.I. DuPont de Nemours & Co.*, 2002 WL 1270121, slip op. at *4 (W.Va. Cir. Ct. 2002) (April 10, 2002 Order, Pl. Br. Ex. 1). *See also* Hill Aff., Ex. 3 (DuPont's RFA responses in *Leach* case).

By 1984, PFOA was detected in the drinking water of the communities surrounding the Plant but DuPont withheld that information. 9/08 Op. at 3. After the contamination became public, in 2002, DuPont sampled the City of Parkersburg's drinking water supply (the "PWD") and told the community that despite a "trace" of PFOA, sampling of the treated drinking water actually "going out of the plant" "showed no evidence of the chemical." Pl. Br. Ex. 6. In 2006,[2] a Parkersburg newspaper reported that the PWD had retested its water and was surprised to find a quantifiable level of PFOA. *See* Pl. Br. Exs. 19 and 23. Subsequent sampling and analysis of the PWD water has repeatedly confirmed the PFOA in the PWD drinking water supply with ever increasing concentrations. *See* Pl. Br. Ex. 21-22. The most recent data reveals PFOA levels as high as 0.11 ppb in one of the PWD's main production wells, and levels between 0.06 and 0.07 ppb of PFOA at the tap of PWD customers. *See* Hill Non-MM Aff., Ex. 8.

DuPont has admitted that it is a source of the PFOA contaminating the PWD: In 2003, DuPont's own expert[3] co-authored a report with the United States Environmental Protection Agency ("EPA"), the

---

[2] DuPont fails to cite any authority for its statement that "until November 2006, PFOA levels were less than 0.05 ppb." DuPont Mem. at 4. Such statement is also inconsistent with its admission that until "recent developments in the capability of analytical chemistry, it was not even possible to measure" PFOA levels in the drinking water. *Id.* at 2. DuPont also fails to cite any evidence in support of its claim that "it analyzed PUB water in the 1980s for PFOA" and that the "water was non-detect." DuPont Mem. at 3.

[3] DuPont has identified Andrew Hartten, who was the "Principal Project Leader" for the 2003 study and co-author of this 2003 report, *see* Hill Aff., Ex. 8, at 2, as an expert in this case with respect to "environmental conditions around [the Plant], about PFOA emissions and data on and offsite around [the Plant] and about fate and transport." *Id.*, Ex. 7, at 3. DuPont also designated Mr. Hartten to speak on DuPont's behalf in this case under Rule 30(b)(6) with respect to "[t]he environmental conditions on-site at [the P]lant as well as off-site … related to PFOA … released in connection with operations at the … plant, including but not limited to all environmental investigation, modeling, sampling and analysis performed by DuPont and/or its consultant(s) related to PFOA … in the on-site or off-site air,

West Virginia Department of Environmental Protection ("WVDEP"), and the West Virginia Bureau for

Public Health ("WVBPH") assessing the extent of impacts from DuPont's PFOA releases at the Plant,

which expressly concluded:

- With respect to "the source of C-8 [PFOA] in" the "Parkersburg Water Department" wells:  "It is believed that the C-8 levels are transported from the DuPont Washington Works Facility via air emissions.  Please note that:  C-8 transported in air emissions and deposited on surfaces is likely to be mobilized by precipitation and migrate via water transport to surface and/or groundwater."  Hill Aff., Ex. 8, at 23.

- "Air emissions of C-8 from the Washington Works Facility are believed to be the source of C-8 detected in areas of West Virginia located adjacent to the facility and the Local Landfill."  *Id.* at 9.

- "Air emissions of C-8 from the plant are believed to be the source for C-8 along the Ohio River upstream of the plant."[4]  *Id.*

DuPont's outside experts also have confirmed in the published, peer-reviewed literature that "particulate

deposition from [the Plant] air emissions to soil and the subsequent transfer of the chemical through the

soil was determined to be the most likely source of PFOA that was detected in groundwater" at locations

off-site from the Plant, including the PWD.  *Id.*, Ex. 9, at 28 and 31 (at *).[5]  DuPont submitted a report to

EPA as recently as October of 2008 through ENVIRON, another one of DuPont's experts in this case,[6]

again confirming that transport of PFOA from the Plant through the air to off-site sources, including

public water supply wellfields, results in the "highest estimated exposures … in areas located

immediately north, northwest or northeast of the Washington Works facility" due to "the off-site transport

of PFOA via ambient air in those directions."  *Id.,* Ex. 21, at ES-3.  The PWD is, as confirmed in the

maps prepared by DuPont's consultants, directly to the northeast of the plant.  *See id.* at Fig. 2-1.  *See also*

*id.* Ex. 20, at 34 (noting primary wind direction is to the northeast) and Sections 3-4, and 6.  Moreover,

DuPont has admitted repeatedly in formal Rule 36 responses that the Plant is either a source of the PFOA

---

soil, surface water, groundwater, or waste materials that migrated to the wells of the [PWD], which supply drinking water to customers in Parkersburg, WV."  *Id.*, Ex. 22, at 2; *Id.*, Exs. 23-24.
[4] With no citation to actual evidence, DuPont contends that its PFOA emissions cannot reach the PWD wellfields because they draw water from the Ohio River upstream from the Plant, which ignores the fact that contamination can occur through airborne emissions.  *See* Memorandum in Support of Defendant's Motion for Summary Judgment ("DuPont Mem.") at 3; Hill Aff. Exs. 8, at 9 and 23, and 9, at 28 and 31.
[5] *See also* Hill Aff. Ex. 2 (responses to RFAs 94-96, 103 and 109).
[6] *See, e.g., id.* Ex. 7, at 1 (disclosing Stephen T. Washburn of ENVIRON as a DuPont expert in this case).

in local public and private water supplies or that it is unable to identify any other sources of the PFOA, *see, e.g., id.,* Exs. 1 (responses to RFAs 9-10) and 2 (responses to RFAs 110, 113-120, 122, 114 and 115 in *Leach* case). EPA agrees that DuPont is the source of PFOA detected in the public and private drinking water supplies in the vicinity of the Plant. *See, e.g.,* DuPont's Mem., Ex. 8, at ¶¶ 33-37; *see also* Hill Aff. Exs. 10-11 (EPA concerns with DuPont's PFOA releases).

