**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**PARKERSBURG DIVISION**

WILLIAM R. RHODES, et al.,

                Plaintiffs,

v.                                    CIVIL ACTION NO.  6:06-cv-00530

E.I. Du Pont De Nemours and Company,

                Defendant.

**MEMORANDUM OPINION & ORDER**

Pending before the court are the defendant's Motion for Summary Judgment Based Upon the Statute of Limitations [Docket 279] and its Motion for Summary Judgment on the merits [Docket 335], and the plaintiffs' Motion for Certification of Non-Medical Monitoring Claims [Docket 277]. For the reasons discussed below, the Motion for Summary Judgment Based Upon the Statute of Limitations is **DENIED**, and the Motion for Summary Judgment on the merits is **DENIED** in part and **GRANTED** in part.  The plaintiffs' Motion for Certification is **DENIED** as moot.

Defendant E.I. du Pont de Nemours and Company ("DuPont") has, for an extended period of time, admittedly discharged chemicals into the environment surrounding Wood County, West Virginia.  The potential effects of these chemicals on human health are of great public concern. Issues of institutional competence, however, caution against judicial involvement in regulatory affairs.  Courts are designed to remediate, not regulate. Because the plaintiffs' claims are not cognizable under traditional tort theories, the majority of these claims cannot withstand DuPont's

summary judgment motion. Only the plaintiffs' medical monitoring claim—a recently recognized and much criticized cause of action under West Virginia law—survives.

## I.    Background

This case arises from DuPont's release of perfluorooctanoic acid ("PFOA" or "C-8") from its Washington Works plant in Wood County, West Virginia.[1] The plaintiffs allege that PFOA released from the plant has contaminated the drinking water in the Parkersburg Water District ("PWD"). (2d Am. Class Action Compl. ¶ 1 [Docket 267].) On May 26, 2006, William R. Rhodes, Russell H. Miller, and Valori A. Mace filed a class action complaint in the Circuit Court of Wood County, West Virginia, seeking relief from the alleged contamination. On June 29, 2006, DuPont removed the action to this court [Docket 1].

On January 31, 2008, after extensive discovery, the plaintiffs moved for this court to certify a class of "all individuals . . . who, for a period of at least one year since November 1, 2005, to the date of an Order certifying the class herein, have been residential water customers of the [PWD]." (Pls.' Post-Hr'g Br. 1 [Docket 246].) That motion was denied on September 30, 2008 [Docket 255]. The plaintiffs sought leave to appeal the order denying class certification [Docket 256], and the United States Court of Appeals for the Fourth Circuit denied that request [Docket 261].

The plaintiffs subsequently filed a Motion for Leave to Amend Amended Class Action Complaint [Docket 263] in order to include a class claim for public nuisance. On January 8, 2009, I granted that motion [Docket 266], and the plaintiffs filed their Second Amended Class Action Complaint [Docket 267]. In the Second Amended Class Action Complaint, the plaintiffs assert

---

[1]    The chemical is also known as FC-143, DFS-1, and DFS-2. (2d Am. Class Action Compl. ¶ 1.) For simplicity, this Order refers to this chemical as PFOA.

seven claims based on the alleged PFOA contamination of the PWD drinking water: (1) negligence, (2) gross negligence, reckless, willful, and wanton conduct, (3) private nuisance, (4) past and continuing trespass, (5) past and continuing battery, (6) medical monitoring, and (7) public nuisance. (2d Am. Class Action Compl. ¶ 89-128.)  The plaintiffs seek compensatory and punitive damages; costs and fees; as well as medical monitoring, the abatement of PFOA releases from the plant, and the provision of alternative drinking water.  (*Id.* at p. 22-23.)

On March 30, 2009, DuPont filed a Motion for Summary Judgment Based Upon the Statute of Limitations [Docket 279], followed by a general Motion for Summary Judgment on June 12, 2009 [Docket 335].  The resolution of the two summary judgment motions is appropriate at this time despite the pending motion for class certification.[2]  A district court should certify a class "at an early practicable time."  Fed. R. Civ. P. 23(c)(1).  This rule affords a district court discretion to rule on a summary judgment motion before ruling on a class certification motion.  *See* Fed. R. Civ. P. 23(c)(1) advisory committee's note (2003) (explaining that a decision to certify a class may be deferred pending the outcome of a motion to dismiss or motion for summary judgment).  Since this Order grants the defendant's Motion for Summary Judgment with respect to the plaintiffs' public nuisance claim, the plaintiffs' pending Motion for Certification of Non-Medical Monitoring Claims is **DENIED** as moot.

---

[2]      On March 24, 2009, the plaintiffs filed a motion seeking certification of all the non-medical monitoring claims in their Second Amended Class Action Complaint, except for battery.  (Mem. Supp. Mot. Leave File Mot. Certification 2 n.2 [Docket 276].)   I denied that motion for all claims except for the public nuisance claim [Docket 346].

## II.      Standard of Review for Summary Judgment Motions

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor."  *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position.  *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion.  *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *Ross v. Comm'cns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds*, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

### III.    Standing

Under Article III of the Constitution, federal courts only possess jurisdiction to decide "Cases" and "Controversies."  U.S. CONST., Art. III, § 2.  These two words "limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process."  *Flast v. Cohen*, 392 U.S. 83, 95 (1968).  They also "define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government."  *Id.*; *see also Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 599 (2007) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." (internal quotation marks and citations omitted)).

Although neither party in this case has raised the issue of standing, federal courts are obliged to satisfy themselves that they possess subject matter jurisdiction in every case, and may sua sponte raise the issue of standing.  *Juidice v. Vail*, 430 U.S. 327, 331 (1977).  The "irreducible constitutional minimum of standing contains three elements:" injury, causation, and redressability.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  To satisfy the injury requirement, "[t]he plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged . . . conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical."  *City of L.A. v. Lyons*, 461 U.S. 95, 101-02 (1983).

While standing is a constitutional requirement for subject matter jurisdiction, its ease of definition belies its difficulty of application.  *See Valley Forge Christian Coll. v. Ams. United for Separation of Church and State*, 454 U.S. 464, 475 (1982) ("We need not mince words when we say

that the concept of Art. III standing has not been defined with complete consistency in all of the various cases decided by this Court."). Here, the plaintiffs' alleged injuries are their significantly increased risk of disease justifying medical monitoring.[3]   Although some courts have questioned "whether enhanced risk generally qualifies as sufficient injury to confer standing," *Baur v. Veneman*, 352 F.3d 625, 634 (2d Cir. 2003),  "the courts of appeals have generally recognized that threatened harm in the form of an increased risk of future injury may serve as injury-in-fact for Article III standing purposes," *id.* at 633.  For example, as the Second Circuit recently explained:

> An injury-in-fact may simply be the fear or anxiety of future harm.  For example, exposure to toxic or harmful substances has been held sufficient to satisfy the Article III injury-in-fact requirement even without physical symptoms of injury caused by the exposure, and even though exposure alone may not provide sufficient ground for a claim under state tort law. . . . The risk of future harm may also entail economic costs, such as medical monitoring and preventative steps . . . .

*Denney v. Deutsche Bank AG*, 443 F.3d 253, 264-65 (2d Cir. 2006) (citations omitted).  And while the Supreme Court has thus far declined to address this issue, at least two justices apparently believe that "fear of cancer or medical monitoring" could be an Article III injury-in-fact.  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 884 (1999) (Breyer, J., concurring).

The Fourth Circuit has not directly addressed this issue in the context of medical monitoring, but it has recognized that an increased risk of injury may be an injury-in-fact.  In *Friends of the*

---

[3]      In their various submissions, the plaintiffs sometimes characterize their alleged injuries differently.  For example, the plaintiffs argue that they "are seeking damages for . . . contamination" and for "the presence of PFOA in their tap water affecting the use and enjoyment of their property."  (Mem. Opp'n Mot. Summ. J. 9.)  As will be explained later in this Order, the plaintiffs cannot rely on such purported injuries to support their claims for relief, as they do not meet the legal requirements for an injury.  Thus, for determining whether the plaintiffs have pled an injury sufficient for standing purposes, I focus on their alleged significantly increased risk of disease that justifies medical monitoring.

*Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 164 (4th Cir. 2000) (en banc), a property owner alleged that he suffered an injury-in-fact when a chemical company that was upstream from his lake discharged impermissible levels of toxic chemicals into the lake. He asserted that the defendant's chemicals had caused his property to decline in value, and that the pollution had caused his family to swim and fish in the lake less. *Friends of the Earth*, 204 F.3d at 156. Finding standing to sue, the Fourth Circuit stated that "threatened rather than actual injury can satisfy Article III standing requirements." *Id.* at 160. The court explained that although "[t]hreatened environmental injury is by nature probabilistic," "[t]hreats or increased risk . . . constitute[] cognizable harm." *Id.*[4]

At least one circuit court of appeals has held that a plaintiff has standing to sue for medical monitoring when his only injury is a perceived risk of future harm. In *Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568 (6th Cir. 2005), the Sixth Circuit addressed whether a plaintiff could proceed on a products-liability cause of action for medical monitoring against the manufacturers of a medical-implant device, despite the fact that the plaintiff had suffered only an increased risk of disease. The plaintiff's claims rested only on evidence that other patients had suffered medical complications from the defendants' device; he suffered no such complications. But, he contended, as a result of having had the "allegedly defective and unreasonably dangerous device implanted in him," he "suffered economic losses and large medical expenses and [had] an increase[d] . . . risk for . . .