**B.     PFOA is Toxic and Hazardous to Humans, Something DuPont Has Known For Decades.**

After years of litigation with DuPont by residents surrounding the Plant in the *Tennant v. E.I. du Pont de Nemours & Co.*, No. CA-6:99-048 (S.D.W.Va.) ("*Tennant*") and *Leach* cases, the toxic and hazardous nature of PFOA was revealed. Indeed, the *Leach* court held that PFOA "is toxic and hazardous to humans and is bio-persistent, meaning that it is absorbed into and persists in the blood of humans exposed" to PFOA. Pl. Br. Ex. 9 (p.2). DuPont's own epidemiology expert in this case acknowledged this and further stated that she would recommend that people try to limit their exposure to PFOA, and thinks "the effort should be made to have the exposure to the lowest level [of PFOA] achievable." *See* Hill Non-MM. Aff., at Ex. 2, pp. 335-336; *see also* Hill Aff. Ex. 2 (responses to RFAs 147-49).

After reviewing even more recent data, and considering testimony from Plaintiffs' experts, this Court noted that: "plaintiffs have presented compelling evidence that exposure to C-8 may be harmful to human health, and the evidence certainly justifies the concerns expressed by the plaintiffs." 9/08 Op. at 1. This Court also noted that "[b]ecause C-8 itself does not degrade, it is persistent in the environment and can accumulate in living organisms." *Id.* at 2. Furthermore, the Court noted that existing data indicated that PFOA "*may* cause liver disease, elevated cholesterol levels, and several types of cancer. These studies have concerned government agencies and led them to conduct research on the health effects of C-8 and also to take C-8 abatement measures." *Id.* at 3 (emphasis in original). Plaintiffs' experts have since produced additional reports providing even more information confirming the adverse health effects and associated risks to Plaintiffs from their PFOA exposure in this case. *See* Hill Aff. Exs. 27-28. Much of this new data, including some of the results from the on-going study of approximately 70,000 PFOA-exposed area residents under the *Leach* settlement, have also now been addressed in a recently-published,

peer reviewed article by independent scientists and regulators.  *See id.* Ex. 19.

This past February, after reviewing much of this same data in response to a WVBPH request (*see* Hill Aff. Ex. 14), the federal Agency for Toxic Substances and Disease Registry ("ATSDR") warned:

> **Because of concerns for potential adverse effects in vulnerable groups, persons such as pregnant women, women of child-bearing age, children, and the elderly living in the vicinity of the Washington Works facility should reduce local water exposures to levels that are as low as reasonably achievable.**
>
> **In addition, ATSDR concurs with previous verbal advice given by the West Virginia Department of Public Health; that it is prudent public health practice for caregivers in the area near the Washington Works Facility to reduce drinking water exposures to infants by using premixed baby formula.**

*Id.*, Ex. 15, at 2 (emphasis in original).  Soon thereafter, the WVBPH released similar guidance advising the use of "alternative water sources not containing PFOA" for infants and advising that "[p]regnant women, women of child-bearing age, children, and the elderly should reduce exposures to untreated water containing PFOA as much as is reasonably achievable."  *Id.*, Ex. 16.

**C.    Long-Term PFOA Water Exposures Are Not Currently Regulated in West Virginia.**

As DuPont knows, neither West Virginia nor EPA have established any regulatory standard or guideline yet for long-term exposure to PFOA in drinking water.  The January 2009 EPA Provisional Health Advisory ("PHA") for PFOA is inapplicable on its face: EPA defines its drinking water Health Advisories as applying to either "lifetime" or short-term exposures (typically only a matter of days).  *See* Hill Aff. Ex. 25, at 2-3.  The PFOA PHA expressly states that the "relevant period of exposure for the Health Advisory is a short-term exposure."  *See* DuPont Mem. Ex. 3, at 3.  *See also* Hill Aff. Ex. 26.  In other words, EPA's PFOA guideline is set to protect people in a situation where the level of PFOA in water is so high that even a brief exposure to such concentrations for only a matter of *days* is high enough to present an imminent and substantial endangerment to their health, warranting immediate removal from such exposure.[7]  EPA has acknowledged that any guideline protective for *long-term* exposure to PFOA in

---

[7] This was further confirmed in March 2009 when EPA entered into its revised Consent Order with DuPont in which it used its new PHA as the basis for evaluating whether the level of PFOA in drinking water is high enough that

drinking water would necessarily be much (approximately *10-times*) lower, more similar to the 0.04 ppb

guideline that the New Jersey Department of Environmental Protection set in 2007[8] and the 0.02 ppb level

Dr. Gray discussed earlier in this case.[9] *See, e.g.,* Hill Aff. Exs. 12-13. *See also id.* Exs. 17-18-19.

**D.    The Levels of PFOA In Plaintiffs' Blood and Water Are Above General Background Levels.**

The levels of PFOA found in the Plaintiffs' blood[10] all significantly exceed the average level of

PFOA found in the general United States population. *See* Pl. Reply Ex. 1; Hrg. Tr. (7/2) at 94-95; Pl.

Hrg. Ex. 33; Hill Aff. Ex. 27, at 7-8, 29-30. Plaintiffs' expert Dr. Gray has also found that Plaintiffs'

"tapwater PFOA concentrations as provided by the Parkersburg water supply system are more than

tenfold higher than th[e] U.S. background value." *See* Hill Aff. Ex. 27, at 6.  Dr. Gray further concluded

that Plaintiffs have been "significantly exposed to PFOA relative to the general population." *Id.* at 29.

*See also id.*, Ex. 28 (Dr. Levy's expert report) at 36-37.[11]

**E.    The Specific Risks  to Plaintiffs From Their PFOA Exposure Have Been Quantified.**

While Plaintiffs' experts have not provided a specific dose at which PFOA generally causes

human disease, Plaintiffs' experts have opined on the specific increased risks these Plaintiffs now face

based on their specific exposure to PFOA.  These opinions are based, in part, on the actual levels of

PFOA found in the PWD and Plaintiffs' blood, Plaintiffs' historical consumption and use of the water,

certain individual medical information, relevant scientific literature, and the findings of the PFOA

Science Panel established under the *Leach* settlement.  *See generally*  Hill Aff. Exs. 27 and 28.