---

[4]       Admittedly, the plaintiffs in *Friends of the Earth*, unlike the instant plaintiffs, sued a corporation for violating a federal statute—the  Clean Water Act.  In finding standing, the court observed that "it is well established that the 'injury required by Article III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.'"  204 F.3d at 156 (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).  Yet the court also noted that "[o]ne does not have to await the consummation of threatened injury to obtain preventative relief."  *Id.* at 160 (internal citation and quotation marks omitted).

-7-

injuries." *Sutton*, 419 F.3d at 569.  The district court had dismissed the plaintiff's claim for a lack

of standing.  The district court reasoned that the plaintiff "did not demonstrate that he personally

suffered an injury-in-fact.  Plaintiff has not provided the Court with any information from which to

assess his allegedly increased risk of harm from implantation of the" device.  *Sutton v. St. Jude*

*Med., Inc.*, 292 F. Supp. 2d 1005, 1008 (W.D. Tenn. 2003).

Reversing the district court, the Sixth Circuit held that the plaintiff's claim could proceed.

The court concluded that "Sutton has alleged sufficient facts, when accepted as true, to suggest an

increased risk of future harm resulting from being implanted with St. Jude's device." *Sutton*, 419

F.3d at 574.  The court explained that alleging "an increased risk of harm when comparing those

individuals implanted with the device to those" not implanted with the device constituted a injury

sufficient to satisfy Article III.  *Id.* at 575.

Even courts that express doubt as to whether injuries premised on increased risk constitute

an injury-in-fact acknowledge that such claims are cognizable in the context of environmental harms

and toxic exposures.  *See, e.g., Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C.

Cir. 2005) (stating that "hypothesized 'increased risk' has never been deemed sufficient 'injury'"

for cases that do not involve "increased exposure to environmental harms");  *Sutton*, 292 F. Supp.

2d 1005 at 1008 n.3 (W.D. Tenn. 2003) (distinguishing cases "where exposure to a toxic substance

created an increased risk of harm," since such exposure "rarely provides any medical benefits [and]

therefore the exposure itself causes an injury").

While this is a not an easy question, the weight of authority suggests that an increased risk

of injury constitutes an injury-in-fact under Article III.  The standing inquiry "serves to distinguish

a person with a direct stake in the outcome of the litigation—even though small—from a person with

-8-

a mere interest in the problem." *United States v. Students Challenging Regulatory Agency Procedures* ("SCRAP"), 412 U.S. 669, 690 n.14 (1973) (citing cases in which the Court "allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote, a $5 fine and costs, and a $1.50 poll tax" (citations omitted)).  The plaintiffs' interest in safe drinking water is certainly an "important interest," and even if they may not currently be able to show a large impairment of that interest, they have a "direct stake" in this issue as residents of the PWD and former, and perhaps future, consumers of its water.  Their alleged significantly increased risk of future disease thus constitutes an injury-in-fact under Article III.[5]

## IV.  Motion for Summary Judgment Based Upon the Statute of Limitations

By its Motion for Summary Judgment Based Upon the Statute of Limitations, DuPont contends that West Virginia's two-year statute of limitations for personal injury and property damage claims bars the plaintiffs' claims.  It asserts that the named plaintiffs "knew of their alleged claims against DuPont for more than two years prior to the Complaint being filed."  (Mem. Supp. Mot. Summ. J. Limitations 1 [Docket 280].)  As explained below, there exist genuine issues of material fact as to whether DuPont's alleged acts constitute a continuing tort.  Summary judgment based on the statute of limitations is therefore inappropriate.

---

[5]        Having concluded that the plaintiffs have sufficiently alleged an injury-in-fact, I must also consider whether there is causation and redressability.  The "fairly traceable" standard of causation for standing inquiries is less stringent than the standard of tort causation.  *See, e.g., Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 324 (4th Cir. 2002).  My finding of causation in the discussion of the plaintiffs' substantive tort claims therefore establishes this element. Finally, the relief sought by the plaintiffs—compensatory and punitive damages, costs and fees, and appropriate equitable and injunctive relief—can redress their alleged injuries.  Although only the plaintiffs' claim for medical monitoring damages survives DuPont's motions for summary judgment, relief in the form of medical monitoring would redress the plaintiffs' alleged injury.  Accordingly, the plaintiffs possess standing to bring their claims.

The plaintiffs argue that the statute of limitations for their claims has not run because DuPont's actions constitute a continuing tort.  The continuing-tort doctrine applies "[w]here there is a repeated or continuous injury and where the damages do not occur all at once but increase as time progresses"; in such instances, "the tort is not completed, nor have all the damages been incurred, until the last injury is inflicted or the wrongdoing ceases." *Patrick v. Sharon Steel Corp.*, 549 F. Supp. 1259, 1264 (N.D. W. Va. 1982).  Accordingly, "where a tort involves a continuing or repeated injury, the cause of action accrues at and the statute of limitations begins to run from the date of the last injury or when the tortious overt acts or omissions cease." *Graham v. Beverage*, 566 S.E.2d 603, 614 (W. Va. 2002).

The plaintiffs have made a sufficient showing that the continuing-tort doctrine applies in this case because the plaintiffs' claims are based on alleged continuous tortious conduct, namely, DuPont's release of PFOA into the environment, and its continuing failure to remediate the PFOA currently present in the PWD water supply.  DuPont has not disputed the allegation that it continues to emit PFOA from the Washington Works Plant, nor is this court aware of any remediation by DuPont with respect to PFOA.

DuPont's arguments to the contrary are unpersuasive.  First, DuPont contends that the continuing-tort doctrine cannot apply to the plaintiffs' medical monitoring claim.  To support this contention, it relies on *State ex rel. Chemtall Inc. v. Madden*, 607 S.E.2d 772 (W. Va. 2004).  In that case, the Supreme Court of Appeals of West Virginia ("Supreme Court of Appeals") recognized that "a cause of action accrues (i.e., the statute of limitations begins to run) when a tort occurs." *Madden*, 607 S.E.2d at 784.  The court explained that "under 'the discovery rule,' the statute of limitations is tolled until a claimant knows or by reasonable diligence should know of his claim."

-10-

*Id.* (internal quotation marks omitted).   DuPont asserts that the plaintiffs knew, or should have

known, of their injuries at least prior to May 23, 2004, and the discovery rule thus precludes the

plaintiffs' lawsuit.

Importantly, however, the discovery rule does not impede the operation of the continuing-tort

doctrine.  *Patrick*, 549 F. Supp. at 1263-64.  In fact, the continuing-tort doctrine is an exception to

the discovery rule.  Although the discovery rule mandates that the statute of limitations begins to

run for injuries that were, or could have been, discovered, the concept of a continuing injury

recognizes that a tort is not complete until the wrongdoing ceases.[6]  Therefore, because DuPont

continues to discharge PFOA into the environment, and because the plaintiffs contend that they

continue to suffer harm from DuPont's actions, the discovery rule has not caused the statute of

limitations to run in this case.[7]

Next, DuPont relies on the decision in *State ex rel. Smith v. Kermit Lumber & Pressure

Treating Co.*, 488 S.E.2d 901 (W. Va. 1997), to assert that the continuing-tort doctrine only tolls the

---

[6]         DuPont is incorrect that *Patrick* applied only the discovery rule in analyzing the
statute of limitations question in that case.  (Reply Mem. Opp'n Mot. Summ. J. 13.)  In *Patrick* the
court held that it could not grant summary judgment based on the discovery rule because there were
questions of fact as to when the plaintiffs knew of their injuries.  *Patrick*, 549 F. Supp. at 1264.  But
the court also denied summary judgment based on the continuing-tort doctrine.  Without explicitly
naming the continuing-tort doctrine, the court held that "[w]here a tort involves a continuing or
repeated injury, the cause of action accrues at, and limitations begin to run from the date of the last
injury, or when the tortious overt acts cease."  *Id.* (quoting *Handley v. Town of Shinnston*, 289
S.E.2d 201, 202 (W. Va. 1982)).