Specifically, Dr. Gray performed a risk analysis based on individual PFOA exposure from tap

water for each individual Plaintiff and opined that Plaintiffs' significant exposures to PFOA resulted in

---

even *fourteen days* of exposure above that level constitutes an "imminent and substantial endangerment to health" requiring DuPont to immediately provide clean water. *See* DuPont's Mem. Ex. 8, at ¶¶ 39 and 42.
[8] NJDEP's 0.04 ppb lifetime exposure guideline has now been published in the peer-reviewed literature. *See* Hill Aff. Ex. 19.
[9] DuPont does not dispute that, at least since 2002, the levels of PFOA in the PWD finished water fluctuated between 0.027-0.079 ppb.  DuPont Mem. at 3-4.
[10] *See* Pl. Hrg. Ex. 33 (confirming PFOA levels of 14.5 ppb, 14.7 ppb, and 21.1 ppb in the named Plaintiffs' blood). *See also id.* at Ex. 38 (confirming mean of 16.77 ppb PFOA in Plaintiffs' blood with 0.03 ppb- 0.08 ppb in drinking water).
[11] Plaintiffs' blood also was analyzed for PFOS, which DuPont claims to not use or manufacture at the Plant. *See* DuPont's Mem. at 3.  Plaintiffs' PFOS levels (18.5, 24.6, and 27.6 ppb) were found to be consistent with general US population PFOS blood levels, which range from approximately 15 to 35 ppb. *See id.* at 3; Hill Aff. Ex. 28 at 36-37.

increased risks of at least 11 to 18 percent of contracting hypercholesterolemia and at least 15 to 22

percent of contracting hyperuricemia. *Id.* Ex. 27, at 29. Dr. Levy opined on the specific diseases causally

associated with each Plaintiff's exposure to PFOA for which they are at significant increased risk,

calculated the percentage of increased risk for each Plaintiff for each disease, identified the medical

monitoring tests available to detect those diseases at an early treatable stage (including frequency of

testing), identified whether the increased risks are significant enough to warrant medical monitoring, and

set forth the costs of the medical monitoring. *See id.* Ex. 28, at 4, 37-49.

**F.      DuPont Has Covered Up PFOA Information and Has Refused to Provide Clean Water.**

Despite knowing of the toxic and hazardous nature of PFOA for decades, and knowing that it

continued to release PFOA from the Plant into area drinking water supplies, DuPont did not alert the

public. DuPont's own lawyers knew that residents drinking water contaminated with DuPont's PFOA

would not react well to finding out that, not only had DuPont known about the PFOA contamination

problem and health risks for decades, but DuPont had actively covered it up:

> I think we need to make more of an effort to get the business to look into what we can do
> to get the [impacted] community a clean source of water or filter the PFOA out of the
> water. … We are going to spend millions to defend these lawsuits and have the
> additional threat of punitive damages hanging over our head. Getting out in front and
> acting responsibly can undercut and reduce the potential for punitives.… Our story is not
> a good one, we continued to increase our emissions into the river in spite of internal
> commitments to reduce or eliminate the release of this chemical into the community and
> the environment because of our concern about the biopersistence of this chemical.

Pl. Br. Ex. 67 (email exchanged among DuPont in-house counsel in Oct. 2000). DuPont nevertheless

resisted PFOA disclosures[12] and any community testing for PFOA, water treatment, or clean-up efforts

over the next several years. To date, DuPont has steadfastly refused to take any remedial action, despite

eventually agreeing to provide clean water in neighboring communities where the level of PFOA in the

water is even lower than that found in the PWD system. *See* Pl. Memo at 6; Hill Aff. Ex. 30. It was only

after these facts came to light through litigation filed by local residents, after EPA filed its own lawsuit

---

[12] DuPont even sought a gag order from this Court in the *Tennant* case to prevent plaintiffs' counsel from disclosing
PFOA contamination data to public health authorities. The Court refused DuPont's request. *See* Affidavit of R.
Edison Hill in Support of Pl. Post-Hrg. Br. (Doc. 247) at Ex. 1 (Reilly email dated 3/27/01 (EID781983)).

against DuPont for covering up its PFOA pollution of local drinking water supplies, and after the United
States Department of Justice initiated a criminal investigation into DuPont's activities in this regard that
DuPont eventually "agreed" to start reducing its emissions and production of PFOA. *See* Hill Aff. Ex. 29.

### III.   ARGUMENT

Summary judgment may be granted only if there is "no genuine issue as to any material fact and
the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a motion for
summary judgment, "the court must consider whether a reasonable jury could find in favor of the non-
moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to
the non-movant." *In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). It is not the function of
the court to weigh the evidence or assess the credibility of witnesses. *Williams v. Staples, Inc.*, 372 F.3d
662, 667 (4th Cir. 2004).

### A.   DuPont's Release of PFOA Contaminated Plaintiffs' Water and Blood.

There is ample evidence in the record from which a reasonable jury could infer that DuPont
contributed to the PFOA levels in the PWD water supply and Plaintiffs' blood, including DuPont's own
admissions. *See supra* at 1-4.[13] Where the plaintiff has set forth competent evidence of causation, the
issue is one for the jury, not the court, to decide. *I.V. Cunningham v. West Virginia-American Water Co.*,
457 S.E.2d 127, 132 (W. Va. 1995). Moreover, DuPont's argument that expert evidence on causation is
required has been specifically rejected by the Supreme Court of Appeals of West Virginia. *Id.* at 132 ("we
have never held that a respondent must, in order to defeat a motion for summary judgment, submit
affidavits of an expert"); *see also Smith v. Slack*, 26 S.E.2d 387, 390 (W. Va. 1943) ("Direct testimony,
expert or otherwise, is not always necessary to prove the casual connection between the negligence or
wrong of a tortfeasor and the injury suffered by his victim. Circumstantial evidence may be sufficient.").
Even if "expert" testimony on this issue were required, DuPont ignores the fact that *its own* experts and

---

[13] DuPont's implication that it cannot be a source of PFOA contamination of the PWD well fields because those well
fields draw water upstream from DuPont's Plant not only conflicts with DuPont's earlier admissions, but also
ignores the fact that airborne emissions of PFOA from the Plant have caused contamination. *See supra* at 2-4.

corporate designee have already admitted that DuPont is at least a source of the PFOA contamination.[14]

**B.      Plaintiffs Have Sufficiently Identified the Injuries and Damages They Seek.**

While it is true that Plaintiffs have made clear to DuPont that they are *not* claiming that they are currently suffering from any particular manifest illness or disease as a result of their PFOA exposure, they have also made clear that they *are* claiming that PFOA has contaminated their water and blood/bodies and are seeking damages for such contamination, in addition to equitable relief in the form of medical monitoring and clean water. *See* Plaintiffs' Second Amended Complaint, Doc. 267; Hill Aff. Exs. 4-6; DuPont's Mem. Exs. 10-11.  DuPont fails to explain or cite any authority as to how such injuries and damages are somehow deficient as a matter of law. *See* DuPont Mem. at 6-8.