[7]         Furthermore, neither *State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*,
488 S.E.2d 901 (W. Va. 1997), nor *Taylor v. Culloden Public Service District*, 591 S.E.2d 197 (W.
Va. 2003), preclude the application of the continuing-tort doctrine in this case.  DuPont suggests that
under those cases, a continuing tort occurs only when "a cessation of tortious conduct also result[s]
in the immediate cessation of 'injury' to the plaintiff's property."  (Reply Mem. Opp'n Mot. Summ.
J. Limitations 13.)  But these cases establish no such rule.

statute of limitations for injuries caused by the presence of hazardous substances that exceed regulatory limits. (Reply Mem. Opp'n Mot. Summ. J. Limitations 14.) DuPont argues that because its release of PFOA has not exceeded regulatory limits, the release is not a continuing tort. But *Kermit Lumber* only recognized that the presence of toxic contaminants in soil above the regulatory limit demonstrated that the toxic contaminants posed a danger to the public health, safety and the environment. *Kermit Lumber*, 488 S.E.2d at 925. It did not foreclose the possibility that contamination at a lower level could also be harmful. Indeed, the release of contaminants at a level below regulatory limits may constitute a tort if such a release causes harm. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, Master File 1:00-1898, MDL 1358, M21-88, 04 CV 2389, 04 CV 3417, 04 CV 5424, 2007 WL 1601491, at *7 (S.D.N.Y. June 4, 2007) (explaining that statute of limitations can begin to run when a hazardous substance is present at levels below the regulatory limit if the plaintiff knew that human exposure to such concentration of the substance was hazardous); *see also Md. Heights Leasing, Inc. v. Mallinckrodt, Inc.*, 706 S.W.2d 218, 224 (Mo. Ct. App. 1985) ("[F]ederal emissions standards are only guidelines, not absolute safety levels below which no injuries can occur."). Accordingly, DuPont's release of PFOA could qualify as continuing tortious conduct even though the release does not violate any regulations and the resulting concentration of PFOA in the PWD water supply does not exceed any regulatory limits.

There remains a question of material fact as to what amount of PFOA release constitutes "tortious conduct," and consequently, when the plaintiffs' alleged injuries accrued. The plaintiffs have provided ample evidence that PFOA may cause some harm, but, as DuPont asserts, they have not identified a harmful level of contamination. DuPont's continuing release of PFOA and refusal to remediate tolls the statute of limitations only if such behavior constitutes tortious conduct. It

-12-

appears that DuPont has reduced its PFOA emissions from the Washington Works plant. (*See* Mem. Opp'n Mot. Summ. J. Limitations Ex. 2.) Therefore, it is possible that PFOA releases have been reduced to a harmless level. If so, then DuPont's tortious conduct would have ceased at the moment that it dropped below that level. Because there are questions of fact as to what level of PFOA released from the Washington Works plant constitutes tortious conduct, it cannot be determined when such tortious conduct began or ended. Under such circumstances, dismissal on statute-of-limitations grounds would be inappropriate. Therefore, DuPont's Motion for Summary Judgment Based Upon the Statute of Limitations is **DENIED**.[8]

## V.   Summary Judgment on the Merits

By its Motion for Summary Judgment on the merits, DuPont seeks summary judgment on all of the plaintiffs' claims. Generally, DuPont argues that the plaintiffs cannot show any injuries supporting their claims and, alternatively, that the plaintiffs cannot show the injuries were caused by DuPont. Because the plaintiffs assert several different causes of action, I will address each one in turn. Since a defendant's "underlying liability [for a medical monitoring claim] is established based upon a recognized tort," *Bower v. Westinghouse Elec. Corp.*, 522 S.E.2d 424, 433 (W. Va. 1999), I will address each of the non-medical-monitoring claims first.

### A.   The Plaintiffs' Negligence, Gross Negligence, and Reckless, Willful and Wanton Conduct Claims Fail to Allege a Sufficient Injury for the Claims to Independently Survive.

The plaintiffs have asserted claims of negligence, gross negligence, and reckless, willful and wanton conduct. The elements of a negligence action are: (1) the existence of a duty, (2) the breach

---

[8]     Notwithstanding the application of the continuing-tort doctrine, there exist genuine issues of material fact as to when the plaintiffs knew, or should have known, of these injuries.

of that duty, (3) loss or damage to another caused by the breach, and (4) actual loss or damage to another.  W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 30 (5th ed. 1984); *see also Strahin v. Cleavenger*, 603 S.E.2d 197, 205 (W. Va. 2004) ("To prevail in a negligence suit, the plaintiff must prove by a preponderance of the evidence that the defendant owed a legal duty to the plaintiff and that by breaching that duty the defendant proximately caused the injuries of the plaintiff.").  Gross negligence and reckless, willful and wanton conduct involve the same elements, but different degrees of awareness of the likelihood of loss or damage.  *See Stone v. Rudolph*, 32 S.E.2d 742, 749-50 (W. Va. 1944) (explaining that willful and wanton conduct is shown if a defendant "'was conscious of [its] conduct, and conscious . . . that injury would likely or probably result from [its] conduct, and that with reckless indifference to consequences [it] consciously and intentionally did some wrongful act or omitted some known duty which produced the injurious result'" (citation omitted)); Keeton et al., *supra*, § 34, at 212 (explaining that grossly negligent conduct occurs if a defendant commits very great negligence, that is, the defendant demonstrates "more than ordinary inadvertence or inattention").

DuPont challenges these claims on two grounds: (1) the plaintiffs' inability to demonstrate proximate causation, and (2) the plaintiffs' failure to demonstrate a physical injury.  (Mem. Supp. Mot. Summ. J. 8-9.)  I first address DuPont's causation challenge.

### 1.  The Plaintiffs Have Provided Sufficient Evidence to Raise a Question of Material Fact With Respect to Causation.

The plaintiffs' different claims are based on the same alleged injuries:  the presence of PFOA in their drinking water and bodies, and their resulting significantly increased risk of disease justifying medical monitoring.  Even if an increased risk of disease constitutes an injury under tort law, DuPont argues that the plaintiffs' claims still fail because the plaintiffs cannot demonstrate that

-14-

DuPont caused this increased risk.  Specifically, DuPont argues that the plaintiffs have not shown that: (1) the amount of PFOA exposure experienced by the plaintiffs can cause a significantly increased risk of disease, or (2) that the PFOA in the PWD water supply and the plaintiffs' bodies originated at the Washington Works plant.

For this section, I will temporarily assume without discussion that a significantly increased risk of disease constitutes an injury.  The issue at hand in this section is only whether the plaintiffs have sufficiently shown that DuPont's behavior caused an increased risk of harm.  The causation analysis of this section may also apply to the plaintiffs' other causes of action to the extent they require causation.  *See, e.g.*, *Bower v. Westinghouse*, 522 S.E.2d 424, 432 (W. Va. 1999) (requiring, inter alia, that plaintiffs show that "as a proximate result of the exposure [to a proven hazardous substance,] plaintiff has suffered an increased risk of contracting a serious latent disease").  Because DuPont's argument on this issue involves in part the reliability of the plaintiffs' experts, I will briefly discuss the dispute concerning those experts.

DuPont argues that the plaintiffs' expert reports are inadmissible to establish causation or any element of the plaintiffs' claims and could not establish the elements even if they were admissible.  DuPont did not, however, move to exclude expert testimony until July 8, 2009 [Docket 348], almost a full month after it filed its motion for summary judgment and more importantly, after the plaintiffs filed their response to that summary judgment motion.  Thus, it is inappropriate to consider DuPont's arguments regarding the admissibility of plaintiffs' experts' reports and testimony at this time.  As I have stated earlier in this litigation, I am skeptical of some of the evidence and expert reports provided by the plaintiffs, and it is by no means certain that such evidence will allow them to prevail before a jury.  *See, e.g.*, *Rhodes v. E.I. de Pont de Nemours & Co.*, 253 F.R.D. 365,

378-79 (S.D. W. Va. 2008).  But such evidence and reports are sufficient to raise questions of material fact for the purposes of summary judgment.  Accordingly, I will consider the entire record before the court, including the plaintiffs' expert reports, to determine whether summary judgment is appropriate.

### a.  There Is a Question of Material Fact as to Whether the Amount of PFOA in the PWD Water Can Cause a Significantly Increased Risk of Disease.

The plaintiffs have provided evidence from which a jury could conclude that the plaintiffs' exposure to PFOA in the PWD water supply could cause a significantly increased risk of disease. PFOA has been detected in the PWD finished water supply at concentration levels as high as 0.079 ppb.  (Mot. Certify Class [Docket 188] Ex. 23.)  The plaintiffs have presented at least two pieces of evidence indicating that PFOA concentrations at that level in drinking water can cause a significantly increased risk of disease.  First, the plaintiffs have presented a forthcoming, peer-reviewed article that calculated a health-based drinking water concentration of 0.04 parts per billion (ppb) to be protective for lifetime exposure.[9]  (Hill Aff. Ex. 19, June 26, 2009.)[10]  Second, the plaintiffs' experts have testified that the plaintiffs have experienced a significantly increased risk of disease based on their exposure to PFOA at concentrations present in the PWD water supply.  (*Id.* Exs. 27, 28.)  This evidence is sufficient to raise a question of material fact as to whether the PFOA in the PWD water can cause a significantly increased risk of disease.