Moreover, Plaintiffs' property damage claims are based on the presence of PFOA in their tap water affecting the use and enjoyment of their property – not on the presence of PFOA in their residential soils.  Thus, the lack of soil sample data is irrelevant.  And DuPont does not dispute that Plaintiffs have demonstrated that PFOA is present in their water as evidenced, in part, by tap samples,[15] and that this contamination is claimed to affect their use and enjoyment of their properties. *See* DuPont Mem. at 7-8. Plaintiffs claim that the presence of PFOA in their water at the levels actually detected constitutes tortious contamination of their property for which they can recover damages[16] and equitable relief.[17]

---

[14] DuPont also mischaracterizes what Plaintiffs' experts have actually said about the source of the PFOA contamination.  Dr. Gray did not "concede" that no connection exists between DuPont and the PFOA contamination at issue, but rather testified that he was not asked to perform a separate analysis of that issue. *See* DuPont's Mem. Ex. 1, at 74-75.  When asked if he had an opinion on where the PFOA came from, Dr. Gray made clear that "it's likely air deposition leaching into the groundwater." *Id.*  Dr. Gray also stated in his expert report that "PFOA emissions from [the Plant] have created the potential for human health risk by contaminating nearby drinking water supplies including the [PWD].  Exposure to PFOA released from the DuPont facility has increased internal PFOA body burden in the surrounding population, including the plaintiffs in this case, through the consumption of contaminated tapwater." Hill Aff. Ex. 27, at 7.  Dr. Gray further states that the Plant "has emitted PFOA and precursors to PFOA by various environmental pathways resulting in the contamination of the environment including the groundwater in and near Parkersburg, West Virginia.  The PFOA contamination has entered the [PWD] that is the tapwater supply for the plaintiffs." *Id.* at 8.  As a result, Dr. Gray concludes that "a major cause of the plaintiffs' elevated serum PFOA levels is the consumption of tapwater contaminated with PFOA." *Id.*

[15] DuPont's argument that Plaintiffs' claims are based on the "presence of one molecule of PFOA," DuPont's Mem. at 8, is wrong.  As DuPont is well-aware, Plaintiffs claims are based on their exposure to PFOA at the levels indicated in their drinking water and in their blood – all of which are well above "one molecule." *See generally* Second Amended Complaint; Hill Aff. Exs. 4-6, 27-28; DuPont's Mem. Exs. 7, 10-11.

[16] Plaintiffs are not seeking compensatory damages for any common law claim that is certified as a class claim.

**C.      Plaintiffs Have Proffered Sufficient Evidence Regarding Their Increased Risk of Disease, Which Is Only Required for Plaintiffs' Medical Monitoring Claim.**

In support of Plaintiffs' claim for medical monitoring, Plaintiffs' experts Dr. Gray and Dr. Levy have set forth evidence regarding the significant increased risk of serious latent disease that each of the Plaintiffs now face as a result of their exposure to PFOA. *See supra* at 6-7. In addition, Dr. Levy has opined on the existence, need for, and cost of medical monitoring for each of the Plaintiffs that would not be required absent the exposure to PFOA. *See supra.* at 7. DuPont has offered no evidence to the contrary, which would only create a genuine issue of material fact precluding summary judgment. DuPont apparently hopes to avoid confronting this clear factual dispute by asserting that Plaintiffs' expert testimony cannot even be considered by the Court, because DuPont allegedly plans to file motions to exclude such testimony *in the future*. *See* DuPont's Mem. at 9 and n. 11. Yet, because DuPont has *not* filed any such motion and none of Plaintiffs' experts' testimony or opinions has been excluded, all of Plaintiffs' expert's opinions and testimony remain for consideration in connection with this Motion.[18]

Moreover, contrary to DuPont's mischaracterization, Plaintiffs do not rest their private and public nuisance, trespass, battery, negligence, and gross negligence claims on allegations of increased risk of disease; nor is proving an increased risk of disease an essential element of any of Plaintiffs' non-medical monitoring claims.[19] DuPont cites no authority to the contrary. *See* DuPont Mem. at 8-9.

---

[17] Plaintiffs have changed their water consumption habits and are concerned about the health risks associated with PFOA. *See* Rhodes Depo. at 94:1-9, 154:24-155:7, 315:6-9 (Hill Aff. Ex. 31); Miller Dep. at 369:1-7, 403:19-404:5, 491:14-22, 492:16-493:7, 513:1-514:18, 600:7-10 (Hill Aff. Ex 32); Mace Dep. at 133:25-136:4, 144:6-11, 146:16-147:5, 156:24-157:5, 689:8-10 (Hill Aff. Ex. 33). To the extent one or more Plaintiffs reduced consumption of water at a certain time due to concerns regarding taste, such evidence merely creates an issue of fact, and thus, does not support summary judgment. *See* DuPont Mem. at n.9.

[18] Further, the two cases cited by DuPont, *Tolley v. ACF Indus., Inc.*, 575 S.E.2d 158, 168-69 (W.Va. 2002) and *White v. Dow Chemical Co.*, 2009 WL 931703 (4th Cir. 2009), to support its argument that Plaintiffs will not be able to prove causation without their experts are inapposite. The plaintiffs in those cases only alleged that they were potentially or possibly exposed to a harmful chemical and offered no proof of actual exposure. *Tolley*, 575 S.E.2d at 162; *White*, 2009 WL 931703 * 6. Here, it is undisputed that Plaintiffs were actually exposed to PFOA and that Plaintiffs have direct evidence, apart from expert testimony (in the form of water and blood results), regarding the amount of PFOA in their water/blood and the duration of their water usage. *Tolley*, 575 S.E.2d at 169; *White*, 2009 WL 931703 * 6.

[19] *See* discussion of public and private nuisance, battery, and trespass claims *infra*. Similarly, contamination of the Plaintiffs' water supply is sufficient injury for their negligence claims. *See, e.g., Minyard Enterprises, Inc. v. Southeastern Chemical & Solvent Co.*, 184 F.3d 373, 380 (4th Cir. 1999) (affirming finding that actions causing environmental contamination constitute negligence, applying similar South Carolina negligence standard); *City of*

**D.      Plaintiffs' Nuisance Claims Are Proper**

   **1.   Plaintiffs have standing to assert a public nuisance claim.**

   DuPont's contention that Plaintiffs lack standing to pursue a public nuisance claim is wrong.

First, Plaintiffs are seeking class certification of the public nuisance claim, and therefore are not required

to demonstrate special injury to obtain relief on that claim. Rest. (2nd) of Torts § 821C(2).[20]  *See* Docs.

276 and 278.  Consistent with the Restatement, the Supreme Court of Appeals of West Virginia has

recognized the public policy benefit of allowing private parties to bring public nuisance suits to enjoin

environmental contamination.  In *Taylor v. Culloden Public Serv. Dist.*, 591 S.E.2d 197, 206 (W. Va.