---

[9]     Though this article implements the ratio of microgram per liter, one microgram per liter is equivalent to one part per billion.

[10]     All subsequent references in this Order to "Hill Aff." are to the June 26, 2009 affidavit.

DuPont argues that the plaintiffs' causation theory is flawed because it would allow "the presence of even a single molecule of an allegedly toxic substance [to be] the basis for a lawsuit." (Reply Mem. Opp'n Mot. Summ. J. 2.)  Again, I disagree.  The plaintiffs' experts have concluded that the plaintiffs have a significantly increased risk of various diseases based on the level of PFOA in their blood, which is more than one molecule.  (Hill Aff. Exs. 27, 28.)  After modeling the relationship between PFOA levels in blood serum and the incidence of certain medical conditions, the plaintiffs' experts applied that model to the plaintiffs' blood serum PFOA concentrations to calculate their increased risk of disease.  This evidence is sufficient to raise a question of material fact as to whether the plaintiffs' exposure to the PFOA in the PWD water caused them to have a significantly increased risk of disease.

In response to DuPont's contention that the amount of PFOA in the PWD water supply complies with all relevant regulatory guidelines, the plaintiffs argue that the regulation referenced by DuPont has no bearing on whether the plaintiffs have suffered a significantly increased risk of disease.  (Mem. Opp'n Mot. Summ. J. 5.)  I agree with the plaintiffs because it is possible that human exposure to PFOA concentrations below regulatory guidelines could nevertheless cause human diseases.  *See In re Methyl Tertiary Butyl Ether (MTBE) Prods.*, 458 F. Supp. 2d 149, 158 (S.D.N.Y. 2006) (concluding that while a regulatory level "may serve as a convenient guidepost in determining that a particular level of contamination has likely caused an injury, [the regulatory limit] does not define *whether* an injury has occurred").

Moreover, in the instant action, existing regulatory guidelines are particularly unhelpful.  The regulatory guidance identified by DuPont applies to circumstances different from those here, and the plaintiffs have identified other data indicating that a lower concentration might be harmful.

-17-

DuPont offers only one regulatory guidance applicable to the PFOA concentration in the PWD water supply: the United States Environmental Protection Agency's ("EPA") Provisional Health Advisory ("PHA") for PFOA and PFOS, which is 0.4 ppb for PFOA.[11]  (Mot. Summ. J. Ex. 3 at 4.)  As the plaintiffs observe, the PHA applies only to short-term exposure and therefore provides no guidance about what level of PFOA concentration is safe for long-term exposure.  (Mot. Summ. J. Ex. 3 at 3; *see also* Hill Aff. Ex. 26.)  The plaintiffs allege more than a short-term exposure to PFOA in their drinking water.

Also, the plaintiffs have offered evidence that long-term exposure to PFOA concentrations lower than 0.4 ppb may be harmful to humans.  The fact that the New Jersey Department of Environmental Protection ("NJDEP") adopted a guidance level of 0.04 ppb lends credence to the plaintiffs' contentions.[12]  (Mem. Opp'n Mot. Summ. J. Ex. 18 at 2; *see also* Mot. Certify Class Ex. 41 at 9.)  The New Jersey guidance level "is for lifetime chronic exposure in order to protect water consumers over their lifespan."  (Mem. Opp'n Mot. Summ. J. Ex. 18 at 3.)  And the NJDEP's study has been accepted for a publication in a peer-reviewed journal.  (*Id.* Ex. 19.)

Accordingly, DuPont's compliance with the EPA's PHA does not preclude the plaintiffs' establishing a question of material fact, through other evidence, that their exposure to PFOA caused them injury, in the form of a significantly increased risk of disease.

**b.  There are Questions of Material Fact as to Whether DuPont's Actions Caused the PFOA Presence in the PWD Water and the Plaintiffs' Blood.**

---

[11]     I also note that PHA values "are developed to provide *information* in response to an urgent or rapidly developing situation."  (Mot. Summ. J. Ex. 3 at 1 n.1 (emphasis added).)

[12]     NJDEP, *Perfluorooctanoic Acid (PFOA) in Drinking Water*, http://www.state.nj.us/dep/watersupply/pfoa.htm (last visited September 18, 2009).

DuPont argues that the plaintiffs cannot show that the PFOA in the PWD water supply is attributable to the Washington Works plant.  (Mem. Supp. Mot. Summ. J. 2, 5.)  But the record shows a question of material fact as to that issue.  As an initial matter, there appears to be some consensus that PFOA has traveled via air emissions from the Washington Works plant into neighboring environments and water supplies.  (*See, e.g.*, Hill Aff. Ex. 9 at 28 ("Following considerable analyses, particulate deposition from facility air emissions to soil and the subsequent transfer of the chemical through the soil was determined to be the most likely source of PFOA that was detected in the groundwater."); Ex. 20 at 39 ("The two most significant transport pathways for on-site PFOA sources to migrate to off-site environmental media are permitted air emissions and permitted wastewater discharges to the Ohio River.").)  DuPont has itself admitted that there is a question of fact as to whether PFOA emissions from the Washington Works plant have contributed to the PFOA found in the neighboring water supplies. (*See*, *e.g.*, *id.* Ex. 1 ¶¶ 9-10 (admitting that emissions from the Washington Works plant "may have contributed to the levels of PFOA measured in Parkersburg finished water at some point in time" without admitting that "DuPont is the source of any and all PFOA in the Parkersburg finished water"); Ex. 2 ¶¶ 103, 109 (admitting that residents of Lubeck and Little Hocking that drink water from the public drinking water supply "are potentially exposed to air emissions of [PFOA] from DuPont's Washington Works plant").)

The plaintiffs have submitted more specific evidence with respect to the PWD.  One document presented by the plaintiffs is an August 2003 report prepared by a Groundwater Investigation Steering Team ("GIST") pursuant to a consent order between the West Virginia Department of Environmental Protection, the West Virginia Department of Health and Human Resources-Bureau for Public Health, and DuPont.  The GIST reported that "[a]ir emissions of

[PFOA] from the [Washington Works] plant are believed to be the source for [PFOA] along the Ohio River upstream of the plant." (*Id.* Ex. 8 at 9.) The report further stated that "[i]t is believed that the [PFOA] levels [for the PWD water supply] are transported from the DuPont Washington Works Facility via air emissions." (*Id.* at 23.)

The plaintiffs have also submitted a Data Assessment for the Washington Works plant. The Assessment, dated October 2, 2008, was prepared by DuPont as part of a Memorandum of Understanding that it entered into with the EPA. (Hill. Aff. Ex. 20.) The Assessment "allowed for the determination of the presence of PFOA in environmental media on and around the [Washington Works site and] for evaluation of potential transport pathways from the Site." (*Id.* at x.) The Data Assessment reported that "[d]eposition of PFOA-containing air emissions is a primary PFOA transport pathway from th[e Washington Works plant] Site source to on- and off-site environmental media." (*Id.* at 35.) Though such emissions have "historically migrated from the [plant] in all directions to some extent," the Data Assessment indicates that "[t]he primary wind direction at the Site is from the southwest towards the northeast." (*Id.* at 34-35.) Parkersburg lies northeast of the Washington Works plant. Based on this evidence, there is a question of fact as to whether DuPont's actions at the Washington Works plant caused the presence of PFOA in the PWD water supply.

For the reasons discussed above, the plaintiffs have raised a question of material fact as to whether the PFOA in the PWD water and in their blood originated at the Washington Works plant. Assuming that a significantly increased risk of disease can qualify as an injury, the plaintiffs have also raised questions of material fact with respect to whether DuPont's actions caused them to suffer such an increased risk.

### 2. The Plaintiffs Have Not Alleged Injury Sufficient to Support Their Free-Standing Negligence Claims.

To recover under a negligence theory, a plaintiff must show injury.  In general, the injury can be either present injury or "reasonably certain" future injury.  *Ellard v. Harvey*, 231 S.E.2d 339, 342 (W. Va. 1976) (holding that "a plaintiff may recover the cost of reasonable and necessary future medical and hospital services and for future pain and suffering where the evidence shows that it is reasonably certain that such future expenses will be incurred and are proximately related to the negligence of the defendant").  The plaintiffs "have made clear . . . that they are not claiming that they are currently suffering from any particular manifest illness or disease as a result of their PFOA exposure."  (Mem. Opp'n Mot. Summ. J. 9.)  The plaintiffs have also failed to assert—and, based on the current evidence, they cannot successfully assert—that they will be subject to "reasonably certain" future injuries.  In short, under traditional tort law, the plaintiffs have shown no compensable injury to sustain their negligence causes of action.  Thus, to the extent that these actions assert free-standing claims for damages, DuPont's Motion for Summary Judgment is **GRANTED**.[13]

### B.  The Plaintiffs Have Not Raised Questions of Material Fact with Respect to Their Public Nuisance and Private Nuisance Claims.