2003), the Court rejected the contention that a private party was without standing to bring a public

nuisance claim based primarily on "the need for common law remedies in addition to [environmental

regulations]."  The Court noted that nuisance law "has been particularly effective in addressing

environmental problems" and that "[w]ere it not for the availability of nuisance actions as a remedy, it

seems certain an inestimable number of business and private actions that have deleterious health and

environmental results as a byproduct of their operations would have continued unabated."  *Id.*

   Plaintiffs have also established the existence of a special injury sufficient to maintain a public

nuisance claim in an individual action.  In addition to suffering the general public injury - contamination

of PWD water - Plaintiffs have suffered special injury through PFOA contamination of their properties

and bodies, which required them to modify their use of drinking water and face an increased risk of

disease.[21]  *Cf.* Rest. (2nd) of Torts § 821C cmt. d. ("When the public nuisance causes personal injury to

---

*Greenville v. W.R. Grace & Co.*, 827 F.2d 975, 977-78 (4th Cir. 1987) (in negligence claim "the injury...is the contamination...").

[20] "In order to maintain a proceeding to enjoin to abate a public nuisance, one must (a) have the right to recover damages [from having suffered special injury], or (b) have the authority as a public official or public agency . . ., or (c) have standing to sue as a representative of the general public, as a citizen in a citizen's action or as a member of a class in a class action."   It is clear from the disjunctive "or" that class members falling under § 821C(2)(c) do not have to show the special injury requirement referred to in § 821C(2)(a). West Virginia courts have substantially relied upon the Restatement in the public nuisance context.  *See Hendricks v. Stalnaker*, 380 S.E.2d 198, 201 (W. Va. 1989); *Duff v. Morgantown Energy Assoc.*, 421 S.E.2d 253, 257 n.6 (W. Va. 1992); *Carter v. Monsanto Co.*, 575 S.E.2d 342, 347 (W. Va. 2002).

[21] DuPont's claim that this increased risk of disease or "special injury" from the blood/water contamination is the same for everyone served by the PWD directly contradicts all of DuPont's prior class certification arguments/briefs

the plaintiff or physical harm to his land or chattels, the harm is normally different in kind from that suffered by other members of the public and the tort action may be maintained.").

On this point, *Int'l Shoe Co. v. Heatwole*, 30 S.E.2d 537, 530 (W. Va. 1944), is particularly instructive. The court held that "[t]he simple pollution of a river would be an offense against the public, and not a wrong for which an individual could have private damages." *Id.* at 539. However, the court then explained several scenarios where a private individual would suffer special injury:

> If, however, sediment, sludge, or any other refuse matter placed in the river by the [defendant] was, in fact, carried to and cast upon the [plaintiff's] land, to its injury, a right of action would accrue to him. And pollution of a stream by sewage, chemicals or other deleterious matter, which impairs the use of the water by lower riparian owners for domestic purposes, may create a private right of action in such owners. *Id.* at 540-41 (citations omitted).

Here, Plaintiffs not only allege harm through contamination of PWD water, but additionally allege that DuPont has directly intruded upon Plaintiffs' property and into their bodies. Consequently, Plaintiffs can maintain a public nuisance claim in this action both as class members and as individuals.

## 2. The levels of PFOA in Plaintiffs' water support the nuisance claims.

DuPont's argument that the only way Plaintiffs can prove their nuisance claims is to provide expert testimony that the presence of PFOA is substantial or significant such that it created an increased risk of serious latent disease (*see* DuPont Mem. at 12) is wrong; increased risk is not an element of a public or private nuisance claim. West Virginia defines public nuisance as "an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons." *Hark v. Mountain Fork Lumber Co.*, 34 S.E.2d 348, 354 (W. Va. 1945)(internal citations omitted); *see also Taylor*, 591 S.E.2d at 206. West Virginia courts have looked to the Restatement for guidance in public nuisance cases. *See Duff*, 421 S.E.2d at 257 n.6 ("We believe this definition [in *Hark*] is consistent with the Restatement…). The Restatement defines public nuisance as "an unreasonable interference with a right common to the general public." Rest. of Torts: § 821B(1). Rights common to the public have included "roadway safety, air and water pollution, disorderly conduct, and public health…" *State of R.I. v. Lead Indus. Assoc., Inc.*

---

and related expert opinions/testimony that such risks and injuries necessarily vary, along with this Court's 9/30/08 Order noting that some PWD customers may not have any increased risk of disease. *See* 9/08 Op,. at 26.

951 A.2d 428, 444 (R.I. 2008) (citation omitted).  Pollution of environmental media are violations of a

public right.  *See* Rest. of Torts at § 821B cmt. g.; *Int'l Shoe Co.*, 30 S.E.2d at 540.  Specifically, the right

to clean water is a public right.  *Phila. Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 316 (3rd Cir. 1985).

The Supreme Court of Appeals of West Virginia has defined private nuisance as "a substantial

and unreasonable interference with the private use and enjoyment of another's land."  *Carter*, 575 S.E.2d

at 346 (quoting *Hendricks*, 380 S.E.2d 198).  Conduct rises to the level of a nuisance when it "annoys or

disturbs the free use of one's property."  *Id.* at 346.  An interference is "substantial" when there is "a real

and appreciable invasion of the plaintiff's interest," and is "unreasonable when the gravity of the harm

outweighs the social value of the activity alleged to cause the harm."  *Id.* at 347 (citations omitted).  It is

well-established that pollution of the environment and environmental media can constitute substantial and

unreasonable interferences that can give rise to a nuisance claim.  *See Int'l Shoe*, 30 S.E.2d at 530;

*Taylor*, 591 S.E.2d at 206-07; *Harless v. Workman*, 114 S.E.2d 548, 554 (W. Va. 1960); Rest. (2nd) of

Torts § 821B cmt. g.  Economic loss or physical injury is not required: a plaintiff "is entitled to just

compensation for annoyance, discomfort, and inconvenience caused by a nuisance, even though he makes

no showing of a monetary loss or bodily injury or illness.*" Taylor*, 591 S.E.2d.at Syl. ¶ 3.   Here,

Plaintiffs claim that the actual level of PFOA in Plaintiffs' water supply has interfered with the use and

enjoyment of Plaintiffs' property and the public right to clean water as supported by West Virginia law.