The plaintiffs have asserted both private and public nuisance claims.  In West Virginia, "nuisance is a flexible area of the law that is adaptable to a wide variety of factual situations." *Sharon Steel Corp. v. City of Fairmont*, 334 S.E.2d 616, 621 (W. Va. 1985).  A private nuisance interferes with the *private* use or enjoyment of land, while a public nuisance interferes with a *public*

---

[13]     As will be discussed later in this Order, the plaintiffs have sufficiently established the elements of "tortious conduct" to support their medical monitoring claim.  Therefore, to the extent that the plaintiffs' negligence claims establish liability for their medical monitoring claims, their negligence claims survive.

-21-

right or inconveniences an indefinite number of people.  *See Hendricks v. Stalnaker*, 380 S.E.2d 198,

200-01 (W. Va. 1989) ; *Hark v. Mountain Fork Lumber Co.*, 34 S.E.2d 348, 354 (W. Va. 1945).  A

plaintiff that has suffered a private interference with the use and enjoyment of his land always has

standing to bring a private nuisance claim.  A plaintiff only has standing to pursue a public nuisance

claim, however, if he has suffered a special injury different in kind from the public in general.  *Hark*,

34 S.E.2d at 354.

### 1.  The Plaintiffs Have Not Raised a Question of Fact as to the Existence of a Private Nuisance.

A private nuisance is "a substantial and unreasonable interference with the private use and

enjoyment of another's land." *Hendricks*, 380 S.E.2d at 200; *see also* Restatement (Second) of Torts

§ 822 (1979).  Importantly, a private nuisance "injures one person or a limited number of persons

only." *Hark*, 34 S.E.2d at 354.  In West Virginia, conduct causing water pollution constitutes a

private nuisance when the pollution interferes with the rights of landowners whose land abuts the

polluted water.  For example, in *International Shoe Company v. Heatwole*, the Supreme Court of

Appeals explained that an interference with the private use of land might occur if "sediment, sludge,

or any other refuse matter placed in the river . . . was, in fact, carried to and cast upon the

respondent's land, to its injury" or if the "pollution of a stream by sewage, chemicals or other

deleterious matter . . . impairs the use of the water by lower riparian owners for domestic purposes."

30 S.E.2d 537, 540 (W. Va. 1944).  The court further suggested that an action for private nuisance

might exist if the pollution of the river "rendered [the water] unfit for human consumption," and the

water had been used, or plausibly would be used, for such a purpose.  *Id.*; *see also Taylor v.

Culloden Pub. Serv. Dist.*, 591 S.E.2d 197 (W. Va. 2003) (discussing questions related to the

plaintiffs' nuisance claim without questioning that the alleged discharge of effluents into a stream flowing through the plaintiffs' property was a nuisance).

A private nuisance does not exist where water pollution affects only a municipal water supply.  In order to effect a private nuisance, the contaminated water must reach the groundwater below the plaintiff's property or affect a direct supply of water on an individual's property.  *See Anderson v. W.R. Grace & Co.*, 628 F. Supp. 1219, 1233 (D. Mass. 1986) ("The right to be free of contamination to the municipal water supply is clearly a 'right common to the general public', thus interference with that right would be a public nuisance."); *see also Adkins v. Thomas Solvent Co.*, 487 N.W.2d 715, 721 n.11 (Mich. 1992) (noting that "the contamination of ground water may give rise to an action for public nuisance").  Therefore, when a release of pollutants directly affects only the municipal water supply rather than a private water supply on the plaintiff's property, the pollutants affect only a right common to the general public and can give rise only to a public, rather than a private nuisance.  *Anderson*, 628 F. Supp. at 1233; *see also* Restatement (Second) of Torts § 821B cmt. b (explaining that conduct interfering with the public health constitutes a public nuisance).

The conclusion in *Anderson* that the contamination of a municipal water supply is a public nuisance accords with West Virginia law.  According to the Supreme Court of Appeals, a public nuisance "operates to hurt or inconvenience an indefinite number of persons."  *Hark*, 34 S.E.2d at 354.  In other words, a public nuisance "affects the general public."  *Id.*  The Supreme Court of Appeals has explained that this definition of a public nuisance is "consistent with the Restatement (Second) of Torts § 821B(1), which defines a public nuisance as 'an unreasonable interference with

a right common to the general public.'" *Duff v. Morgantown Energy Assocs. (M.E.A.)*, 421 S.E.2d 253, 257 n.6 (W. Va. 1992).

When a municipal water company provides water to the general public, the right to clean water from that company is a right common to all customers and not the right of each individual recipient. *See* Restatement (Second) of Torts § 821B cmt. g ("A public right is one common to all members of the general public."). In this case, the interference alleged by the plaintiffs is the contamination of the public water supply provided to all PWD customers. Accordingly, the alleged interference is an interference with a public right, and the plaintiffs have not made any showing of a private nuisance. DuPont's motion for summary judgment with respect to the plaintiffs' private nuisance claim is **GRANTED**.

### 2.  The Plaintiffs Have Not Demonstrated a Special Injury.

DuPont contends that the plaintiffs lack standing to bring a public nuisance claim. (Mem. Supp. Mot. Summ. J. 2, 10.) Specifically, DuPont argues that the plaintiffs cannot show that they have suffered a special injury different in kind from the general public. The mere contamination of their water supply, DuPont asserts, absent "personal injury" or "physical harm" to property, does not qualify as a special injury. (Reply Mem. Opp'n Mot. Summ. J. 5 (quoting Restatement (Second) of Torts § 821C cmt. d).) Further, DuPont maintains that the relevant comparative population for demonstrating special injury is the population of PWD water consumers rather than "persons in areas not contaminated by PFOA." (Mem. Supp. Mot. Summ. J. 11 (quoting Ex. 10, Interrog. # 13).) DuPont argues alternatively that the plaintiffs cannot demonstrate a special injury regardless of the comparative population because the blood serum of most people in the general population contain some concentration of PFOA and, allegedly according to the plaintiffs' own experts, "a single

molecule of PFOA results in contamination and significantly increased risk of disease." (*Id.*) Accordingly, the plaintiffs cannot show that they suffer an injury different in kind from that experienced by the general population. (*Id.*)

The plaintiffs argue that they are not required to demonstrate a special injury because they are seeking class certification of their public nuisance claim. (Mem. Opp'n Mot. Summ. J. 11.) I disagree.[14] West Virginia law requires a plaintiff to demonstrate a special injury that is different in kind and degree to have standing. *Duff*, 421 S.E.2d at 257 n.7; *Hark*, 34 S.E.2d at 354. The plaintiffs have identified no exception to this well-established rule.

Accordingly, I must determine whether the plaintiffs have demonstrated a special injury different in kind and degree from that of the general public. *See In re Lead Paint Litig.*, 924 A.2d 484, 503 (N.J. 2007) (explaining that a special injury in the public nuisance context is an injury different from those "directly arising from the common right"). To make such a determination, I must first identify the relevant comparative population. The relevant comparative population is the community seeking to exercise the same public right as the plaintiff. *See* Restatement (Second) of Torts § 821C cmt. b ("The private individual can recover in tort for a public nuisance only if he has suffered a harm of a different kind from that suffered by other persons exercising the same public

---

[14]    Though the Second Restatement of Torts suggests that a class representative may have standing to bring a public nuisance action even without a special injury, *see* Restatement (Second) of Torts § 821C(2)(c), I am not persuaded that the suggestion applies to the instant matter. The Restatement adopted its new rule based on the development of "[s]tatutes allowing citizens' actions or authorizing an individual to represent the public, and extensive general developments regarding class actions and standing to sue." *Id.* § 821C cmt. j. The Restatement references cases involving state statutes that have expanded the standing rules for public nuisance claims, but it does not identify any cases in which a court has adopted an exception to the public nuisance standing rule for class representatives. Though the Supreme Court of Appeals has followed the Restatement's guidance in developing West Virginia tort law, I can find no authority advocating a class action exception to the special-injury rule absent legislative measures.

right.").  Here, the relevant comparative population for determining whether the plaintiffs have

suffered a special injury is the population of PWD customers attempting to exercise their public right

to a clean municipal water supply.[15]

The plaintiffs have not suffered a special injury different in degree and kind from the other

PWD customers.  The only injuries alleged by the plaintiffs as "special injuries" are the "PFOA

contamination of their properties and bodies" and their "increased risk of disease."  (Mem. Opp'n

Mot. Summ. J. 11.)  These injuries, however, are not special injuries with which the plaintiffs have

standing to bring a public nuisance claim.  First, the alleged PFOA contamination alone, without any

evidence of physical harm, is not an injury at all and certainly not one upon which the plaintiffs

could base their public nuisance claim.[16]  Second, though a significantly increased risk of disease[17]

could perhaps qualify as a special injury, it cannot in this case because the plaintiffs have alleged

---

[15]     The broadest possible comparative population would be all persons whose right to clean public drinking water has been infringed by DuPont's release of PFOA from the Washington Works plant.  But as demonstrated below, my analysis with respect to the plaintiffs' special injury would be the same whether I considered the narrow comparative population consisting only of PWD customers or the more expansive comparative population consisting of all persons whose municipal drinking water may contain PFOA emitted from DuPont's Washington Works plant.  In neither case have the plaintiffs made a sufficient showing of a special injury.