DuPont's argument that the levels of PFOA in PWD water cannot constitute a nuisance because

those levels do not exceed any applicable regulatory standard is also wrong.  First, no regulatory standard

governing PFOA contamination levels in this case even exists; the EPA PHA DuPont cites does not

address the long-term exposure Plaintiffs have suffered.  *See supra* at 5-6; *In re Flood Litig.*, 607 S.E.2d

863, 877 (W. Va. 2004) (compliance with regulations may be evidence in any cause of action against the

tortfeasor for negligence or unreasonable use of land "if the injury complained of is the sort the

regulations were intended to prevent.").  Second, the Supreme Court of Appeals of West Virginia has

been clear that mere compliance with a regulatory standard does not give rise to a presumption that a

party is not liable for nuisance.  In *In re Flood Litigation*, the court squarely held that compliance with a

regulatory standard does not preclude liability for nuisance. 607 S.E.2d at 877.[22]

In addition, DuPont's unsupported assertion that expert testimony is necessary is simply incorrect. The issue of what constitutes an unreasonable interference is a fact question for the jury. *See Taylor*, 591 S.E.2d at 207-08 (W. Va. 2003); *Sticklen v. Kittle*, 287 S.E.2d 148, 161 (W. Va. 1981); *Mahoney v. Walter*, 205 S.E.2d 692, 697 (W.Va. 1974) Plaintiffs have contended and submitted evidence that DuPont's release of PFOA caused an actual invasion of PFOA into Plaintiffs' property and bodies, not just a "fear." Thus, a rational jury could find that such invasion constitutes a substantial interference.

**E.      Plaintiffs Battery and Trespass Claims Are Proper.**

DuPont incorrectly asserts that Plaintiffs are trying to recover "unspecified compensation" for contamination of their persons and property "with any amount of PFOA" under theories of battery and trespass. *See* DuPont Mem. at 12-13. Plaintiffs' claims are for equitable relief and damages, including nominal damages, for contamination of their blood and water with the actual elevated levels of PFOA that have been measured in their blood and water supply.

**1.      Plaintiffs' battery claim is supported in law and fact.**

Contrary to DuPont's contentions, West Virginia law permits Plaintiffs to pursue their battery claims. Battery requires only: (1) intent to cause a harmful or offensive contact; and (2) a harmful contact directly or indirectly results. *West Virginia Fire & Cas. Co. v. Stanley*, 602 S.E.2d 483, 494 (W. Va. 2004) (citing Rest. (2nd) of Torts § 13). "The word 'intent' in the Restatement denotes that 'the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it." *Funeral Servs. by Gregory, Inc. v. Bluefield Comm. Hosp.*, 413 S.E.2d 79, 82 (W. Va. 1991) (citing Rest. (2nd) of Torts § 8A).

DuPont is incorrect that a chemical exposure cannot constitute a battery and misconstrues the

---

[22] Other courts have also held that liability is not precluded by the fact that water contamination has not exceeded a specified maximum contaminant level. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 458 F. Supp. 2d 149, 158 (S.D.N.Y. 2006) (concluding that "while the MCL may serve as a convenient guidepost in determining that a particular level of contamination has likely caused an injury, the MCL does not define whether an injury has occurred."); *Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 478 n.11 (S.D. Ohio 2004) (plaintiffs may have been damaged "[r]egardless of whether the municipal water supply has been deemed safe by the Ohio EPA and/or determined to be below the federal and state established maximum contaminant levels ('MCL')").

holding in *McClenathan v. Rhone-Poulenc, Inc.*, 926 F. Supp. 1272, 1276 n.5 (S.D. W. Va. 1996).  The

Court's rejection of the battery claim in that case concerned claims for emotional distress that were not

supported by any *physical impact* from the exposure.  *Id.* at 1274.  The Court's battery holding was thus

made in the context of an allegation of mere exposure without physical impact, *see id.* at 1275, and was

carefully limited to that circumstance.  *Id.* at 1276 n.5 ("The Court is not prepared to extend the contours

of this tort to hold the mere presence and resultant inhalation of chemicals in the air constitutes a 'harmful

or offensive contact' by the emitter.").  Here, by contrast, Plaintiffs have set forth significant evidence not

only that they were exposed to PFOA, but also that the exposure has resulted in the presence of a bio-

persistent chemical in their bodies.  While the Supreme Court of Appeals of West Virginia has not, to

Plaintiffs' knowledge, expressly commented on the viability of a chemical battery claim, other courts that

also follow the Restatement have upheld such claims.  *See, e.g.*, *Tolen v. Honeywell Intern., Inc.*, 2006

WL 3333754, *4-*5 (S.D. Ill. Nov. 16, 2006) (battery claim where nearby nuclear plant released

radioactive gas into the atmosphere); *Swope v. Columbian Chems. Co.*, 281 F.3d 185, 195-96 (5th Cir.

2002) (battery claim for exposure to ozone); *see also Werlein v. United States*, 746 F. Supp. 887, 907 (D.

Minn. 1990) (battery claim for exposure to TCE and other chemicals through groundwater from nearby

industrial sites), *vacated in part on other grounds*, 793 F. Supp. 898 (D. Minn. 1992).

DuPont's contention that Plaintiffs have failed to demonstrate "bodily harm" is also incorrect.

"Bodily harm" has been defined to mean "any physical impairment of the condition of another's body, or

physical pain or illness."  *Gregory*, 413 S.E.2d at 82 n.6  (citing Rest. (2nd) of Torts § 15).  In comment a.

§ 15, the Restatement defines "physical impairment of the condition of another's body," explaining that

"[t]here is impairment of the physical condition of another's body if *the structure or function of any part*

*of the other's body is altered to any extent even though the alteration causes no other harm*." (emphasis

added).  Here, the evidence shows that PFOA altered Plaintiffs' bodies by causing a bio-persistent

chemical to be present and persist in their blood at levels exceeding that found in the general population.

As the Restatement acknowledges, it is not necessary for this alteration to cause other harm.