[16]     Though the private nature of personal injuries and private property damage qualify such injuries as "special injuries," the plaintiffs have not demonstrated either personal injury or private property damage in this matter.  *See* Keeton et al., *supra*, § 90, at 648 ("Where the plaintiff suffers personal injury, or harm to his health . . . there is no difficulty in finding a different kind of damage." (footnote omitted)).

[17]     I acknowledge that I found this alleged risk sufficient to sustain the plaintiffs' negligence claims for purposes of bringing the medical monitoring claim.  But without a special injury, the plaintiffs lack not just the traditional requisite injury, but also standing to bring the public nuisance cause of action.  Moreover, as discussed later in this Order, I do not specifically rule on whether all of the plaintiffs' common law claims could support their medical monitoring claim, relying instead on their negligence claims alone to serve this purpose.

that all individuals who have consumed PWD water for at least one year have suffered a significantly increased risk of disease.

The plaintiffs' attempt to seek class certification of their public nuisance claim has undermined their ability to demonstrate standing for that claim.  The plaintiffs allege that DuPont's actions have caused "special injury to the Plaintiffs and other class members as residential water customers of the [PWD] for at least one year, including but not limited to, intrusion into Plaintiffs' and other class members' homes and bodies, rendering Plaintiffs' and other class members' water supply unfit for domestic purposes and human consumption, and placing Plaintiffs and other class members at an increased risk of developing serious latent diseases." (2d Am. Class Action Compl. ¶ 128.)  The putative class members include "all individuals who have consumed, for at least one year, drinking water supplied by the [PWD]." (*Id.* ¶ 1.)  In other words, the class is the same set of people as the comparative population in the special injury analysis:  the set of people exercising the public right to consume clean, safe water from the public water supply.  Considering that the plaintiffs themselves have alleged that the entire class has suffered a significantly increased risk of disease, I cannot find that the plaintiffs have suffered a special injury. *Cf. Venuto v. Owens-Corning Fiberglas Corp.*, 22 Cal. App. 3d 116, 125 (Cal. Ct. App. 1971) (holding that plaintiffs alleging respiratory disorders caused by defendant's air pollution had not demonstrated a special injury conferring standing for a public nuisance claim because the general public was also suffering general irritation to their respiratory systems and therefore the plaintiffs' injury was not different in kind).

Admittedly, this result cuts against the Supreme Court of Appeals's view that public nuisance actions should be available to address environmental harms such as the one at issue in the present action.  In *Taylor v. Culloden Public Service District*, 591 S.E.2d 197, 205-06 (W. Va.

2003), the court held that the plaintiffs had standing to bring a public nuisance action based on the discharge of effluents from a facility into a creek that bisected their property. The defendants therein contended that the plaintiffs did not have standing to bring the public nuisance action because the West Virginia Water Pollution Control Act did not contain a citizen suit provision allowing them to bring an action for the discharge of effluents. *Taylor*, 591 S.E.2d at 205-06. The Supreme Court of Appeals explained, however, that the West Virginia Water Pollution Control Act did not bar any common law actions for public nuisance, and that the plaintiffs thus had standing. *Id.*

The Supreme Court of Appeals did not discuss whether the plaintiffs in *Taylor* had experienced a special injury. The court did, however, imply that it would look favorably on nuisance actions commenced to abate an environmental hazard:

> In this Court's opinion, this case aptly demonstrates the need for common law remedies in addition to the [West Virginia Water Pollution Control] Act, especially where it is arguable that the government agency charged with protecting the public's interests may not be acting with sufficient alacrity to eradicate the alleged nuisance which may be presenting serious public health concerns or posing a potential environmental hazard. . . .
> Nuisance law . . . "has been particularly effective in addressing environmental problems." . . . Were it not for the availability of nuisance actions as a remedy, it seems certain an inestimable number of business and private actions that have deleterious health and environmental results as a byproduct of their operations would have continued unabated.

*Id.* at 206 (citation omitted).

It is clear, however, that the plaintiffs in *Taylor* suffered an injury different in kind from the general public because the discharged pollutants damaged their private property. As a policy matter, the Supreme Court of Appeals certainly supports the use of public nuisance suits to address environmental harms, but *Taylor* did not alter the legal requirements of a public nuisance claim. Here, because the plaintiffs have not suffered a special injury different in kind from that of the

-28-

public in general, DuPont's motion for summary judgment is **GRANTED** with respect to the public

nuisance claim.

### C.  Summary Judgment is Granted With Respect to the Plaintiffs' Intentional Tort Claims.

The injuries the plaintiffs allege—the presence of PFOA in their bodies and drinking water

and their significantly increased risk of disease justifying medical monitoring—do not effect the

tangible interference with bodily integrity and property to sustain trespass and battery claims.

Because the plaintiffs have not offered evidence of injuries remediable through trespass or battery

causes of action, I **GRANT** DuPont's motion for summary judgment with respect to those claims.

### 1.  The Plaintiffs Cannot Sustain a Trespass Claim Because They Have Not Offered Evidence of an Interference with the Possession of Property.

A trespass is "an entry on another man's ground without lawful authority, and doing some

damage, however inconsiderable, to his real property."  *Hark v. Mountain Fork Lumber Co.*, 34

S.E.2d 348, 352 (W. Va. 1945) (internal citation and quotation marks omitted); Keeton et al., *supra*,

§ 13, at 70 ("Any intentional use of another's real property, without authorization and without a

privilege by law to do so, is actionable as a trespass without regard to harm.").  Traditionally, the

law has required that:

> [A]n invasion must constitute an interference with possession in order to be actionable as a trespass . . . .  It is this requirement of interference with possession and, therefore, with use, of another's property that separates the tort of trespass from the tort of private nuisance, and it is this requirement that justifies the notion that the invasion is actionable without physical harm to the land being caused.

Keeton et al., *supra*, § 13, at 70 (footnotes omitted).  Further, only tangible, rather than intangible,

invasions were deemed to constitute an actual interference with property.  *See id.* at 71 (noting "the

defendant's act must result in an invasion of tangible matter"); *id.* at 71-72 ("There are a few . . .

-29-

decisions finding a trespass constituted by the entry of invisible gases and microscopic particles, but only if harm results. These are, in reality, examples of either the tort of private nuisance or liability for harm resulting from negligence." (footnote omitted)); *see also* Dan B. Dobbs, *The Law of Torts* § 53, at 104 (2001) ("Anything less than a tangible entry, such as penetration of the land by smoke, noise, or light, might affect enjoyment, but it would not affect possession. If the defendant who caused air pollution was guilty of any tort at all, it was not the tort of trespass.").

      An increasing number of courts recognize trespass actions for intangible intrusion of particles so long as there is property damage. *See Maddy v. Vulcan Materials Co.*, 737 F. Supp. 1528, 1540 (D. Kan. 1990) (holding that the "emission and migration of airborne gases" onto plaintiffs' property could entitle plaintiffs to recovery under a trespass cause of action if plaintiffs can demonstrate "actual and substantial damage"); *Borland v. Sanders Lead Co., Inc.*, 369 So. 2d 523, 529 (Ala. 1979) (holding that entry of intangible particles may constitute a trespass if it causes a substantial damage to the landowner's property); *Pub. Serv. Co. of Colo. v. Van Wyk*, 27 P.3d 377, 390 (Colo. 2001) ("[W]e now hold that, in Colorado, an intangible intrusion may give rise to claim for trespass, but only if an aggrieved party is able to prove physical damage to the property caused by such intangible intrusion."). Some courts recognize trespass based on intangible invasions even absent actual damage, if the defendant has interfered with the plaintiff's interest in possession of her property. *See Md. Heights Leasing, Inc. v. Mallinckrodt, Inc.*, 706 S.W.2d 218, 225-26 (Mo. Ct. App. 1985) (holding that radioactive emissions may constitute a trespass if they interfere with landowner's right of exclusive possession of property); *Martin v. Reynolds Metals Co.*, 342 P.2d 790, 794 (Or. 1959) (holding that "trespass [is] any intrusion which invades the possessor's protected interest in exclusive possession, whether that intrusion is by visible or invisible pieces of

matter or by energy which can be measured only by the mathematical language of the physicist," provided actual damage or interference in possession is shown).

The only West Virginia case on point indicates an adherence to the traditional rule requiring a trespass to involve an invasion of property by tangible objects.  In *Bartlett v. Grasselli Chemical Co.*, the Supreme Court of Appeals held that the "chemical deposits upon [land] from fumes, gases, and dust emitted from the defendant's furnaces and carried over the land by air currents, or spreading over it through the air," does not effect a trespass but instead a private nuisance. 115 S.E. 451, 451, 455 (W. Va. 1922).  Though the instant matter involves the intrusion of particles through a municipal drinking water supply rather than through the air,[18] *Bartlett* is equally applicable here. Moreover, even assuming West Virginia would recognize trespass actions for intangible intrusion of particles upon a showing of damage to the property or interference with possession, the plaintiffs have failed to make such a showing.  Accordingly, DuPont's motion for summary judgment is **GRANTED** with respect to the plaintiffs' trespass claim.