Even without evidence of "harm," Plaintiffs' battery claim still survives based on evidence

reflecting the "offensiveness" of the contact, which DuPont completely ignores.  The elements of an

offensive contact battery are: (1) an act intending to cause a harmful or offensive contact; and (2) an

offensive contact directly or indirectly results.  Rest. (2nd) of Torts § 18.  "A bodily contact is offensive if

it offends a reasonable sense of personal dignity."  Rest. § 19.  Further, bodily harm is not required:

"Since the essence of the plaintiff's grievance consists in the offense to the dignity involved in the

unpermitted and intentional invasion of the inviolability of his person and not in any physical harm done

to his body, it is not necessary that the plaintiff's actual body be disturbed."  Rest. § 18 cmt. c; *see also*

*Johnson v. Ramsey County*, 424 N.W.2d 800, 804-05 (Minn. App. 1988) (unconsented to kiss on the lips

sufficient evidence to support a jury finding of battery).  DuPont cannot seriously argue that a reasonable

jury could not conclude that the invasion of PFOA into a person's body is offensive.[23]

DuPont also incorrectly argues that no reasonable jury could find the requisite intent to support a

battery claim because the "weight of scientific evidence" does not establish a causal link between PFOA

and disease.  Yet, it is the jury who weighs evidence.  Moreover, this Court has found "compelling

evidence" showing that PFOA is hazardous and toxic.  Further, the relevant inquiry is whether Plaintiffs

have offered evidence from which a rational trier of fact could conclude that DuPont "desire[d] to cause

the consequences of [its] act, or that [it] believed that the consequences [were] substantially certain to

result from [the act]."  Here, evidence indicates that DuPont knew for decades that its emissions of a

hazardous and toxic chemical was contaminating public water.  DuPont also understood that PFOA is a

bio-persistent chemical but failed to inform the public of the risk and actively participated in a cover-up.

A jury could easily find that DuPont either desired to cause the consequences of its act (the invasion of

PFOA into the bodies of Plaintiffs) or believed that the consequences were substantially certain to result.

### 2.    Plaintiffs' trespass claim is supported in law and fact.

In claiming that West Virginia does not recognize environmental contamination as a trespass,

DuPont ignores current West Virginia law.  Since *Bartlett v. Grasselli Chem. Co.*, 115 S.E.2d 451 (W.

Va. 1922), the West Virginia Supreme Court has recognized environmental contamination as a trespass.

---

[23] *See also* Affidavits of Plaintiffs submitted contemporaneously herewith in support.

*Koch v. Eastern Gas & Fuel Associates*, 95 S.E.2d 822 (W. Va. 1956) (action for trespass resulting from

smoke and fumes); *Taylor*, 591 S.E.2d at 208 (whether contamination of stream crossing plaintiffs'

property constituted a trespass was a jury question). The West Virginia Supreme Court has long

recognized that water contamination constitutes a trespass. In *Atkinson v. Virginia Oil & Gas Co.*, 79

S.E. 647 (W. Va. 1913), the court ruled that a defendant who caused water to obstruct the flow of gas into

a plaintiff's gas well acted a trespass against the plaintiff. The court analogized the injury to the

contamination of a water supply that renders the water unfit for use, like the claim brought by the

Plaintiffs here, even though a gas well "is not so essential to the enjoyment of premises as a water well."

*Id.* at 648. A trespass can exist if DuPont intentionally or negligently invaded Plaintiffs' property without

lawful authority and caused some damage, even if that damage is "inconsiderable" or "trivial." *Hark*, 34

S.E.2d at 352. The physical invasion of Plaintiffs' real property through water contamination constitutes

a trespass. *See, e.g., Smith v. Carbide & Chems. Corp.*, 507 F.3d 372, 377-81 (6th Cir. 2007) (water

contamination constitutes a trespass regardless of potential physical injury).

      DuPont incorrectly claims that Plaintiffs cannot prove that the entry of PFOA into the water

system was "without lawful authority," because the level of PFOA did not exceed a regulatory limit for

drinking water. Neither EPA nor West Virginia has set an applicable limit for PFOA, and, more

importantly, Plaintiffs did not consent to release of PFOA into their water or blood. A defendant acts

without lawful authority when it has no right to invade the plaintiff's property.[24] *See, e.g., U.S. Steel*

*Mine Co., Inc. v. Mitros*, 54 F.3d 775 (4th Cir. 1995) (West Virginia law) (granting summary judgment in

favor of defendant who had bargained for a contractual right to go on the plaintiff's land). Here, Plaintiffs

never authorized DuPont to put PFOA in their water or bodies.

      DuPont also claims that Plaintiffs are required to show "substantial damages" to recover for

chemical trespass, but cites only an Ohio decision requiring a plaintiff claiming trespass due to air

_____

[24] DuPont does not dispute that blood can constitute "property." *See, e.g., Greenburg v. Miami Children's Hosp. Research Inst., Inc.*, 264 F. Supp. 1064, 1075 (S.D. Fla. 2003) (recognizing "property right in blood" and citing *Moore v. Regents of the Univ. of Calif.*, 793 P.2d 479 (Cal. 1990)); *Balkowitsch v. Minneapolis War Mem. Blood Bank, Inc.*, 132 N.W.2d 805 (Minn. 1965) (noting blood transfusion can be both transfer of property and a service).

pollution to show "substantial damages." West Virginia law does not require that a trespass plaintiff

alleging water contamination show substantial damages.

**F.      Plaintiffs Have Provided Evidence to Support Their Claims for Punitive Damages.**

Plaintiffs have not stated a "separate cause of action" for punitive damages,[25] but rather assert

punitive damages as a form of relief for their other tort claims, for which punitive damages are available

under West Virginia law. *Mayer v. Frobe*, 22 S.E. 58 (1895) (syl. ¶ 4) ("In actions of tort, where gross

fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil

obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may

assess exemplary, punitive, or vindictive damages."); *Garnes v. Fleming Landfill, Inc.*, 413 S.E.2d 897,

901 (W. Va. 1991) ("Courts have long awarded punitive damages in tort cases.").

While not disputing that punitive damages are available for battery and gross negligence, DuPont

argues that such damages are not available for Plaintiffs' nuisance and trespass claims. DuPont contends

that the nuisance claims only seek abatement and that the trespass claims only seek nominal damages (not

compensatory), and thus cannot give rise to punitive damages. DuPont is wrong on both accounts. First,

Plaintiffs' nuisance claims seek not only abatement, but also damages (on an individual, not class, basis),

including nominal damages. Second, DuPont is wrong that nominal damages do not qualify as

compensatory damages under West Virginia law. *See Rohrbaugh v. Wal-Mart Stores, Inc.*, 572 S.E.2d

881, 888 n.19 (W. Va. 2002) ("A plaintiff 'may be entitled to recover punitive damages if he shows that

he suffered at least nominal damage[.]'" (quoting *Surrency v. Harbison*, 489 So.2d 1097, 1105

(Ala.1986)). Because the purpose of punitive damages is to deter both dangerous and potentially

dangerous conduct, West Virginia courts acknowledge that punitive damage awards can be appropriate in

cases where compensatory damages may be nominal. *See Garnes*, 413 S.E.2d at 908 (citing *Hosp. Auth.

of Gwinnett Cty. v. Jones*, 409 S.E.2d 501 (Ga. 1991)). In such cases "a jury may reasonably find

punitive damages commensurate with the potential harm," notwithstanding the fact that only nominal

damages are involved *Id.* Further, there is no basis for drawing a distinction between nominal and