### 2.  The Plaintiffs Have Not Shown Harmful Contact Supporting A Battery Claim.

---

[18]     The plaintiffs based their trespass claim not only on the entry of PFOA onto their real property, but also the entry of PFOA into their bodies. (2d Am. Class Action Compl. ¶¶ 104-109.) The plaintiffs specifically argue that blood can constitute "property" and presumably be the subject of a trespass action.  (Mem. Opp'n Mot. Summ. J. 17 n.24.)  This assertion demonstrates the plaintiffs' fundamental misunderstanding of the tort of trespass.  Trespass definitionally involves an interference with the possession of real or personal property.  The plaintiffs have offered no case law, and I am aware of none, in which a court has held that the infusion of a chemical into a person's blood may qualify as a trespass.  Such violations of a person's body fall more properly within the scope of personal injury torts such as battery.  The plaintiffs may not evade the requirements of battery or other torts involving bodily injury by reframing the invasion of their bodies as an invasion of property.

The Supreme Court of Appeals has adopted the definition of battery from the Second Restatement of Torts:

> "[A]n actor is subject to liability to another for battery if (a) he acts *intending* to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results."

*Funeral Servs. by Gregory, Inc. v. Bluefield Cmty. Hosp.*, 413 S.E.2d 79, 82 (W. Va. 1991) (quoting Restatement (Second) of Torts § 13 (1965)), *overruled on other grounds by Courtney v. Courtney*, 437 S.E.2d 436 (W. Va. 1993).

In *McClenathan v. Rhone-Poulenc, Inc.*, 926 F. Supp. 1272 (S.D. W. Va. 1996), a putative class sought relief for injuries, including emotional distress, caused by the release of toxic chemicals from the defendant's plant. The court noted that West Virginia law allowed recovery for emotional distress absent a physical injury only in limited circumstances. *McClenathan*, 926 F. Supp. at 1274. The plaintiffs argued, however, that they could recover emotional distress damages as "a by-product of battery." *Id.* at 1276 n.5 (internal quotation marks omitted). The court rejected that argument because the plaintiffs had not alleged facts supporting a battery claim. The court explained that "'[i]n order to be liable for a battery, an actor must act with the intention of causing a harmful or offensive contact with a person,'" and that "the mere presence and resultant inhalation of chemicals in the air [does not] constitute[] a 'harmful or offensive contact' by the emmitter." *Id.* (quoting *Funeral Servs.*, 413 S.E.2d at 80).

*McClenathan* stands for the proposition that "mere . . . inhalation" of chemicals cannot support a battery claim, absent more of a showing of "harmful or offensive conduct." The plaintiffs have made no such showing. They have presented no evidence that they have suffered any harmful or offensive contact. A harmful bodily contact is contact resulting in "any physical impairment of

the condition of another's body, or physical pain or illness."  Restatement (Second) of Torts § 15 (1965).  The plaintiffs concede that they are not "currently suffering from any particular manifest illness or disease as a result of their PFOA exposure." (Mem. Opp'n Mot. Summ. J. 9.)  The plaintiffs' experts testify in their reports that the plaintiffs have experienced an increased risk of different diseases as a result of their exposure to PFOA, but they do not assert that the plaintiffs have suffered any physical harm yet.  (*See* Hill Aff. Ex. 27 at 29-30; *Id.* Ex. 28 at 37-49.)  Absent any such demonstration that their contact with PFOA caused them harm, or that the PFOA present in their blood has altered the structure or function of some body part, the plaintiffs cannot sustain their battery claim based on the mere presence of PFOA in their blood.  (*See* Mem. Opp'n Mot. Summ. J. 15.)  With respect to offensiveness, the plaintiffs have failed to show how their exposure is dispositively more offensive than that of the *McClenathan* plaintiffs.  Indeed, the exposure in *McClenathan* was arguably more offensive.  In that case, a cloud of toxic substances was released as result of an accidental fire at a chemical plant.  *See McClenathan*, 926 F. Supp. at 1272 (noting "the public was ordered to temporarily 'shelter-in-place' and certain thoroughfares were closed temporarily").

For the reasons discussed in this section, DuPont's Motion for Summary Judgment is **GRANTED** with respect to the plaintiffs' trespass and battery claims.

### D.  The Plaintiffs' Medical Monitoring Claim Survives.

The sixth count of the plaintiffs' Second Amended Class Action Complaint asserts a claim for medical monitoring.  In *Bower v. Westinghouse Electric Corp.*, the Supreme Court of Appeals recognized a cause of action for "the recovery of medical monitoring costs, where it can be proven that such expenses are necessary and reasonably certain to be incurred as a proximate result of the

defendant's tortious conduct."  522 S.E.2d 424, 431 (W. Va. 1999).  Under this cause of action, a

plaintiff must prove that:

> (1) he or she has, relative to the general population, been significantly exposed; (2) to a proven hazardous substance; (3) through the tortious conduct of the defendant; (4) as a proximate result of the exposure, plaintiff has suffered an increased risk of contracting a serious latent disease; (5) the increased risk of disease makes it reasonably necessary for the plaintiff to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of exposure; and (6) monitoring procedures exist that make the early detection of a disease possible.

*Id.* at 432-33.

Courts first started to recognize medical monitoring claims in the mid-1980s, although the

earliest cases "involved classic examples of traumatic impacts and physical injuries."  James A.

Henderson, Jr. & Aaron D. Twerksi, *Asbestos Litigation Gone Mad:  Exposure-Based Recovery for*

*Increased Risk, Mental Distress, and Medical Monitoring*, 53 S.C. L. Rev. 815, 838 (2002).

Gradually, courts expanded the theory to allow recovery "in the absence of traumatic impact or

manifested physical injury."  *Id.* at 839.

This expansion slowed after 1997, when the Supreme Court, in a majority opinion written

by Justice Breyer, expressed disapproval of medical monitoring damages.  *See Metro-North*

*Commuter R.R. Co. v. Buckley*, 521 U.S. 424 (1997).  In the course of holding that an employee

bringing a claim under the Federal Employers' Liability Act could not recover lump-sum medical

monitoring costs, the Court offered several criticisms of medical monitoring awards.  First, the Court

noted a troubling "uncertainty among medical professionals about just which tests are most usefully

administered and when," making the provision of medical monitoring awards difficult for courts.

*Id.* at 441.  The Court also worried that "tens of millions of individuals may have suffered exposure

to substances that might justify some form of substance-exposure-related medical monitoring," and

this fact, "along with uncertainty as to the amount of liability, could threaten both a 'flood' of less important cases (potentially absorbing resources better left available to those more seriously harmed)" and other ills such as "vast testing liability adversely affecting the allocation of scarce medical resources." *Id.* at 442 (citation omitted). The Court also fretted that "a traditional, full-blown ordinary tort liability rule would ignore the presence of existing alternative sources of payment," such as plaintiffs' employers or current or future insurance coverage. *Id.* at 442-43.

Following *Buckley*, "the trend toward recognition of medical monitoring claims for uninjured plaintiffs shifted." Herbert L. Zarov et al., *A Medical Monitoring Claim for Asymptomatic Plaintiffs: Should Illinois Take the Plunge?* 12 DePaul J. Health Care L. 1, 7 (2009). Many states found the Supreme Court's reasoning persuasive:

> Since *Buckley,* the Supreme Courts of Alabama, Kentucky, Michigan, Mississippi, Nevada, and Oregon have all relied on the public policy considerations discussed in Justice Breyer's opinion in rejecting medical monitoring claims for asymptomatic plaintiffs. Several states' lower courts and federal courts predicting state law have relied on similar public policy considerations in rejecting medical monitoring claims. Taken together, these cases show that *Buckley* ushered in a "recent trend of rejecting medical monitoring" for asymptomatic plaintiffs.

*Id.* at 9 (footnotes omitted).

As indicated above, Michigan recently rejected medical monitoring awards absent a physical injury. *Henry v. Dow Chem. Co.,* 701 N.W.2d 684 (Mich. 2005). The Supreme Court of Michigan noted that "recognition of a medical monitoring claim would involve extensive fact-finding and the weighing of numerous and conflicting policy concerns," and stated that the court lacked "sufficient information to assess intelligently and fully the potential consequences of recognizing a medical monitoring claim." *Id.* at 686. The court was also worried about the consequences of dispensing with the "injury" requirement of tort law:

-35-

The requirement of a present physical injury to person or property serves a number of important ends for the legal system. First, such a requirement defines more clearly who actually possesses a cause of action. In allowing recovery only to those who have actually suffered a present physical injury, the fact-finder need not engage in speculations about the extent to which a plaintiff possesses a cognizable legal claim. See Prosser & Keeton, Torts (5th ed.), § 30, p. 165. Second, such a requirement reduces the risks of fraud, by setting a clear minimum threshold-a present physical injury-before a plaintiff can proceed on a claim. . . . In particular, the fact-finder need not be left wondering whether a plaintiff has in fact been harmed in some way, when nothing but a plaintiff's own allegations support his cause of action.