---

[25] Thus, DuPont's cited case of *Roney v. Gencorp*, 431 F. Supp. 2d 622 (S.D. W. Va. 2006) is irrelevant.

compensatory damages; West Virginia courts treat nominal damages as a subcategory of compensatory damages.  *See Rohrbaugh*, 572 S.E.2d at 888 (noting that "nominal compensatory damages" may be awarded).[26]

Moreover, DuPont's alleged regulatory compliance and "state-of-the-art knowledge" defenses do not preclude the recovery of punitive damages in this case.  On summary judgment, the relevant inquiry is whether Plaintiffs have established a genuine issue of material fact that DuPont acted with gross fraud, malice, oppression, or engaged wanton, willful, or reckless conduct in connection with the underlying tortious action.  *Mayer*, 22 S.E. 58 at syl. ¶ 4; *Surber v. Greyhound Lines, Inc.*, No. 2:06-CV-00273, 2006 WL 3761372, at *4 (S.D. W. Va. Dec. 21, 2006).  Plaintiffs have satisfied this obligation through evidence that (1) as early as 1982, DuPont knew that it was emitting a hazardous and toxic chemical into the surrounding area resulting in contamination of the residential water supplies, (2) DuPont understood that PFOA is a bio-persistent chemical that would accumulate in the blood of persons who drink contaminated water, and (3) despite this knowledge, DuPont failed to inform the public of the risk.[27]  *See supra* at 2-4, 7-8; *Greenville*, 827 F.2d at 983 ("ample evidence" to support finding of wanton, willful, or reckless conduct existed where defendant "knew of the health risks associated with exposure to asbestos,…knew [it was]… creating a danger that asbestos fibers would be released into the [plaintiff's property]…[and defendant]…had already developed and begun selling an asbestos-free [product] in response to concerns and publicity about the health risks associated with exposure to asbestos.").[28]

The EPA PHA is inapplicable and would not, in any event, serve as a complete bar to recovery.  *In re Flood Litig.*, 607 S.E.2d at 877 .  Moreover, there is no support in West Virginia law that regulatory compliance renders the imposition of punitive damages improper as a matter of law.  At most, such

---

[26] Contrary to DuPont's contention, whether punitive damages can be awarded for medical monitoring under West Virginia law is far from settled.  The Supreme Court of Appeals of West Virginia expressly left open that question in *State ex rel. Chemtall Inc. v. Madden*, 655 S.E.2d 161, 167 n.5 (W. Va. 2007).

[27] DuPont's claimed voluntary remedial efforts are dubious at best in light of the fact that these efforts began only after several years of non-disclosure and cover-up.  Even if this evidence were relevant, it would still be the province of the jury to weigh that evidence against evidence of egregious conduct offered by Plaintiffs.

[28] *See also* Hill Aff. Exs. 3 (RFA responses), 5-6 (response to interrogatory no. 20) and 29-30 (letters referencing and identifying the voluminous evidence Plaintiffs have produced in this case to support their punitive damage claims in further response to interrogatory no. 20).

compliance serves only as evidence against punitive damages for the jury to weigh. *E.g.*, *Silkwood v. Kerr-McGee Corp.*, 769 F.2d 1451, 1456-57 (10th Cir. 1985); *Gryc v. Dayton-Hudson Corp.*, 297 N.W.2d 727, 736 (Minn. 1980), *cert. denied*, 449 U.S. 921 (1980).[29]

A similar analysis applies with regard to DuPont's asserted "state-of-the-art knowledge" defense. Not only does that defense find no support in West Virginia law, this evidence must be weighed by the jury alongside the significant evidence that DuPont engaged in malicious, wanton, and reckless conduct when it chose to cover-up the information related to its PFOA contamination.

## IV.   CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment should be denied in its entirety.

Respectfully submitted,

**s/ R. Edison Hill**

Robert A. Bilott (OSB#046854)
Taft Stettinius & Hollister LLP
425 Walnut Street
Suite 1800
Cincinnati, OH 45202
513-381-2838

J. Steven Justice (OSB#0063719)
Taft Stettinius & Hollister LLP
Fifth Third Center
110 North Main Street
Suite 900
Dayton, OH 45402
937-228-2838

R. Edison Hill (WVSB#1734)
Harry G. Deitzler (WVSB#981)
Hill, Peterson, Carper,
  Bee & Deitzler, P.L.L.C.
NorthGate Business Park
500 Tracy Way
Charleston, WV 25311-1261
304-345-5667 (office)
304-345-1519 (fax)
rehill@hpcbd.com

Larry A. Winter (WVSB#4094)
Winter Johnson & Hill PLLC
United Center
500 Virginia Street, East
P.O. Box 2187
Charleston, WV 25328
304-345-7800
*Counsel for Plaintiffs*

---

[29] The foreign cases cited by DuPont do not hold that regulatory compliance precludes recovery of punitive damages as a matter of law. In *In re Miamisburg Train Derailment Lit.*, 725 N.E.2d 738, 752 (Ohio Ct. App. 1999), the court granted summary judgment on punitive damages because, unlike the instant case, there was no evidence of conduct necessary to impose such damages, and thus no genuine issue of material fact existed. *Id.* ("Ultimately, we see no factual questions in this case that would warrant submitting the issue of punitive damages to the jury."). The court did not hold, as DuPont suggests, that regulatory compliance always precludes the recovery of punitive damages. Nor did the court in *Colombini v. Westchester Cty. Healthcare Corp.*, 24 A.D.3d 712, 715-16 (N.Y. App. Div. 2005). *See id.* (holding that plaintiffs did not raise a triable issue of fact to support a claim for punitive damages).

## <u>CERTIFICATE OF SERVICE</u>

I, R. Edison Hill, hereby certify that on June 26, 2009, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Nathan B. Atkinson, Esq.          natkinson@spilmanlaw.com
Anthony F. Cavanaugh, Esq.        acavanaugh@steptoe.com
Clifford F. Kinney, Jr., Esq.     ckinney@spilmanlaw.com
Niall A. Paul, Esq.               npaul@spilmanlaw.com
Libretta P. Stennes, Esq.         lstennes@steptoe.com

**s/ R. Edison Hill**
R. Edison Hill (WVSB # 1734)
Harry G. Deitzler (WVSB #981)
HILL, PETERSON, CARPER, BEE & DEITZLER, P.L.L.C.
NorthGate Business Park
500 Tracy Way
Charleston, WV  25311-1261
Tel:  304.345.5667
Fax:  304.345.1519
rehill@hpcbd.com
*Counsel for Plaintiffs*