Finally, and perhaps most significantly, the requirement of a present physical injury avoids compromising the judicial power. . . . In the absence of such a requirement, it will be inevitable that judges, as in the instant case, will be required to answer questions that are more appropriate for a legislative than a judicial body[.]

*Id.* at 690-91.  The Michigan court concluded that the plaintiffs could not recover damages that are "wholly derivative of a *possible, future* injury rather than an *actual, present* injury." *Id.* at 691.  The Michigan court criticized the Supreme Court of Appeals for taking the opposite approach in *Bower*, noting that *Bower* "create[d] a potentially limitless pool of plaintiffs." *Id.* at 694.

The Michigan Supreme Court is not alone in its criticism of *Bower*.  Academic commentators have also questioned its soundness.  *See, e.g.*, Mark A. Behrens & Christopher E. Appel, *Medical Monitoring in Missouri After* Meyer ex rel. Coplin v. Fluor Corp.*: Sound Policy Should be Restored to a Vague and Unsound Directive*, 27 St. Louis U. Pub. L. Rev. 135, 152-53 (2007); Henderson & Twerski, *supra*, at 842-43 (criticizing *Bower* for assuming that "courts are equipped to resolve the issues" raised by medical monitoring claims; noting "the possibility of significant overdeterrence"; and questioning "why justice is necessarily served by allowing, through the back door, recoveries that courts will not allow in through the front").

I am bound to apply West Virginia substantive law in this diversity case.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  Accordingly, I must apply the cause of action for medical

monitoring recognized in *Bower*.  I now turn to whether the plaintiffs can withstand summary judgment on their medical monitoring claim.

DuPont argues that the plaintiffs have not presented any evidence proving the elements of their medical monitoring claim.  (Mem. Supp. Mot. Summ. J. 1.)  Because I have already decided that the plaintiffs have raised questions of material fact with respect to causation, I need only address DuPont's arguments with respect to the other elements.  DuPont specifically challenges the plaintiffs' evidence of the "existence, reasonableness, and need for medical testing that would not be required absent the exposure to the alleged toxin."  (Mem. Supp. Mot. Summ. J. 8.)

The plaintiffs respond that they have provided such evidence through the expert opinion of Dr. Barry S. Levy.  In his expert report, Dr. Levy concluded that the plaintiffs have a significantly increased risk of disease as a result of their exposure to the PWD's PFOA-contaminated water supply and that the increased risk warrants medical monitoring.  (Hill. Aff. Ex. 28 at 37-42.)  Dr. Levy further explained that medical testing is available that could detect at an "early treatable stage" the diseases for which the plaintiffs are at risk.  (*Id.* at 43.)  Dr. Levy's report raises a question of material fact as to whether medical monitoring is reasonably necessary for the plaintiffs as a result of their exposure to PFOA in the PWD water supply and whether such monitoring tests are available.

DuPont does not explicitly challenge the "tortious conduct" element of the medical monitoring cause of action.  That element requires that the "underlying liability must be established based upon a recognized tort."  *Bower*, 522 S.E.2d at 433.  As discussed above, the plaintiffs have not alleged sufficient injury to support their traditional tort claims and cannot independently recover under those claims.  Yet I reluctantly conclude that the plaintiffs need not show an existing injury

or a reasonably certain future injury for their negligence claims to support their medical monitoring claim.[19]  Under *Bower*, "a plaintiff asserting a claim for medical monitoring costs is not required to prove present physical harm resulting from tortious exposure to toxic substances."  *Bower*, 522 S.E.2d at 431.  Instead, the "injury" requirement is satisfied by a negligent invasion of the plaintiff's "'interest in avoiding expensive diagnostic examinations.'"  *Id.* at 430 (quoting *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 826 (D.C. Cir. 1984)).  An exposure to a harmful substance "and the concomitant need for medical testing constitute the injury."  *Id.* (quoting *Hansen v. Mountain Fuel Supply*, 858 P.2d 970, 977 (Utah 1993)); *see also id.* at 435 (Maynard, J., dissenting) (noting that a "speculative and amorphous showing of 'increased risk'" is sufficient injury under the majority opinion).

Bower discusses its requirements for a showing of "injury" with respect to its newly announced "cause of action for future medical monitoring costs," and does not explicitly change the traditional requirements for other tort claims.  *Id.* at 434.  But *Bower* also requires that the "defendant be[] legally responsible for exposing the plaintiff to a particular hazardous substance" and that "[l]egal responsibility is established through *application of existing theories of tort liability*."  *Id.* at 433 (emphasis added).  The Supreme Court of Appeals does not explain how courts should rule when the plaintiffs' only injury cannot support an existing theory of tort liability, but could possibly satisfy the injury requirement for a medical monitoring claim.

---

[19]     I focus on the plaintiffs' negligence claims.  The plaintiffs need only one "recognized tort" to support their medical monitoring claim; accordingly, I need not decide now whether the plaintiffs' other tort claims could also fulfill this role.  I find only that the plaintiffs have sufficiently alleged negligent conduct for the purposes of supporting their medical monitoring claim.

The *Bower* court, however, seems to intend that the relaxed injury requirement of medical monitoring claims apply also to the underlying tort. *Bower* frames its requirement for an pre-existing tort as "tortious *conduct*." *Id.* at 433 (emphasis added). Thus, the emphasis is on whether the defendant has breached a duty that could cause harm—*not* on whether the conduct actually results in present or "reasonably certain" future harm. *See id.* at 430 (quoting *Friends for All Children*, 746 F.2d at 825 for the proposition that a plaintiff "ought to be able to recover the cost for a variety of diagnostic examinations proximately caused by [a tortfeasor's] negligent action," even "in the absence of physical injury"). Indeed, this emphasis is fitting, because under medical monitoring a plaintiff is not recovering for present injury or even, directly, for future injury, but for the need for medical monitoring. To interpret *Bower* otherwise would unduly narrow the medical monitoring cause of action that the Supreme Court of Appeals intended to broadly apply. *Id.* at 428 (reformulating the certified question from its narrow focuses on cases of negligent infliction of emotional distress to "the broader question of 'whether West Virginia law permits an independent cause of action to recover future medical monitoring *absent physical injury*'" (emphasis added)); *see also Aikens v. Debow*, 541 S.E.2d 576, 591 (W. Va. 2000) (suggesting that medical monitoring is a cause of action such as emotional distress or nuisance in which a plaintiff may seek recovery for a defendant's conduct despite the absence of physical injury).

In other words, the *Bower* court must have meant that all elements of an existing theory of tort liability, *except for* the injury requirement, must be met for medical monitoring liability to arise. To determine whether a compensable injury exists for medical monitoring purposes, courts need to look for the new species of injury developed in *Bower*. Language in the state court opinions suggests this approach. For example, *State ex rel. Martinsburg v. Sanders*, 632 S.E.2d 914 (W. Va.

2006), arguably assumed that the plaintiffs' claim for medical monitoring damages, which asserted no present injury and was based on allegations of negligence, was nevertheless actionable.

Thus, for purposes of establishing independent tortious conduct to support the plaintiffs' medical monitoring claim, the plaintiffs have set forth sufficient evidence of at least negligence. DuPont had a duty to avoid unreasonable harm; the plaintiffs' pleadings sufficiently allege a breach of that duty; and, as discussed above, I find the evidence of causation sufficient to withstand summary judgment. The plaintiffs cannot recover under their negligence cause of action because they have shown no compensable injury. But the plaintiffs' negligence claims survive to the extent that they may support their medical monitoring claim.

Because the plaintiffs have raised questions of material fact with respect to each element of their medical monitoring claims, DuPont's motion for summary judgment with respect this claim is **DENIED**.

## VI.     Conclusion

For the reasons discussed above, DuPont's Motion for Summary Judgment Based Upon Statute of Limitations [Docket 279] is **DENIED**. DuPont's Motion for Summary Judgment [Docket 335] is **DENIED** in part and **GRANTED** in part. The Motion for Summary Judgment is **DENIED** with respect to the plaintiffs' Medical Monitoring (Sixth Count) claim. It is **GRANTED** with respect to the plaintiffs' Negligence (First Count), Gross Negligence, Reckless, Wilful and Wanton Conduct (Second Count), Private Nuisance (Third Count), Trespass (Fourth Count), Battery (Fifth Count), and Public Nuisance (Seventh Count) claims. The plaintiffs' Motion for Class Certification [Docket 277] is **DENIED** as moot.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.  The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:        September 28, 2009

Joseph R. Goodwin, Chief Judge